Jennifer Williamson

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

STACY WIHEBRINK, Individually and on
Behalf of All Others Similarly Situated          PLAINTIFF

VS.                    NO. 4:21-CV-573-DPM

LIFE STRATEGIES COUNSELING, INC.                 DEFENDANT

ORAL DEPOSITION

OF

JENIFER WILLIAMSON

TAKEN MARCH 21, 2023, AT 3:02 P.M.

Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas   72206

www.conwaycourtreporting.com

"Spoken to written . . . word for word"

Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

Conway Court Reporting



EXHIBIT E

923bf849-d5a3-47d9-a865-35cb3b2dfb92

2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. COLBY QUALLS

SANFORD LAW FIRM, PLLC

10800 FINANCIAL CENTRE PARKWAY, SUITE 510

LITTLE ROCK, ARKANSAS 72211

colby@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANT:

MR. MARK MAYFIELD

WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.

P.O. BOX 3077

JONESBORO, ARKANSAS 72403

mmayfield@wpmfirm.com

4

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF JENIFER WILLIAMSON, a witness produced at the request of the Defendant, taken in the above-styled and numbered cause on the 21st day of March, 2023, at 3:02 p.m., at the law offices of Sanford Law Firm, 10800 Financial Centre Parkway, Suite 510, Little Rock, Arkansas, pursuant to the Federal Rules of Civil Procedure.

```
 8   Q    Okay.  So looks like you applied or sent something in
 9   then.  But then if you go to Exhibit 34, it's got a date of May
10   16th of 2019.  And then let's look.  And then we've got -- June
11   3rd of 2019 is the date of the acceptance listed on the second
12   page of Exhibit 34.  So let's stay on the first page for a
13   second, then we'll go to the second one.  It looks like the
14   offer of employment was made as a mental health professional at
15   a billable hour rate of $50.
16   A    That's what it says.
17   Q    Okay.  Is that what was -- and then looks like they were
18   also going to do some -- pay you for some training, if you look
19   down at the third bullet point.
20   A    Yeah.
21   Q    Okay.  And so let's look at the second page of this
22   document and just ask you if that's your signature on the
23   second page.
24   A    Yes.
25   Q    Okay.  So other than this document, did Life Strategies
```

18

1  give you any other document that set the terms of how you would
2  be paid?
3  **A**   I don't recall.
4  Q    Okay.  Is this paying you at a billable hour rate of $50,
5  is that how you were paid?
6  **A**   Honestly don't recall.
7  Q    Okay.  You just don't know one way or the other; right?
8  **A**   I really don't remember.
9  Q    Okay, all right.  Did you have a conversation with someone
10 that was in management at Life Strategies where you were
11 promised something additional pay-wise than what is stated in
12 Exhibit 34?
13 **A**   Not that I recall.
14 Q    Are you claiming -- and I just want to make sure I've got
15 this.  Are you claiming that someone at Life Strategies either
16 said something to you or provided you some document or piece of
17 information to tell you that you were going to be paid on a
18 basis other than $50 per billable hour?
19 **A**   Not that I recall.
20 Q    Okay.  And that's what I'm trying to get past.  I
21 understand that that's not what you recall.  But maybe there's
22 somebody else that's going to say something that you know of,
23 or there's some other document or item you've seen.  And so
24 that's why I'm asking you if that's what you're claiming, is
25 that you were going to be paid something different than what's

```
                                                                    19
1    stated in that letter that's Exhibit 34.  And if you can't

2    think of anything, that's fine.  I just want to make sure that

3    I don't hear what you're claiming for the first time at trial.

4    A    We had -- there was just lots of meetings and staffings

5    and stuff.  I can't say for sure.
```

20

1  Q   Okay.  Does -- under job competencies, essential duties
2  and responsibilities, does that accurately describe what your
3  job was while you were at Life Strategies?  And if you're
4  having trouble reading it, I can make it bigger.
5  A   Yeah.  Because I can't see this.
6  Q   I'm sorry about the size of the -- okay.  If you'll take
7  that and hold that, then you can take it --
8  A   Oh, okay.
9  Q   And you can either move that thing or --
10 A   Okay.  Looks about right.
11 Q   Okay.  And would it be fair to say that being a licensed
12 professional counselor in the job that you did at Life
13 Strategies, that it required you having the professional
14 training that you have?
15 A   Yes.
16 Q   Okay. You have to know the techniques and have to know
17 how to know and kind of assess what's going to work with
18 someone; right?
19 A   Right.
20 Q   To be able to provide them therapy in a way that's
21 effective for them; correct?
22 A   Right.

