Shelby Barnhill

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


STACY WIHEBRINK, Individually and on

Behalf of All Others Similarly Situated        PLAINTIFF


VS.                    NO. 4:21-CV-573-DPM


LIFE STRATEGIES COUNSELING, INC.               DEFENDANT


ORAL DEPOSITION

OF

SHELBY BARNHILL

TAKEN MARCH 21, 2023, AT 1:14 P.M.


Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas   72206


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807


Conway Court Reporting



493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

2

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:


MR. COLBY QUALLS

SANFORD LAW FIRM, PLLC

10800 FINANCIAL CENTRE PARKWAY, SUITE 510

LITTLE ROCK, ARKANSAS 72211

colby@sanfordlawfirm.com


ON BEHALF OF THE DEFENDANT:


MR. MARK MAYFIELD

WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.

P.O. BOX 3077

JONESBORO, ARKANSAS 72403

mmayfield@wpmfirm.com

Shelby Barnhill

4

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF SHELBY BARNHILL, a witness produced at the request of the Defendant, taken in the above-styled and numbered cause on the 21st day of March, 2023, at 1:14 p.m., at the law offices of Sanford Law Firm, 10800 Financial Centre Parkway, Suite 510, Little Rock, Arkansas, pursuant to the Federal Rules of Civil Procedure.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

5

```
 1                    P R O C E E D I N G S

 2        THEREUPON,

 3                      SHELBY BARNHILL,

 4              THE WITNESS HEREINBEFORE NAMED, having

 5         been first duly cautioned and sworn by me

 6         to testify to the truth, the whole truth,

 7         and nothing but the truth, testified on her

 8         oath as follows, to-wit:

 9                          EXAMINATION

10   BY MR. MAYFIELD:

11   Q    All right, please state your name for the record, ma'am.

12   A    Shelby Kay Barnhill.
```

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

16

1    Q     That document bears a date of October 13th, 2020.

2    **A**     Yes, sir.

3    Q     And I believe we'll look at some other documents that I

4    think bear that same date.  We'll go through those in a minute,

5    but let me represent to you that October 13th date is what's

6    listed in the other documents.  Might that have been when you

7    began your employment or training with Life Strategies?

8    **A**     Yes, sir.

9    Q     Okay.  All right.  And so when you began with Life

10   Strategies, Exhibit 22 refers to an offer of employment as a

11   mental health professional at a billable hour rate of $42, and

12   there are some other contingencies.  Was that your

13   understanding of what you were going to be paid?

14   **A**     Yes, sir.

15   Q     Do you know of -- and by the way, let me ask this before I

16   get too -- was that rate ever raised any during the time that

17   you were at Life Strategies?

18   **A**     No, sir.

19   Q     Were you given any other document or told by anyone that

20   you would be paid other than on a billable hour rate?

21   **A**     No, sir.

22   Q     It also says that you had a $1,500 sign-on bonus.

23   **A**     Yes, sir.

24   Q     And it refers to that as being -- you have to complete two

25   years of employment.  Did you complete two years of employment

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

17

1   with Life Strategies?

2   **A**    No, sir.

3   Q    Did you have to pay that sign-on bonus back at any part?

4   **A**    No, sir.

5   Q    Okay.  Did anyone make demand on you for you pay to that

6   to them?

7   **A**    No, sir.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

19

17    **A**    You were compensated for the service that you provided.

18    Q    And it had to be a billable service; right?

19    **A**    That is correct.

20    Q    And the rate was this $42 per billable hour; correct?

21    **A**    Yes, sir.

22    Q    Did the billable hour rate include all the tasks necessary

23    to perform the job?

24    **A**    No.

25    Q    Were you supposed to be paid any more than the billable

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

20

1  hour rate for all the tasks necessary to perform that billable

2  hour?

3  **A**   That was not discussed, no.

4  **Q**   Okay.  And so what other tasks are involved in performing

5  a billable hour?

6  **A**   Speaking to school staff, speaking to parents, DHS

7  workers.  All of these services are required for an allotment

8  of time, and if you did not meet that allotted amount of time,

9  it's not considered a billable service.

10 **Q**   What other tasks would you have to perform incident to a

11 billable hour?

12 **A**   Aside from documentation, there was not any.

13 **Q**   And which office did you work out of?

14 **A**   Little Rock.

15 **Q**   And where was that office located?