19  Q    So let me ask this.  If one of your coworkers, if it
20  doesn't take them -- if it takes them five minutes or ten
21  minutes to do what takes you 20 minutes, should y'all make
22  something different?
23              MR. QUALLS:  Objection to form.
24  Q    (Mr. Mayfield continuing)  Should you make more money than
25  that person does because it took you longer?

31

1   **A**    No two people do things the same way.
2   **Q**    Okay.
3   **A**    What I had for me as a standard and a quality of care, a
4   quality of documentation, they may not have.  It's just
5   different.  We're all different.  I don't want to put something
6   on paper that I have go back and try to fix later.  I want to
7   make sure my documentation stands for itself.
8   **Q**    Okay.  So since you -- I take it you believe that you were
9   not paid appropriately while you were at Life Strategies?
10  **A**    (No answer)
11  **Q**    I'm sorry.  I didn't hear an answer.
12  **A**    I didn't hear a question.
13  **Q**    Well, are you saying you were paid inappropriately at Life
14  Strategies?
15  **A**    No, I'm not saying that.
16  **Q**    Okay.  And I think, as I've understood from you -- well,
17  strike that.
18       Have you tried to calculate how much you believe Life
19  Strategies owes you?
20  **A**    No.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

```
 5   Q    How did you receive your pay statements?
 6   A    I think there's some app.
 7   Q    You're able to look at them online or on your phone in
 8   some way?
 9   A    I believe so.
10   Q    What information did your pay statements contain?
11   A    Whatever the pay was and how many hours I had listed,
12   whatever.  It's always very confusing.  But it would show hours
13   that I had and then overtime.  I don't know.  It was confusing,
14   honestly.




21   Q    And so do you know how many hours you would average in
22   terms of billing in a week, or did that vary over time?
23   A    It varied depending on holidays and school hours, that
24   kind of thing.  It varied.
25   Q    And I forgot to ask about this.  During the summer, what
```

33

1  was your work schedule like?
2  **A**   We had summer program.
3  Q   And so what time would you typically start in the summer?
4  **A**   Usually around 8:00, like, billable hours.
5  Q   Right.
6  **A**   But prior to that, picking up and providing the
7  transportation before that.
8  Q   So y'all would transport the children?
9  **A**   Uh-huh, yes.
10 Q   And where would you go?
11 **A**   We would go -- if we were having a program at one of the
12 elementary schools, we would go over there.  Or if we were
13 doing something at the office, we'd transport the kids to the
14 office.
15 Q   Would the children you picked up, if it was at an
16 elementary school, would they typically be close to the
17 elementary school, live close?
18 **A**   Not always.  Because we had -- it was kids that lived even
19 in North Little Rock that went to the schools in Little Rock.
20 Q   Okay, all right.  So what time would that program end in
21 the summer?
22 **A**   We were probably close -- stop around 2:00 or 3:00.  And
23 then we have to transport a lot of them home in the evenings.
24 Q   When would you do your notes during the summer?
25 **A**   Usually around the same time around 8:00, 9:00 at night.