16 **A**   Merrill, I believe.

17 **Q**   On Merrill Drive?

18 **A**   I believe so, yes, sir.

19 **Q**   What types of therapy did you provide?  And I'm talking

20 about individual, family, group.

21 **A**   Individual therapy, family therapy, group therapy, crisis

22 intervention, and master treatment plans, and intakes.

23 **Q**   Okay.  So did you provide any school-based therapy?

24 **A**   Yes.

25 **Q**   And was there a particular school that you covered?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

30

2   Q    And would that have been LeAnn Dickinson?

3   **A**    That is correct.

4   Q    And what did Ms. Dickinson tell you?

5   **A**    That we would be compensated for the hours that were

6   completed by the therapist, completed being fully billed within

7   the computer system.

8   Q    Did Ms. Dickinson discuss what the definition of a

9   billable hour was?

10   **A**    Yes.

11   Q    Were you paid consistent with what Ms. Dickinson

12   described, as far as you know?

13   **A**    Can you elaborate?

14   Q    Yeah.  Was there something that Ms. Dickinson told you

15   that you would be paid that wasn't paid?

16   **A**    No.

17   Q    Was there something -- and I'm going to do the flip side

18   of it.  Was there something that Ms. Dickinson told you

19   wouldn't be paid that you were paid?

20   **A**    No.

21   Q    So you also indicated that Mr. Sandlin said something that

22   gave you some explanation about your pay.  When was that?

23   **A**    When I came in for the interview.

24   Q    And what did he tell you?

25   **A**    That whenever I come in as an LMSW, my pay rate would be

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

31

1   $42 an hour and that if while under their employment if I got

2   my LCSW, or licensed clinical social work, that it would then

3   be increased to an LCSW's pay rate.

4   Q    And so let me see if I can ask it this way.  Are you

5   claiming overtime in this case?

6   **A**    Yes, sir.

7   Q    Okay.  And are you in saying that saying that your basic

8   pay, the pay for the hours that you billed, was paid

9   incorrectly?

10  **A**    Yes, sir.

11  Q    And how was it paid incorrectly?

12  **A**    There was work outside of the billable hour that was not

13  compensated for.

14  Q    And what items are you talking about?

15  **A**    Meeting with families, counselors, school staff, as well

16  as documentation.

17  Q    And you're saying that that was not part of the $42 per

18  billable hour?

19  **A**    That is correct.

20  Q    Who promised you that you would be paid for those items

21  you just mentioned in addition to what you were paid for the

22  billable hour?

23  **A**    I don't recall.

24  Q    Did anyone make that -- say that to you?

25  **A**    I do not recall.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

32

1    Q    And I appreciate that answer.  Are you saying that someone

2    did, and you don't recall that it was?  Or are you saying that

3    you don't know of anyone that said something like that?

4    A    I don't remember off the top of my head who would have

5    informed me of that information.

6    Q    Do you know when that might have been told to you?

7    A    No, sir.

8    Q    Do you have some document or other -- or some electronic

9    communication that told you you would be paid for documentation

10   and for other things with families outside of the billable

11   hour?

12   A    No, sir.

13   Q    Did you ever complain to anyone at Life Strategies that,

14   Hey, I'm not being paid for these items?  I think I ought to be

15   compensated for those.

16   A    My supervisor.

17   Q    And did you complain -- and so that would have been Mr.

18   Sandlin?

19   A    Yes, sir.

20   Q    And when did you complain to Mr. Sandlin?

21   A    I don't have a specific date in mind.

22   Q    Was it by -- was it an in-person conversation?

23   A    Yes, sir.

24   Q    And was there anyone else present?

25   A    No, sir.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

33

1   Q    And what did you say to Mr. Sandlin?

2   **A**    I don't remember off the top of my head exactly what was

3   said.

4   Q    Okay, what was the substance of the conversation?

5   **A**    It would be nice to be compensated for additional time

6   that I spent with these families that is not in -- which is

7   not, I guess, in the same billable time span as an individual

8   family or crisis.

9   Q    And what was the substance of what Mr. Sandlin said?

10   **A**    He didn't really have anything to say at that point.

11   Q    So are you saying he didn't say anything?

12   **A**    Yes, sir.

13   Q    And so did you take whatever his response was as meaning

14   that he agreed with you?

15   **A**    No, sir.