34

1  Q    Did you have as much in billings during the summer or more
2  or about the same, less?
3  A    Honestly, I don't remember.
10 Q    Okay.  All right.  So this is information provided to me
11 by Life Strategies, and it's got regular hours.  And for this
12 one, it's got 40 for this period.  Do you see that?
13 A    Yes.
14 Q    Okay, and it looks like this is for the period of June
15 27th, 2019, July 10th, 2019.  Do you see that?
16 A    Yes.
17 Q    So then it has something below that that says staff.  What
18 is that, if you know?
19 A    A staff meeting.
20 Q    Okay.  So you got paid a lesser rate for staff meetings;
21 is that right?
22 A    Yes.
23 Q    Was there a particular time of the week when those staff
24 meetings would be held?
25 A    They were -- it varied.

```
 1  Q    Okay.  Now, did you do group therapy?
 2  A    Yes.
 3  Q    And I'm assuming there was a lot of that -- well, was
 4  there some in the summer program?
 5  A    Yes.
 6  Q    And some in the elementary schools?
 7  A    Yes.
 8  Q    Would you have it at the higher grades, have group?
 9  A    Yes.
10  Q    How many groups would you typically have?
11  A    Wow.  Lower end, two.
12  Q    Okay.  Two per day?
13  A    Yes.
14  Q    I -- as I understand it, group units would be billed in
15  units, which would be 15 minutes; right?
16  A    Uh-huh.
17  Q    And you got a set amount per unit per person; right?
18  A    Right.
19  Q    And a group could be no less than two and no more than
20  ten; correct?
21  A    Yes.
22  Q    Did you have an average or typical size of a group?
23  A    Eight to ten, more or less.
24  Q    And the more you had in a group, then the more you got
25  paid per unit; right?  Because it was per unit per student.
```

```
                                                              36
 1   A    Yeah.
 2   Q    Okay.  In the summer program, did y'all have groups?
 3   A    Yeah.
 4   Q    Would the numbers vary in terms of how many you might have
 5   in a -- on a day?
 6   A    Yes, it would.
 7   Q    More, less, about the same than during the school year?
 8   A    Probably -- I would say about the same.
 9   Q    Okay.  So typically about two a day?
10   A    Yes.
11   Q    And then size would be about the same, about --
12   A    Eight to ten.
13   Q    -- eight to ten?
14   A    Yes.
15   Q    Okay.  I forgot to ask you this about Saturdays.  And
16   we'll talk about Saturdays during the school year first of all.
17   Saturdays during the school year, if I understood you correctly
18   earlier, you were talking about billing four or five hours in a
19   day.  Does that sound about right?
20   A    Yes.
21   Q    If you billed four or five hours, you weren't working 12
22   hours on a Saturday?
23   A    Not on Saturdays.
```

42

23   Q   When you left Life Strategies, did you tell them that it
24   was because of the way that you were paid or maybe not paid,
25   whichever -- however you want to phrase it.

43

1 **A** No.

2 **Q** Okay. I'd ask you to look at Exhibit 42. I'd ask you in
3 Exhibit 42 down towards the bottom half of the page, there's an
4 email that looks to be from jeniferwilliamson@lscihealth.com
5 and the subject being resignation. Was that the email that you
6 sent to Mr. Sandlin?

7 **A** Yeah.

8 **Q** And that was to be effective July 10th?

9 **A** Yes.

10 **Q** And if I'm reading this correctly, it says, I've enjoyed
11 the time meeting and working with each of you. I'm thankful
12 and eternally grateful for the opportunities you have afforded
13 me here; however, I feel as though the time has come for me to
14 move forward in my career path. Is that what you said?

15 **A** Yeah.

45

3   Q    Oh, okay.  All right.  In working with Medicaid patients
4   at Life Strategies, you had to comply with the Medicaid rules;
5   correct?
6   A    Yeah.
7   Q    Your times couldn't overlap?
8   A    Yes.
9   Q    Meaning you agree that they could not?
10  A    I agree, yes.
11  Q    Okay.
12  A    I'm sorry.
13  Q    And the chart had to be in compliance with what Medicare
14  required -- Medicaid required?  Excuse me.
15  A    Agreed.
16  Q    During the time you were at Life Strategies, were you full
17  time or part time?
18  A    Full time.
19  Q    You would agree that your notes had to be accurate;
20  correct?
21  A    Yes.
22  Q    And you can enter a note that you're providing mental
23  health service to a patient as long as you actually perform
24  that service; correct?
25  A    Correct.

1  Q   You can't write a note for treating a patient if you're
2  not actually providing the service; right?
3  A   No.
4  Q   Life Strategies can't bill for your services if you don't
5  enter the notes correctly; is that right?
6  A   Right.
7  Q   And if Life Strategies didn't get paid for an hour of
8  services for a billable hour, you would not get paid for that
9  hour; correct?
10 A   Correct.
11 Q   And Life Strategies went over with you what made up a
12 billable hour; right?
13 A   Yes.
14 Q   And you may -- did you have some knowledge of what was
15 involved even before you went to work there?
16 A   Yes.
17 Q   Okay.  Ma'am, is there anything that I have said or done
18 that has caused you to change an answer that you've given to me
19 to where it was somehow inaccurate?
20 A   No.
21         MR. MAYFIELD:  Okay.  All right.  Thank you,
22     ma'am.  That's all the questions I have at this time.
23         MR. QUALLS:  None from me.
24         (WHEREUPON, the proceedings were concluded in
25     the matter at 4:18 p.m.)