16   Q    Did you take it that you were going to be paid for those

17   times?

18   **A**    No, sir.

19   Q    Do you believe that you had a contractual -- or had an

20   agreement with Life Strategies for them to pay you for that

21   time?

22   **A**    In the contract, no.

23   Q    If you believed -- did you believe while you were working

24   at Life Strategies that you were supposed to be paid for those

25   items?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

34

1    A    Yes.

2    Q    And by paid I mean that you were supposed to be paid some

3    hourly rate.

4    A    No.

5    Q    I'm not talking about overtime.  I'm talking about an

6    hourly rate for those times.

7    A    No.

8    Q    Okay.  So are you saying that you had -- that if you

9    worked -- you met with a family and it wasn't billable and you

10   spent an hour doing that, are you claiming that Life Strategies

11   had some obligation to pay you some base rate of pay for that

12   time, not overtime -- not an overtime premium but some basic

13   rate of pay?

14   A    Yes.

15   Q    And what was that basic rate of pay?

16   A    $42 an hour.

17   Q    And what basis -- what do you base that assertion on?

18   A    The contract that was signed whenever I first started with

19   Life Strategies.

20   Q    But the contract that you signed says per billable hour,

21   and you just said it's not billable; right?

22   A    An hour with a family is a billable service.

23   Q    Well, but you know what a billable hour is.

24   A    Yes.

25   Q    You were told that.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

35

1   A   Yes.

2   Q   Was it unclear to you in some way what a billable hour was

3   when you were working at Life Strategies?

4   A   No.

5   Q   Do you know anything about how a regular rate is

6   calculated?

7   A   No.

8   Q   Okay.  What -- during the school year, what was -- did you

9   have kind of a regular schedule that you tried to follow?

10  A   Yes.

11  Q   And what was that regular schedule?

12  A   I would be at the school whenever the school bell rang,

13  and I would leave the school whenever the school day was over.

14  Q   Okay.  So what time -- did it vary between the schools?

15  A   Yes, sir.

16  Q   So what's the earliest?

17  A   Earliest would have been 7:30 to 2:30.

18  Q   Okay.

19  A   And another school --

20  Q   Let's do it this way.  What would have been the latest?

21  A   Latest would have been 3:45.

22  Q   Do you know what time the school would have started that

23  ended at 3:45?

24  A   8:00 p.m. -- or sorry -- 8:00 a.m.

25  Q   8:00 a.m.  Okay.  Would you do -- in the interest of

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

36

1    efficiency, would you try to hit those schools that started at

2    7:30 and be there first to have those as your morning or your

3    first things if you could and then try to maybe push the ones

4    that were -- that ended -- the one that ended at 3:45 later in

5    the day?

6    **A**    Yes.

7    Q    Were you able to do that?

8    **A**    Yes.

9    Q    And how many days out of the week were you able to do it

10   that way?

11   **A**    Five days a week.

12   Q    So are you claiming that you would work from 7:30 until

13   3:45 every day of the week?

14   **A**    I'm claiming I worked more than that.

15   Q    I'm not saying that.  I'm saying are you were claiming

16   that you were at a school between 7:30 and 3:45 every day of

17   the week?

18   **A**    Yes, sir.

19   Q    You didn't do that on school holidays; correct?

20   **A**    No, sir.

21   Q    On things like Christmas holiday and summer break, I guess

22   you would try to schedule with the families?

23   **A**    Yes.

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

42

3   Q    Did you have any disputes with Life Strategies about how

4   your total compensation was calculated, meaning disputes that

5   you voiced to them?

6   **A**    Yes.

7   Q    Okay.  And who was that with?

8   **A**    Ms. Shannon Ayers I believe is her name.

9   Q    And do you know approximately when this was?

10  **A**    Just throughout my time at Life Strategies.

11  Q    And what was the nature of your -- I mean, how many times

12  -- you said this throughout your time.  When was the first time

13  it happened?

14  **A**    I do not remember off the top of my head.

15  Q    What was the nature of the question or concern?

16  **A**    The amount of billable hours that I had submitted did not

17  match up with my paycheck even after taxes had been taken out.

18  Q    Okay.  And so how did Ms. Ayers respond?

19  **A**    She did say that it would be put back on my next check

20  after that.

21  Q    Was it?

22  **A**    To my understanding, yes.

23  Q    Were there any other occasion -- and by the way, was that

24  by -- was that phone conversation?

25  **A**    Phone call.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

43

1    Q    Okay.  No emails or anything like that?

2    A    Not to my knowledge, no, sir.

3    Q    And by the way, I'm guessing from that you would check

4    your pay stub?

5    A    Yes.

6    Q    And did that pay stub list the number of billable hours

7    that you had?

8    A    I do not recall.

9    Q    How then -- how did you know then that your pay didn't

10   match what you had for your billables?

11   A    Because I would look at the total amount billable hours

12   that I had and multiply that by the billable rate and then look

13   at just kind of what the taxes and stuff were for Arkansas and

14   do some math.  By the end of it, if I had questions, I would

15   reach out to Ms. Shannon.

16   Q    Was that something you did regularly with your --

17   A    Absolutely.

18   Q    -- paycheck?  Did you have any other occasions where it

19   was -- where you thought it was off?

20   A    Not off the top of my head.

21   Q    If you did, I'm assuming you would follow the same kind of

22   thing --

23   A    Yes.

24   Q    -- to follow through with that?

25   A    Yes.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

44

1    Q    And y'all would try to figure it out between you?

2    A    Yes.

3    Q    Okay.  Were there any other instances where you voiced

4    some -- and by voiced, I mean you may have written somebody

5    about this or made some kind of electronic communication where

6    you voiced some dispute, disagreement, or concern about your

7    paycheck?

8    A    Not in regards to billable hours, no.

9    Q    Okay.  What kind of concerns did you express concerning

10   your paycheck?

11   A    There was a situation where I had enrolled in short-term

12   disability.  And based off of the benefits that were provided,

13   there was a conversation between myself and I believe Ms.

14   Shannon where they had suggested that I was not paying enough

15   for the short-term disability.  And I then had to pay them back

16   the amount that had not been taken care of originally.  And I

17   believe, if my memory serves me correct, it was somewhere

18   between 50 to $60 every paycheck that I had to pay them back.

19   Q    Over how many paychecks?

20   A    That I don't remember.  I do remember that it was for a

21   few months, and I was very peeved.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

50

6   Q    Okay.  And so -- well, let me ask it this way.  We talked

7   about billing more.  Do you think you were more efficient in

8   doing the non-billable tasks than others?

9   **A**    Whenever you say efficient, what do you mean by that?

10   Q    Meaning you -- maybe you -- maybe if it -- and we'll get

11   to this.  Maybe you could do a note faster than somebody else

12   could.

13   **A**    I think my strategy might have been different than other

14   people.

15   Q    Okay.  What you mean by your strategy?

16   **A**    Time management.

17   Q    Okay.

18   **A**    Whenever I would have a client in a session, then if they

19   were completing something that I had asked them to, per their

20   therapeutic intervention, I would start a note.  And that way

21   whenever they were done, I would already have in my brain

22   exactly what it was that we had -- what I did versus their

23   client's response.

24   Q    For just a regular treatment, for a progress note?

25   **A**    Yes.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

51

1    Q    For a progress note if you saw -- you know, you go through

2    a day, and you've seen ten people or you've seen 14 people that

3    day.  And you're at home at night, and you're finishing up the

4    stuff you have to do on a progress note.  And you -- I mean,

5    you know and sense this.  But -- so how long would it take you

6    to do the rest of what you needed to do on a progress note, on

7    a single progress note?  I know we've talked about the total

8    time, but I'm just trying to get kind of individually.

9    **A**    It depends on if there's any additional information that

10   was needed.  There's a lot of button clicking for that program

11   that we used.

12   Q    Okay.  And so two minutes, five minutes, ten minutes,

13   more?  I mean --

14   **A**    I would say, I don't know, five to ten minutes.

15   Q    Okay.  Were you aware of anyone in the Little Rock office

16   that billed more than you did?

17   **A**    No, sir.

18   Q    Were you aware of anyone in any other office that billed

19   more than you did?

20   **A**    No, sir.

21   Q    Okay.  Have you made any attempt to calculate how much you

22   believe you were underpaid?

23   **A**    No, sir.

24   Q    How would you go about doing that?

25   **A**    I have no earthly idea.  I don't even know where to start.

Conway Court Reporting

Shelby Barnhill

52

1   Q    So you don't have a total amount that you're saying that

2   Life Strategies owes you?

3   **A**    No, sir.

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d