# Transcript of the Testimony of
# **Stacy Wihebrink**

**Date:** March 21, 2023
**Case:** Wihebrink v. Life Strategies Counseling



Conway Court Reporting
Phone: 501-319-4807
Email: scheduling@conwaycourtreporting.com
Internet: www.conwaycourtreporting.com

Stacy Wihebrink

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


STACY WIHEBRINK, Individually and on

Behalf of All Others Similarly Situated          PLAINTIFF


VS.                    NO. 4:21-CV-573-DPM


LIFE STRATEGIES COUNSELING, INC.                 DEFENDANT


ORAL DEPOSITION

OF

STACY WIHEBRINK

TAKEN MARCH 21, 2023, AT 10:37 A.M.


Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas  72206


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. COLBY QUALLS

SANFORD LAW FIRM, PLLC

10800 FINANCIAL CENTRE PARKWAY, SUITE 510

LITTLE ROCK, ARKANSAS 72211

colby@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANT:

MR. MARK MAYFIELD

WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.

P.O. BOX 3077

JONESBORO, ARKANSAS 72403

mmayfield@wpmfirm.com

Stacy Wihebrink

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  STACY WIHEBRINK

    Examination by Mr. Mayfield . . . . . . . . . . . . . 5

    Deposition Concluded  . . . . . . . . . . . . . . . 69

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 70

ERRATA SHEET

SIGNATURE PAGE


   (NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

www.conwaycourtreporting.com

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF STACY WIHEBRINK, a witness produced at the request of the Defendant, taken in the above-styled and numbered cause on the 21st day of March, 2023, at 10:37 a.m., at the law offices of Sanford Law Firm, 10800 Financial Centre Parkway, Suite 510, Little Rock, Arkansas, pursuant to the Federal Rules of Civil Procedure.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

5

```
 1                   P R O C E E D I N G S
 2          THEREUPON,
 3                      STACY WIHEBRINK,
 4              THE WITNESS HEREINBEFORE NAMED, having
 5              been first duly cautioned and sworn by me
 6              to testify to the truth, the whole truth,
 7              and nothing but the truth, testified on her
 8              oath as follows, to-wit:
 9                          EXAMINATION
10      BY MR. MAYFIELD:
11      Q    Will you please state your name for the record, ma'am.
12      A    Stacy Wihebrink.
13      Q    Ms. Wihebrink, my name is Mark Mayfield.  We've been
14      introduced.  And I represent Life Strategies Counseling, Inc.
15      in a lawsuit that you've filed.  And so have you ever given a
16      deposition before?
17      A    I have.
18      Q    Okay.  And so just -- how long ago was that?
19      A    Back in 2003, I believe.
20      Q    Okay.  So still 20 years ago.  And just, you know, really
21      I kind of operate on a couple of things.  If you don't
22      understand something I ask you or if you don't hear all the
23      question, just let me know and ask me to repeat it.  And I'll
24      try to do that as best I can.  If you can, give verbal answers.
25      Nods and huh-uhs and uh-huhs are hard to read and decipher, you
```

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

6

1    know.

2         We'll go, and we'll take breaks intermittently.  But if

3    you need to take a break at some point in time for whatever

4    reason, then just let me know.  We may have to finish a line of

5    questioning to get to that point, but we'll try to do that.

6         My questions today are designed to obtain information.

7    I'm not trying to embarrass you or anything like that.  I don't

8    think we'll have anything like that, but I just always kind of

9    say that as a part.  If you don't understand my question or a

10   word I use or something like that, then please let me know;

11   okay?

12   **A**    Okay.

13   Q    All right.  Have you ever gone -- or have you in the last

14   ten years gone by any other name other than Stacy Wihebrink?

15   **A**    No.

16   Q    Okay.  When did you get your professional license?

17   **A**    March 2014.

18   Q    Have you reviewed any documents to prepare for this

19   deposition?

20   **A**    No.

21   Q    Other than your attorneys, have you spoken to anyone to

22   prepare for this deposition?

23   **A**    No.

24   Q    When you were working at Life Strategies, I'm assuming you

25   had to give them your date of birth; is that correct?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

7

1    **A**    Correct.

2    Q    Okay, and rather than me have you state your date of birth

3    on the record, I'm just going to ask you if the date of birth

4    that you gave Life Strategies was your correct date of birth,

5    as far as you know?

6    **A**    Yes.

7    Q    Okay, all right.  What's your present address?

8    **A**    1405 North Lincoln Street, Cabot, Arkansas 72023.

9    Q    And how long have you lived at that address?

10    **A**    Since 2018.

11    Q    Where did you live before that?

12    **A**    20 Sunrise Place, Cabot, Arkansas 72023.

13    Q    How long total have you lived in Cabot?

14    **A**    About since 2009.

15    Q    Where did you grow up?

16    **A**    North Little Rock.

17    Q    What is your marital status?

18    **A**    Married.

19    Q    What's your husband's name?

20    **A**    Ben Wihebrink.

21    Q    And how long have y'all been married?

22    **A**    13 years.

23    Q    Have you been married on any other occasion to Ben

24    Wihebrink?

25    **A**    No.

Conway Court Reporting

Stacy Wihebrink

8

1    Q    Do you have any relatives by blood or marriage that are in

2    the central Arkansas area?

3    **A**    Yes.

4    Q    First of all, let's talk about which parts of central

5    Arkansas, and then we'll kind of get -- drill down, get a

6    little more specific.

7    **A**    Okay.  My mother lives in Cabot.

8    Q    And let me ask one thing.

9              MR. MAYFIELD:  I don't think in this that y'all

10             have asked for a jury trial.  I'm pretty confident

11             that we have not either.  And so I just thought about

12             that.  And you don't know.

13             MR. QUALLS:  I don't know.  I'd have to check,

14             but I would imagine we've not.

15             MR. MAYFIELD:  Okay.  Well, let's -- can we

16             agree to do this?  Rather than me ask her a bunch of

17             questions about relatives, if we get to that, if it

18             figures out that one side or the other asks for a

19             jury, then I can ask those -- then would y'all just

20             provide that by letter?  And I'll prompt you if that

21             becomes an issue; is that okay?

22             MR. QUALLS:  We'll agree to that.

23             MR. MAYFIELD:  Okay, all right.  I'm trying to

24             save some questions.

25    Q    (Mr. Mayfield continuing)  So how is it that you decided

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

9

1   that you wanted to provide therapy to individuals?

2   **A**    I have a history of trauma, and I've had purpose and

3   meaning behind my life experiences and to give back.

4   Q    Do you work with adults, children, both?

5   **A**    Both.

6   Q    And by the way, are you currently working?

7   **A**    Yes.

8   Q    Where is that?

9   **A**    I have three jobs.

10   Q    Okay.

11   **A**    I have a full-time job on the Little Rock Air Force Base

12   as a victim advocate.  It's a sexual assault prevention and

13   response victim advocate.

14   Q    Okay.

15   **A**    I work part time at Life Within Counseling Group, and I

16   work part time as a military and family life counselor with

17   WellFront doing weekend on-demand events with the Arkansas

18   National Guard.

19   Q    And that word you said after military something --

20   **A**    Military family life counselor.

21   Q    Military family life counselor, okay.  And that's with

22   WellFront?

23   **A**    Yes.

24   Q    Okay.  And are you an employee of this group at the air

25   force base?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

10

1   **A**   Yes.

2   Q    And full time in that job, what does that mean?  How many

3   hours does that mean?

4   **A**   40.

5   Q    And this Life Within, are you an employer or an

6   independent contractor?

7   **A**   Independent contractor.

8   Q    Do you have a business name or entity that you have for

9   your independent contractor work?

10  **A**   No.

11  Q    And when do you do that Life Within work?

12  **A**   In the afternoons, evenings during the week.

13  Q    And the WellFront, is that as an employer or an

14  independent contractor?

15  **A**   Independent contractor.

16  Q    And I think if I understood that, that was -- would be

17  during times when there would be training, or did I

18  misunderstand?

19  **A**   Drill weekends.

20  Q    So is that once a month, or is it more often?

21  **A**   It's usually once a month.  Sometimes it's a little more

22  often.

23  Q    Other than these places, what other places have you worked

24  since January of 2018?  We know one of them is Life Strategies.

25  We'll go ahead and put that -- and I'm going to say Life

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

11

1   Strategies by the way.  And is it okay if I say that instead of

2   saying Life Strategies Counseling, Inc.?  Will we understand

3   one another?

4   **A**    Yes.

5   Q    I know there's a -- I think there's a Life Strategies of

6   Arkansas or something like that, but I'm talking about Life

7   Strategies Counseling, Inc.  And I'll just refer to them as

8   Life Strategies, if that's okay?

9   **A**    Yes.

10  Q    Okay.  So we've got Life Strategies.  Who else?

11  **A**    Families, Inc. in Jacksonville and Chenal Family Therapy

12  in Cabot.

13  Q    Okay.  So what did you do for Families, Inc. in

14  Jacksonville?

15  **A**    I was a mental health therapist.

16  Q    Were you an employee or an independent contractor?

17  **A**    Independent contractor.

18  Q    And what period of time did you work for -- work with

19  Families, Inc.?

20  **A**    2014 to 2018, I believe.

21  Q    Why did you leave that job?

22  **A**    I had some health issues, and I needed to take a break.

23  Q    So does that mean that you ended the independent contract?

24  **A**    I did.

25  Q    Okay.  When did you work for Chenal Family Therapy in

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

12

1    Cabot?

2    **A**    I think January 2019 to around December of 2019.

3    Q    And what position did you have at Chenal Family therapy?

4    **A**    Mental health therapist.

5    Q    Were you an employer or independent contractor?

6    **A**    Independent contractor.

7    Q    How did your independent contract end with Chenal Family

8    Therapy?

9    **A**    I walked away.

10   Q    So you ended the contract?

11   **A**    I did.

12   Q    Okay.  Did you do that to go to Life Strategies or --

13   **A**    I did.

14   Q    Okay.  You listed the three places you work now.  When did

15   you begin the job at the air force base?

16   **A**    February 27th of this year.

17   Q    These other part-time jobs, did they -- well, let me just

18   ask it this way.  The Life Within, when did you start with

19   them?

20   **A**    November of '21.

21   Q    What about WellFront?

22   **A**    I started with WellFront as a full-time military and

23   family life counselor in June of '21.

24   Q    Okay.

25   **A**    And when I got offered the position of the victim advocate

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

13

1   with the air force base, I switched from full-time employment

2   to independent contractor doing the on-demand events for drill

3   weekends.

4   Q    Okay.  So part of the time at WellFront you were an

5   employee, and you were full time?

6   **A**    Yes.

7   Q    And I asked two questions there, but are both those

8   statements correct?

9   **A**    Yes.

10  Q    Okay.  Sorry.  I wasn't doing that on purpose.  And so

11  going to the -- and I've got the name written.  I just can't

12  read my own -- going to the victim advocate job, did you go to

13  that because you wanted to do that job rather than do the

14  WellFront job?

15  **A**    Yes.  Working for WellFront, I was considered a government

16  contractor even though I was a full-time employee.  And working

17  for -- as a victim advocate for the air force base, I'm

18  considered a federal employee.  And I was interested in the

19  health benefits.

20  Q    At the air force base are you hourly, salary?

21  **A**    Salary.

22  Q    Do you know whether your position -- well, do you work

23  more than 40 hours at any point in time for them?

24  **A**    No.

25  Q    So there's not an issue of overtime and whether they -- do

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

14

1   you know whether you're exempt or nonexempt?

2   **A**   I am -- I don't really know what that means.  I know that

3   we have flex hours -- or it's called flex scheduling, because

4   we are 24/7.  So if I have -- if I get called in on the

5   evenings or on the weekends, then I flex my time another day

6   within that 80-hour pay period to -- like, I'll take off or --

7   where I still get my 80 hours in that two weeks.

8   Q   You've not been paid overtime at that job?

9   **A**   No.

10   Q   Okay.  What does your spouse do with his time?

11   **A**   As far as a job?

12   Q   If that's where he spends his time, then, yes.

13   **A**   He is a chief financial officer for Cypress Valley Meat

14   Company.

15   Q   Have you -- and I don't mean anything by this, but let me

16   ask this question first of all.  Are you under the influence of

17   any medication or other substance that would affect your

18   ability to give a true and accurate deposition today?

19   **A**   No.

20   Q   Do you have anything going on in your life that would

21   cause you to be unable to give a true and accurate deposition

22   today?

23   **A**   No.

24   Q   And while I'm on that kind of thing -- and I don't mean

25   anything by this, but I'm going to ask the question.  Do you

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

15

1   have -- have you been convicted of a felony or any crime

2   involving dishonesty or false statement?

3   **A**    No.

4   Q    Have you been involved in any other lawsuits?

5   **A**    Yes.

6   Q    What other lawsuits have you been involved in?

7   **A**    Part of my trauma history is from being in an abusive

8   boarding school when I was a teenager, and I was in a lawsuit

9   against them back in 2003.

10   Q    Where was that lawsuit filed, if you know?

11   **A**    Missouri.

12   Q    Where in Missouri?

13   **A**    I do not know.

14   Q    What was the name of the -- what was the name of one of

15   the defendants, if you remember any of them?

16   **A**    Bob Wills.

17   Q    What was the name of the boarding school?

18   **A**    Mountain Park Baptist Boarding Academy.

19   Q    Where was it located?

20   **A**    Poplar Bluff, Missouri.

21   Q    Okay.  And what was the outcome of that lawsuit?

22   **A**    The jury ruled in favor of the defendants.

23   Q    And so y'all actually had a trial?

24   **A**    Yes.

25   Q    Were there other plaintiffs -- were there other people

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

16

1    that had sued them other than you that were participating in

2    that trial?

3    **A**    Yes.

4    Q    Have you been involved in any other lawsuits?

5    **A**    No.

6    Q    At any point in time while you worked for Life Strategies,

7    did you use any social media?

8    **A**    Yes.

9    Q    Okay, what social media?

10   **A**    Facebook.

11   Q    And what name would that have been under?

12   **A**    Stacy Kellar Wihebrink.

13   Q    And spell Keller for me, if you will, just to make sure

14   I've got it right.

15   **A**    K-E-L-L-A-R.

16   Q    And is Kellar your name before you were married?

17   **A**    Yes.

18   Q    You've not had any other last name other than Kellar or

19   Wihebrink?

20   **A**    Correct.

21   Q    How long have you been on Facebook, just approximately?

22   **A**    2008.

23   Q    Do you use any direct messaging -- did you use any direct

24   messaging functions on Facebook back when you were in the --

25   back when you worked for Life Strategies?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

17

1   **A**   Not -- like, the instant messenger?  I believe so.

2   Q   Would you have used any of it to communicate with any of

3   your coworkers?

4   **A**   No.

5   Q   Did you make posts or comments on Facebook on your work at

6   Life Strategies?

7   **A**   No.

8   Q   Did you use any other forms of social media while you

9   worked at Life Strategies?

10   **A**   No.

11              MR. MAYFIELD:  All right.  I've got -- I have

12              put the exhibits -- and these are really for all of

13              the depositions.  I've got them already tabbed and

14              marked.  And you've got a copy of what I've got.  Oh,

15              wait.  This is yours.  And I may have to have y'all

16              kind of look on together.  I'll try to help with that

17              as I can.

18   Q   (Mr. Mayfield continuing)  And is it okay if I stand up?

19   It just makes it easier for me to move this stuff around.

20   **A**   (Witness nodding head up and down.)

21   Q   Okay, all right.  Let's see if we can go through a couple

22   of details.  Okay.  I'm going to start out with Exhibit 13.

23   And Exhibit 13 were some documents that you produced, looks

24   like pages six through eight of your deposition.  And so can

25   you identify this document -- or do you recognize it?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

1    **A**    Yes.

2    Q    Okay, what is it?

3    **A**    My resume.

4    Q    And it looks as if -- that this was probably -- maybe the

5    latest one you had done, because I see where it's got June of

6    2021.  And then when I say latest, the latest -- well, let me

7    ask.  Is it the latest one you have?

8    **A**    My most recent one?

9    Q    Yes, ma'am.

10   **A**    No.

11   Q    All right.  And I just kind of want to go through a few

12   things in this, and this is going to be an open book test.  So

13   we'll work from that part.  You got your bachelors from the

14   University of Arkansas at Little Rock?

15   **A**    Yes.

16   Q    Masters from Harding?

17   **A**    Yes.

18   Q    And then an education specialist from Harding; is that

19   correct?

20   **A**    Yes.

21   Q    And so this -- under experience, the first is this

22   military and family life counselor.  Is that the same air force

23   base job we've been talking about or --

24   **A**    That is with WellFront.

25   Q    Oh, okay.  And so I guess what you're -- part of it is is

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

19

1   it doesn't have what you started doing in, I guess, February?

2   **A**   Yes.  This is old.

3   Q   Right, right.  And that's okay.  I'm not being critical of

4   that.  And so then I'll skip over on the second page of Exhibit

5   13, and we've got the Life Within.  We've talked about that

6   job; correct?

7   **A**   Correct.

8   Q   And the descriptions by these bullet points I assume are

9   accurate descriptions of what -- generally of your duties;

10  correct?

11  **A**   Correct.

12  Q   And then we've got Life Strategies, and your job there was

13  mental health therapist?

14  **A**   Yes.

15  Q   And you've referred to -- the lawsuit refers to mental

16  health professional but same job; correct?

17  **A**   Yes.

18  Q   Okay.  And just take a look at the rest of Exhibit 13 on

19  the experience.  And just all I need to know is is whether that

20  information is accurate.

21  **A**   Yes.

22  Q   Let's flip to the next page.  So -- and just help me out a

23  little bit with this.  I see where in January of 2014 it says

24  you were a licensed associate counselor.  Do you have to be an

25  associate counselor for a period of time before you can be a

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

20

1   professional counselor?

2   **A**   Yes.

3   Q   And what do you have to do to achieve that professional

4   counselor designation?

5   **A**   Have to have 3,000 hours of supervision with a

6   board-approved supervisor.

7   Q   So you've been a licensed professional counselor since

8   January of 2016; correct?

9   **A**   Correct.

10  Q   These -- with respect to your license, have you had any

11  disciplinary action taken against you at any point?

12  **A**   Yes.

13  Q   Okay.  When was that?

14  **A**   February of '21 I had a board complaint.

15  Q   And what -- so when we say board, what board are we

16  talking about?

17  **A**   My licensing board, the Arkansas Board of Counselors.

18  Q   And I'm not interested in going into the details of that.

19  I just wanted to know what the outcome was of that.

20  **A**   The board dismissed the complaint.

21  Q   Okay.  So you didn't have any disciplinary action.  They

22  just dismissed the complaint; correct?

23  **A**   Correct.

24  Q   Other than that occasion, have you had -- well, let me

25  strike that.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

21

1       I'm going to ask the question again, and I'm not being a

2  smart aleck.  I'm just -- since there wasn't any discipline in

3  that situation, I'm just going to ask to make sure I've covered

4  it, whether you've had any incidence where there was

5  disciplinary action taken with respect to your license?

6  **A**     No.

7  Q     Okay.  Has your license as a professional counselor ever

8  not been in good standing for any reason?

9  **A**     No.  It's always been in good standing.

10  Q     Has, to your knowledge, your billing been the subject of

11  any audit or investigation by Medicaid or some other payor?

12  **A**     No.

13  Q     There's some indication of some -- of something called

14  brainspotting in February of '22, and that's listed under

15  certifications and licenses.  Is that a certification, license?

16  **A**     Yes.  It's a counseling technique that you have to receive

17  training for to be able to do it.

18  Q     Okay.  And there's also a mention of certified in TF-CBT

19  in December of 2016.  What is that?

20  **A**     Trauma-focused cognitive behavioral therapy.

21  Q     And what did you have to do to get that certification?

22  **A**     I had to take online module classes, attend a two-day, in-

23  person workshop, and have 12 supervised consultation calls with

24  supervisors that are trained in TF-CBT.

25  Q     What did you have to do to get this brainspotting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

22

1    certification?

2    **A**    Attend, like, a three- or four-day, live workshop and

3    demonstrate brainspotting.

4    Q    When did you begin -- so as I've understood it, you worked

5    for Life Strategies on two separate occasions; right?

6    **A**    Yes.

7    Q    And we'll try to divide them up.  And I can go back here

8    to Exhibit 13, and maybe that will help us on that.  Do you

9    know when in May of 2019 you began with Life Strategies?

10   **A**    I do not.

11   Q    Okay.  And we'll -- I'll tell you what.  Let's go ahead --

12   we'll get to that part of it.  If you'll look at Exhibit 1 in

13   the notebook here, the little tabs on the side have got the

14   numbers.  So -- and when I'm saying the exhibit numbers, it's

15   listed as defendant's deposition exhibit number just so that

16   will be clear in the record.  So it looks like to me that in --

17   it looks like actually on May 6th you accepted an offer from

18   this to become a mental health professional at Life Strategies?

19   **A**    Yes.

20   Q    And is that your signature on the second page of Exhibit

21   1?

22   **A**    Yes.

23   Q    And I'm going to just -- I'm going to go through these

24   quickly.  I'm just trying to hit the high points.  Exhibit 2 is

25   not something that you may have seen, but it has your hire date

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

23

1    listed as May 6th, 2019, so same as the date you signed the

2    letter; correct?

3    **A**    Correct.

4    Q    Then if you'll look at Exhibit 3, it's an employee

5    acknowledgment form of some different areas, I think, that were

6    addressed in orientation or in the handbook.  And is that your

7    signature by employee's signature?

8    **A**    Yes.

9    Q    And the date on that one I think is May 6th, 2019 as well;

10   correct?

11   **A**    Correct.

12   Q    Okay.  I think that's it for that one.  And so you started

13   in May.  May 6th is what it looks like; right?

14   **A**    Yes.

15   Q    And you're -- you've indicated I think that you went until

16   -- I think, right until August.  Do you know when in August you

17   stopped?

18   **A**    I do not.

19   Q    And what caused you to leave Life Strategies in August of

20   2019?

21   **A**    I was having some health issues, and it was taking its

22   toll on my mental health.

23   Q    Okay.  So you decided to -- did you resign your

24   employment?

25   **A**    Yes.

Stacy Wihebrink

24

1   Q    And looking here, if we go to Exhibit 4, do you recognize

2   that document?

3   **A**    I do not.

4   Q    Okay.  On the second page of -- actually, the last page of

5   Exhibit 4 there is a signature.  It looks like it says your

6   name.  Did you sign that?

7   **A**    Yes.

8   Q    Okay.  And so while it may not be familiar with you now,

9   back then it looks like something that you had been given and

10  signed; correct?

11  **A**    Yes.

12  Q    All right.  And then let's go to Exhibit 5.  And so I know

13  the print is pretty small.  Can you see it okay?  If you can't,

14  I can magnify it for you.

15  **A**    I can see it.

16  Q    Okay.  And so if you look down at the bottom part, there's

17  two lines from an email that I think came from you.

18  **A**    Yes.

19  Q    And in that I noted that you said, It all has taken me by

20  surprise.  And so just meaning you weren't expecting to have

21  this medical condition that caused you to end up -- well, let

22  me ask.  Was it the medical condition that took you by

23  surprise, or was it the way that it affected your work that

24  took you by surprise?

25  **A**    Both.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

25

1    Q    Okay.  Fair answer.  And so this email, it comes from

2    stacy.wihebrink@lscihealth.com.  Was that your work email?

3    **A**    Yes.

4    Q    Do you know whether that was your work email when you went

5    back to life strategies?

6    **A**    I believe it was.

7    Q    All right.  Let's go the second time around and go to

8    Exhibit 7.  Exhibit 7 looks a lot like Exhibit 1 I'll represent

9    to you.  But on the second page of Exhibit 7, is that your

10   signature?

11   **A**    Yes.

12   Q    And what date did you -- is listed as the acceptance date?

13   **A**    January 9th, 2020.

14   Q    Is that your handwriting?

15   **A**    Yes.

16   Q    Okay.  And so as I understood this Exhibit 7, it starts

17   out that -- and I'm just going to read a part of it.  We would

18   like to extend an offer of employment as a mental health

19   professional at a billable hour rate of $50.  And then it's got

20   some contingencies with respect to that.  When you went back to

21   Life Strategies, were the terms, in terms of pay, was it

22   similar?  I mean the rate may have been different.  But were

23   the terms similar in terms of what you would get paid for?

24   **A**    Yes.

25   Q    And other than this letter, did anyone back in January of

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

26

1    2020 communicate to you how you -- how they would figure out

2    what you would be paid?

3    **A**    Yes.  $50 at a billable hourly rate.

4    Q    And so did that $50 for a billable hourly rate, did it

5    include all the tasks necessary to complete that billable hour?

6    **A**    I don't understand what you mean.

7    Q    Okay.  Well, let's go at it this way then.  And we'll just

8    start with someone.  Let's kind of get past the point that

9    you've established with that person.  What kind of therapy did

10   you do while you worked at Life Strategies?  Individual, group,

11   both?

12   **A**    Individual therapy, family therapy.  I don't recall ever

13   doing any groups at Life Strategies, but I could have.

14   Q    So what is the difference between individual therapy and

15   family therapy?

16   **A**    Family therapy usually includes members of the client's

17   family, so there would be two or more people in the room.

18   Q    And individual therapy was just one on one?

19   **A**    Yes.

20   Q    What populations, as far as adults, children, did you

21   provide therapy to?

22   **A**    Both children and adults.

23   Q    Did you provide any therapy in the schools?

24   **A**    Yes.

25   Q    Which school or schools?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

27

1   **A**    Central Elementary, Southside Elementary, Cabot Freshman

2   Academy, Cabot Junior High North, Cabot Junior High South,

3   Cabot Middle South, Cabot Middle North, Eastside Elementary,

4   Stagecoach.  I believe that was it.

5   Q    All in the Cabot School District; correct?

6   **A**    Correct.

7   Q    Did you provide any therapy at the Life Strategies offices

8   in Cabot?

9   **A**    Yes.

10  Q    Did you provide therapy at any other office location of

11  Life Strategies?

12  **A**    No.

13  Q    Did you provide any therapy in the clients' homes?

14  **A**    On occasion, yes.

15  Q    And when you say on occasion, how frequently would that

16  be?

17  **A**    Maybe once a month or every other month.  It wasn't my

18  favorite thing to do, so I tried to avoid it.

19  Q    And let me say this as I'm asking questions.  I'm not

20  going to ask you a question that I intend to try to bring out

21  the name of a particular client.  If for some reason my

22  question gets into something like that, tell me that before you

23  just say the client's name.

24      I mean, we can protect it in terms of confidentiality, but

25  I would just assume not even have to do that if we can avoid

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

28

1    it.  I mean, I want you to be able to tell and give full and

2    complete answers, but I don't -- I think we can figure out ways

3    to avoid that; okay?

4    **A**    Yes.

5    Q    I wanted to say that just to -- not because I thought you

6    were going to but just to sort of preempt that I guess, for

7    lack of a better term.  And so with conducting individual

8    therapy with someone that's already established, what are the

9    steps to -- I mean, I guess somebody's got to have an

10   appointment or got to have a time when you're going to meet

11   with them.  How does that get figured out -- or how did that

12   get figured out at Life Strategies?

13   **A**    We were responsible for making our own schedules and

14   scheduling our own clients.  So when a client got put on my

15   caseload, I would contact them by phone to schedule that

16   appointment.

17   Q    And then with the ongoing parts of scheduling, would that

18   sometimes be done in the course of -- you might do that -- you

19   would schedule the next appointment at the end of the current

20   appointment?

21   **A**    Yes.

22   Q    And would there be occasions I assume where schedules had

23   to change, or schedules would change or someone would need to

24   reschedule for some reason?  Would you handle those things as

25   well?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

29

1   **A**    Yes.

2   Q    Okay.  So other than scheduling, would there be anything

3   else that you would do in preparation for an appointment with a

4   client?

5   **A**    I would need to make sure that they were in compliance

6   with their PCP referral, treatment plans.  They were required

7   to see the nurse practitioner.  So if they had missed those

8   appointments, they would not be allowed to be seen by a

9   therapist.  So there was a few things I had to take -- make

10  note of before, such as just to make sure that if a client came

11  to session, that they were in compliance.  And I would be paid

12  for that session.

13  Q    Right.  And those were all things you had to do to make

14  sure that it was going to be billable; correct?

15  **A**    Correct.

16  Q    And just so I can understand it, when in relation -- if

17  somebody had an appointment Monday at 3:30, when would you be

18  trying to figure out these things you've talked about that were

19  the compliance points?

20  **A**    Usually the week prior.  But I would kind of make myself a

21  list of when things expired so that I would take care of it

22  well in advance and not wait until last minute.

23  Q    Got you.

24  **A**    So if a PCP referral was going to expire next month, then

25  I would be trying to get in touch with the PCP now.  Because

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

30

1   sometimes they can take a few weeks to get a PCP referral in.

2   Q    And by the way, PCP is just all caps.  So primary care

3   provider; correct?

4   **A**    Correct.

5   Q    Okay.  And that's fine.  I'm just trying to make sure I'm

6   not just assuming things from the way the record is going to

7   read.  So you would make sure the person was in compliance,

8   schedule the appointment.  Anything else you would typically

9   have to do in preparation for an appointment?

10  **A**    Depending on the client's needs, sometimes I'd have to

11  research, you know, different interventions.  Or if I was

12  having difficulty, I'd have to research, you know, maybe

13  different strategies that I haven't thought about.  Other than

14  that, not really.

15  Q    Okay.  You would have the session.  And then what

16  paperwork would you have to do for that, for just a typical

17  session?

18  **A**    For a typical session, the paperwork would be a progress

19  note, if the treatment plan was in compliance.  If it was not,

20  then I'd have to do a progress note and a treatment plan

21  update.

22  Q    And when would you do that progress note, at the end of

23  the session, some other time?

24  **A**    Usually, I wouldn't have time to do them during the

25  session or at the end of the session.  I would have to wait

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

31

1    until evening to do those.  Another thing is, because of Optum

2    and Medicaid requirements, we also had to take care of the

3    Optum paperwork as far as the compliance factors go.

4    Q    When did it start that you had to do that with Optum, if

5    you know?

6    **A**    I believe that all changed in the summer of 2018, maybe

7    2019.  I believe it's 2018, because that was when I was leaving

8    Families, Inc.  And there were a lot of changes.

9    Q    Any other work that you would have to do relative to a

10   session with them, the existing client?

11   **A**    No.

12   Q    And by the way, I referred to them as clients.  Is it

13   client, patient?  What's the terminology you use?

14   **A**    We use client.

15   Q    Okay, all right.  I thought that was the case, but I

16   didn't want to assume that.  And so for all these tasks that

17   you have mentioned, is the billable hour rate here in Exhibit 7

18   that's listed as $50 a billable hour, is -- it is -- if it was

19   an hour session, is $50 what you would receive for doing those

20   things, the scheduling, the check and compliance, the research,

21   the actual visit, and then the paperwork?

22   **A**    No.  The $50 was for the 53 to 60 minutes I spent face to

23   face with the client.

24   Q    Okay.  So were you paid for the other time that you've

25   referenced for the -- well, let me ask it this way.  Were you

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

32

1    paid for the schedule?

2    **A**    No.

3    Q    Were you paid for the time spent if you had to check

4    compliance?

5    **A**    No.

6    Q    Were you paid for the time that you had to conduct

7    research if you had to conduct that?

8    **A**    No.

9    Q    Okay, were you paid for the time you had to do paperwork

10   if you did it outside the 53 to 63 minutes?

11   **A**    No.

12   Q    And so what is it in this paperwork -- can you show me in

13   Exhibit 7 something that tells you that you were going to be

14   paid for the paperwork, the compliance, the scheduling, the

15   research?  Where does it say that in Exhibit 7?

16   **A**    It doesn't say it, but it doesn't talk about any of those

17   things either.

18   Q    Okay.  Who told you that you would be paid that in

19   addition to $50 per hour?

20   **A**    Nobody.

21   Q    When you worked for Life Strategies on a previous

22   occasion, were you paid for those items that we've talked about

23   outside of the therapy session?

24   **A**    No.

25   Q    Okay.  What is it that causes you then to believe that you

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

33

1   were to be paid for the time other than the time spent with the

2   client?

3   **A**   I don't know how to answer that.

4   Q   Okay.  Well, is there some piece of information that you

5   can think of that says your deal with Life Strategies

6   Counseling was not for $50 per billable hour that included all

7   of those tasks?  Is there something that you -- some piece or

8   item that you have that tells you that's not how -- that you

9   weren't paid $50 per billable hour?

10  **A**   No.

11  Q   Okay.  Is there something that tells you that you were

12  going to be paid something more than $50 per billable hour for

13  the other tasks that go with that hour that we just talked

14  about?

15  **A**   No.

16  Q   All right.  Let's -- we've been going about an hour.

17  Let's take a break.

18              (WHEREUPON, after a break was taken, the

19          proceedings were resumed as follows, to-wit:)

20  BY MR. MAYFIELD:

21  Q   I'd ask you to turn to Exhibit 9.

22              MR. MAYFIELD:  And then I'll tell you, Colby,

23          these will not all be in sequence.  I kind of put

24          them in order just kind of to keep them sort of

25          chronological, but I'm just going to talk about the

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

34

1          ones -- so if you see one that I've missed, we're

2          going to leave that with you so you'll know what the

3          others are.

4                  MR. QUALLS:  Sure.

5                  MR. MAYFIELD:  But I just wanted to explain

6          that.  It may not be that I go over every single

7          number.  I just had put them together to help keep

8          them organized.

9    Q    (Mr. Mayfield continuing)  Exhibit 9 as I understand it is

10   the orientation schedule for the training that you went --

11   underwent.  So -- underwent, that sounds terrible.  The

12   training that you had, excuse me.  On the second page of

13   Exhibit 9, there is a signature there, and I wanted to know if

14   that was your signature.

15   **A**    Yes.

16   Q    And so you had to come to Jonesboro I guess and go through

17   a training on a number of issues even though you had worked at

18   Life Strategies before; correct?

19   **A**    Yes.

20   Q    And then if you will, Exhibit 10, if you'll take a look at

21   it.  Exhibit 10, as I understand it, has a bunch of different

22   sections of things.  Just take a look at -- well, strike that.

23   That's an internal document.  That's not something you would

24   have been involved in.

25          Let's go to Exhibit 11.  Did -- is that your signature at

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

35

1   the bottom of that page?

2   **A**   Yes.

3   Q   Did you go over these different areas that are listed with

4   the X's on the box?

5   **A**   Yes.

6   Q   And then let's go to Exhibit 12.  And I'll ask you if you

7   signed on the second page of Exhibit 12?

8   **A**   Yes.

9   Q   And when was that signed?

10  **A**   January 15th, 2020.

11  Q   And after seeing those documents with the different dates

12  in January, did you begin on or about the 15th -- January 15th,

13  2020?

14  **A**   Yes.

15  Q   Okay.  We were talking about some specifics a moment ago,

16  and I sort of put it as the typical visit.  Would the typical

17  visit be much different in terms of the things you would do

18  outside of the session for individual therapy versus family

19  therapy?  Did I ask that question badly?  I can ask it again.

20  Let me try.  The things you did outside of a session, would

21  they be similar for individual or family versus family therapy?

22  **A**   Yes.

23  Q   You made reference earlier to I think something called a

24  treatment plan.

25  **A**   Yes.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

36

1    Q    A treatment plan is a more involved thing; right?

2    **A**    Yes.

3    Q    You have to gather more information.  It's got more detail

4    to it than a progress note does; correct?

5    **A**    Yes.

6    Q    And how long typically would the billing be for a

7    treatment plan encounter?

8    **A**    Zero.

9    Q    Okay.  And so you couldn't bill any of the time for

10   preparing the treatment plan; correct?

11   **A**    Correct.

12   Q    You also indicated at times you have to update the

13   treatment plan; right?

14   **A**    Every 90 days.

15   Q    And when you have to do that every 90 days, how does it

16   compare to preparing one the first time around?

17   **A**    It's not as in-depth as the first one, but it still takes

18   a little bit of time.  Well, I take that back.  It actually

19   probably takes a little bit more time, because for each goal

20   and objective you're having to write up progress and medical

21   necessity to either keep the goal and objective or change the

22   goal and objective and why.

23   Q    Okay.  What other points of documentation would you

24   regularly have to do?

25   **A**    The Optum evaluations.  The intakes took a long time.  And

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

37

1   that usually took two or three hours, and we were only paid for

2   one.

3   Q    So for an intake you got paid for -- when you say paid for

4   one, you meant one billable hour?

5   A    One billable hour.

6   Q    So when I asked you earlier about another version of

7   Exhibit 12, do you recognize Exhibit 12?

8   A    I don't know that I recognize it.  I signed it.  It's

9   probably something I saw on January 15th, 2020 and never saw

10  again.

11  Q    Okay.  Take a second and read the essential duties and

12  responsibilities.  And I'll ask you -- and I'm going to preface

13  this with this part.  If you'll read through them -- if you see

14  something that's listed there that you didn't do, then tell me

15  that.  By the same token, I want you to be thinking.  Because

16  I'm going to ask you at the end if there are other things you

17  did that aren't listed there.

18  A    I did all those.

19  Q    Are there -- were there other duties other than the ones

20  listed on the job description duties of 12?

21  A    Obtaining PCP referrals, that's not on here.  I attended

22  court on a few occasions for clients.  I don't see on here

23  where it talks about scheduling clients.

24  Q    Anything else?

25  A    We were -- we had to be trained under a new electronic

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

38

1   medical record called Pimsey.  That took a lot of time to learn

2   their new system.

3   Q    Did you all -- speaking of training, did you all have some

4   type of in-service training that you would do?

5   **A**    Yes.

6   Q    How often would that be?

7   **A**    There were a couple of annual trainings, and then they

8   probably had some type of training at least once a month, every

9   other month.

10  Q    There are instances where I think there's a listing in

11  some of the records, and we can get to those -- we'll get to

12  those in a little bit.  But -- where it refers to training time

13  and maybe paid half the billable hourly rate.  Do you know if

14  you were paid a different amount for training time?

15  **A**    No.  To my recollection, we were not paid for any

16  training.

17  Q    You were not, okay.  All right.  And so did your schedule

18  differ just in general the first time you were with Life

19  Strategies in 2019 versus the second time you were with Life

20  Strategies?

21  **A**    Yes.

22  Q    Okay.  And so the first time that you worked, do you know

23  -- were you full time, part time?

24  **A**    I was -- I believe I was part time, because I did not have

25  that many clients.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

39

1   Q    And I'm going to try -- I'm going to ask this question,

2   see if I can cut this part short.  In the time that you were

3   with Life Strategies from May of 2019 to August of 2019, did

4   you work any overtime?

5   **A**    No.

6   Q    Okay.  So when you come back the second time, do you know

7   -- were you full time, part time?  In 2020 were you full time,

8   part time?

9   **A**    Full time.

10  Q    And do you know at Life Strategies what made a person full

11  time?

12  **A**    I believe billing 25 to 28 hours a week on average.

13  Q    Okay.  How many hours did you average?  Again, I'm talking

14  the second time around in 2020 not the first time.

15  **A**    Probably between 25 and 30.

16  Q    Okay.  So let's -- what was your schedule when you came

17  back in 2020?  What was it generally?

18  **A**    Average 7:00 a.m. to 7:00 p.m.  That would not include

19  extra time I spent doing paperwork at home until 10:00 p.m.

20  Q    What days of the week would that be?

21  **A**    Monday through Friday.

22  Q    What times of -- so if you worked from 7:00 a.m. to 7:00

23  p.m. and you're having, what -- based on your estimate that

24  would mean you would be five to six hours billable in a day?

25  **A**    I would have more clients scheduled but taking into

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

40

1    account no-shows or cancellations.  I would average probably

2    six or seven clients a day.

3    Q    Okay.  And so if it's -- okay.  You indicated that you

4    would do your notes -- you do some note work, I'm going to say,

5    or paperwork after hours -- after 7:00 p.m.; is that right?

6    **A**    Yes.

7    Q    Or before 7:00 a.m., whichever way you want to look at it.

8    So if you left at 7:00 p.m., when would you typically -- well,

9    how often would you have to do notes during the week?  Was that

10   an everyday thing, just some days?

11   **A**    Usually every day as notes were due the following day by

12   10:00 p.m.

13   Q    So approximately how long in the evening would you have to

14   work kind of again on average?

15   **A**    Probably on average two hours.

16   Q    So two hours every day.  And so I think if I'm doing my

17   math right -- well, let me ask this first of all.  Between 7:00

18   a.m. and 7:00 p.m., would you take any breaks?

19   **A**    Yes.  Sometimes I would.  Sometimes I would take a lunch

20   break and then drive in between schools.  So usually, you know,

21   7:30 to 2:30, 3:00 would be at a school.  And then the evening

22   hours would be set for -- or the afternoon hours would be set

23   for families or my adult clients that worked that need

24   afternoon hours.

25   Q    And so let me kind of get this part to kind of break down

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

41

1   and understand a little bit better.  Would you -- if you were

2   at a school, would you most of the time spend the entire day at

3   that particular school?

4   **A**    Not usually.  It depends on how many clients I had.  There

5   were some schools where I only had a couple of clients at that

6   school, and I would not spend all day there.

7   Q    Okay.  So you would then be traveling between whatever

8   school it was?

9   **A**    Yes.

10   Q    And I'm guessing -- well, I don't want to guess.  But with

11   Cabot you've got some where the schools would be right beside

12   one another and some where they're in different parts of town;

13   right?

14   **A**    Correct.  And working around student's school schedules

15   was difficult as well as the older kids, middle school.  And

16   you could not pull from any core classes.  You could only pull

17   from, like, electives or activity classes.  So I might be able

18   to see one at this school at this time only, and I couldn't see

19   my next kid there until the afternoon.  So I'd have to go

20   between schools just to match up schedules.

21   Q    Got you.  And so -- but even with the different schools

22   that you handled, most of the time we're talking about probably

23   a -- five or ten minutes to get from one to the other, wouldn't

24   it?

25   **A**    Yes.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

42

1  Q    Okay.  During the school day when you said that 7:30 to

2  2:30 kind of time frame, would you sometimes take a lunch break

3  during that time?

4  **A**    Yes.  I would usually take a lunch break 11:30, 12:30.

5  Q    So approximately an hour?

6  **A**    (Witness nodding head up and down.)

7  Q    Is that a yes?  I'm sorry.  We've got to --

8  **A**    Yes, I'm sorry.

9  Q    It's okay.  And out of a five-day week, how many times

10  would you get the chance to take a lunch break between 11:30

11  and 12:30 on average?

12  **A**    Probably three.

13  Q    Okay.  So on the other two days, would you get any lunch

14  break at all?

15  **A**    Not usually due to -- because of schedules I would try to

16  meet with clients during that time.

17  Q    When you took -- on the days that you took a lunch break,

18  what would you -- was there anything typical that you did, or

19  what would you do during that time?

20  **A**    Drive through Sonic or Subway, maybe go to the office to

21  eat.

22  Q    The office there in Cabot?

23  **A**    Yes.

24  Q    Did you take any other breaks during the day other than a

25  lunch break?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

43

1  **A**    Not on purpose.

2  Q    Okay.  And just so we'll go ahead and get this part of it,

3  you can't be billing for two people at -- during the same

4  period of time during the day; is that right?

5  **A**    Correct.  Unless you're doing a group session.

6  Q    Right.  And as I've understood it, you didn't do groups.

7  So -- and so at 2:30 you would go -- typically you would go

8  back.  You would go to the office?

9  **A**    Yes.

10  Q    And are you saying you would be at the office until 7:00

11  on average?

12  **A**    Usually.  And they -- there was a policy that no one

13  therapist could be there by themselves.  So sometimes I would

14  have to wait on another therapist to finish up so that

15  therapist wouldn't be there by themselves.

16  Q    If you had to do that, did you -- could you do your notes

17  then?

18  **A**    Yes.  And there were times that I did do some paperwork

19  then.

20  Q    And so let me kind of get this and understand this part of

21  it.  You've talked about how long it takes to do a treatment

22  plan.  With progress notes, how long would it take you to

23  complete a progress note?

24  **A**    Probably ten minutes per note.

25  Q    And I don't know that I got this.  And if I asked it

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

44

1  earlier, I apologize.  But to do the update of a treatment

2  plan, how long would it take you to do that?

3  **A**    Maybe about 20 to 30 minutes.

4  Q    Did you all, in your second go-around with Life

5  Strategies, did you use electronic medical records?

6  **A**    Yes.

7  Q    Did you do any paper records?

8  **A**    No.

9  Q    And so between 2:30 and 7:00 p.m., you would have -- I

10  know we've already talked about you would have therapy

11  sessions; right?

12  **A**    Yes.

13  Q    What else would you do during that time?

14  **A**    I had to supervise a QBHP.  And there was other paperwork

15  to do when I wasn't with clients, as far as some of the other

16  things I mentioned for the compliance, writing court updates

17  for DHS or the court system or get PCP referrals, making those

18  phone calls, scheduling clients to come in, like, if I needed

19  to do family sessions.  Because if I see the kids at school,

20  I'm not necessarily in contact with the family.  So I need to,

21  you know, make those phone calls to schedule family sessions.

22  Just different administrative duties or cleaning.

23  Q    Would you use your personal cell phone for any of those

24  calls?

25  **A**    Yes.  We were not issued a work cell.

Conway Court Reporting

Stacy Wihebrink

45

1    Q    Right.  And I was going to distinguish that.  You talked

2    about calling PCPs and doing other things.  And I was trying to

3    figure out did you use the office phone much, if any?

4    **A**    No.  We did not have phones in our offices.

5    Q    What was your cell phone number at the time you worked at

6    Life Strategies?

7    **A**    501-259-9944.

8    Q    And what company was that with?

9    **A**    AT&T.

10   Q    Is that account in your name?

11   **A**    My husband's name, Ben Wihebrink.

12   Q    Did you make any notes of the time that you got to work,

13   the time that you took a lunch break, the time you ended a

14   lunch break, or the time that you left work?

15   **A**    No.

16   Q    Did you make any notations of when you spent time entering

17   information into the records system after 7:00 p.m. or before

18   7:00 a.m.?

19   **A**    No.  But the records should have a time stamp on them.

20   Q    Did you do any work on the weekends typically?

21   **A**    Not typically unless I was completing the work from a

22   Friday.

23   Q    So it might be -- you indicated that you spent about two

24   hours doing notes every -- doing paperwork every night.  And I

25   say paperwork.  I know it's electronic but just paperwork just

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

46

1    to describe it.  Would there be times where you wouldn't have

2    time on Friday evening to do that, so you might do it over the

3    weekend?  Is that what you're saying?

4    **A**    Yes.

5    Q    Okay.

6    **A**    Or if there were a crisis call on the weekend, I would

7    have to take care of that and do paperwork.

8    Q    Who was your supervisor?

9    **A**    At Life Strategies?

10   Q    Yes.

11   **A**    Matt Davis.  Before then it was Luke.

12   Q    Sandlin?

13   **A**    Yes.

14   Q    So was Mr. Davis your supervisor in the 2020, 2021

15   employment?

16   **A**    Most of it, yes.

17   Q    I guess there was some part of it that Mr. Sandlin was

18   your supervisor then?

19   **A**    Yes.

20   Q    You indicated you had to supervise a QBHP.  Who was that?

21   **A**    Amanda Howard.

22   Q    And what did that supervision involve -- entail?

23   **A**    An hour consultation of her talking about clients and what

24   she's doing with them, going over the treatment plan,

25   observation.  I had to observe her in a session.

Stacy Wihebrink

47

1   Q     When -- are you saying an hour every day?

2   A     No.  About once a week.

3   Q     And when you say observe her in a session, how often would

4   that occur?

5   A     At least once a month.

6   Q     Were there instances of observing her in a session that

7   you could bill for or --

8   A     No.

9   Q     Okay.

10  A     And there was paperwork to go along with that, too.

11  Q     Were you ever eligible for health insurance at Life

12  Strategies?

13  A     I do not recall.

14  Q     Did you receive a pay stub?

15  A     Electronic, yes.

16  Q     Were you the one that would go in and look at that, see

17  what it showed?

18  A     Yes.

19  Q     You all changed, I think, and had different systems at

20  different times; is that right?

21  A     Yes.

22  Q     But you were able -- did you have electronic access

23  through both systems?

24  A     Yes.  But it did not have -- it just gave the amount.  It

25  didn't say -- it didn't break it down.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

48

1   Q    When you said it didn't break -- so you're saying it just

2   gave you, what, a gross pay amount, a net pay amount?

3   **A**    Yes.

4   Q    Do you have copies of any of that information?

5   **A**    No.

6   Q    But it didn't show you what your deductions were?

7   **A**    It showed all that.  It didn't show what I was being paid

8   for.

9   Q    So it didn't show whether you had -- how many billable

10  hours you had?

11  **A**    Correct.

12  Q    Did you keep up with how many billable hours you had in

13  the week?

14  **A**    Typically, yes, just looking at my calendar.

15  Q    What calendar would you look at?

16  **A**    My planner where I scheduled clients.

17  Q    Okay.  I'd ask you to take a look at Exhibit 15, and we're

18  going to -- we're not going to start on page one.  We're going

19  to go back to -- I'll represent to you that these are -- this

20  is -- Exhibit 15 is a pay summary that goes from your time

21  starting in January all the way to the end of April of 2021.

22       And so let's just pick for a moment.  If you'll turn to

23  the page -- and do you see down at the bottom it's got a page

24  number on the right-hand side?  Go to 245 so we're looking at

25  the same page, LSCI 245.  Okay, so on 245 you can see just

Stacy Wihebrink

49

1    under gross pay it's got regular and then train, in parens,

2    field three.  Do you see that?

3    **A**    What?

4    Q    Let me show it to you.  These categories.

5    **A**    Uh-huh.

6    Q    Okay.  So you see those references, and you see where it's

7    got rate.  And that rate would be what your billable hour rate

8    was; correct?

9    **A**    Correct.

10   Q    At least for the regular.  For the training, the rate it's

11   got 25; right?

12   **A**    Yes.

13   Q    And then on the hours it says 56.  Now, I'll represent to

14   you that that is for half a month was 56 hours billed.  And

15   then it's got four hours of training.  But I think what I'm

16   hearing from you is is that you didn't see how many hours you

17   had of regular hours or how many hours of training; correct?

18   **A**    Yeah.  I didn't get this.

19   Q    Okay.  You would get a document that would show -- and

20   this week it shows gross pay of $2,900.  Do you see at the top

21   right?

22   **A**    Yes.

23   Q    And then it shows a list of various deductions and a net

24   of 2,273.16; correct?

25   **A**    Yes.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

50

1    Q    So you would see those.  You would see the deductions, and

2    you would see the gross amount and then the net amount; right?

3    **A**    Yes.

4    Q    But to your recollection, there wasn't anything else on

5    the stub?

6    **A**    Correct.

7    Q    Were there any other documents or reports that you had

8    access to with respect to your pay other than the stub?

9    **A**    No.

10   Q    Did you have any instance where you believed your pay was

11   incorrect, again in 2020 or 2021 with Life Strategies?

12   **A**    No.

13   Q    Did you ever question anyone at Life Strategies about

14   getting paid for anything done outside of the session time with

15   a client?

16   **A**    Yes.

17   Q    Okay.  When did you do that?

18   **A**    I cannot remember the approximate time.  There was another

19   employee there that was being paid salary regardless of her

20   billable hours.  Well, so she got paid regardless of if she had

21   people show up or not show up to sessions.  So we inquired

22   about becoming salaried versus per billable hour.

23   Q    Okay.  Who was the employee that was salaried?

24   **A**    Tracy Polly.

25   Q    And you said "we" inquired.  Who is the "we"?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

51

1   **A**   A couple of other the therapists and myself.

2   Q   And do you recall who they were?

3   **A**   Renee Drennan, Kristi Johnson.

4   Q   Okay.

5   **A**   And I cannot remember the other therapists' names.

6   Q   You believe there were others.  You just can't remember

7   who it was; correct?

8   **A**   Yes.

9   Q   And who did you communicate those concerns?  Who was that

10  addressed to?

11  **A**   Matt Davis and Kerri Garrison -- Garrett.

12  Q   I believe it's Garrison.

13  **A**   Okay.

14  Q   And what was Kerri Garrison's position?

15  **A**   She was the clinical director of all of Life Strategies

16  offices.

17  Q   And how was this communication handled?  Discussion,

18  email, some combination of both, text?  I mean --

19  **A**   Telephone calls.  With Matt it was in person.

20  Q   Ms. Garrison wasn't based in Cabot; correct?

21  **A**   No.  She was in Jonesboro.

22  Q   And so did you personally have a discussion with Matt

23  Davis about this issue of being salaried?

24  **A**   Yes.

25  Q   And was it one discussion, more than one discussion?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

52

1   **A**   More than one discussion.

2   Q   Over what period of time?

3   **A**   Probably three months.

4   Q   But you don't know when; correct?

5   **A**   No.  I believe it was the fall of 2020.

6   Q   And over the three months, how many times did you talk

7   with Mr. Davis?

8   **A**   Probably three.

9   Q   Okay.  With the first conversation, who else was present?

10   **A**   Renee.

11   Q   Anyone else?

12   **A**   No.

13   Q   And tell me about the substance of that conversation.

14   **A**   We asked if it was possible for us to become salaried

15   versus hourly employees.

16   Q   Who did most of the speaking?

17   **A**   I did.

18   Q   Okay.  And what was the response you received?

19   **A**   He would talk to admin team about it and get back to me.

20   Q   Did he say anything else about being salaried at that

21   point?

22   **A**   No.

23   Q   Did he say anything else about the way in which you were

24   paid in that conversation?

25   **A**   No.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

53

1   Q    And did you hear back from him?

2   A    No.  I had to approach him again.

3   Q    Okay.  And when you approached him again, was there anyone

4   with you?

5   A    The second time, no.

6   Q    And tell me about the substance of that conversation, the

7   second one.

8   A    I asked him if he had been able to talk to the admin team

9   or if he has heard anything back about us becoming salaried.

10  And he said -- I can't remember what he said exactly but pretty

11  much that nothing had been decided about that yet.  It was a

12  virtual conversation.

13  Q    Okay.  And then what about the third conversation?

14  A    Third conversation was me, Renee, and Kristi.  And we

15  again, because we were having difficulties with clients making

16  appointments, asked about becoming salaried.  And we were

17  dismissed.

18  Q    What do you mean dismissed?

19  A    He pretty much told us no and that he was too busy to talk

20  to us.

21  Q    What did he say?

22  A    I don't remember exactly what he said, but it was -- Tracy

23  was salaried due to special circumstances, and we couldn't

24  change over to being salaried.  I don't know what those special

25  circumstances were, why she got to be salaried versus everybody

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

54

1   else.

2   Q    And did you have some discussion with Ms. Garrison about

3   being salaried?

4   **A**    I had talked to her on the phone, and she told me no.

5   Q    Was that before or after this last conversation with Matt

6   Davis?

7   **A**    After.

8   Q    And what was the substance of your conversation with Ms.

9   Garrison?

10  **A**    Matt and I started having difficulties with our

11  relationship, and I had reached out to Kerri to ask that

12  question.  And she had told me that that's not how they do

13  things.

14  Q    So -- and kind of -- you were having difficulties with

15  Matt Davis, your supervisor; correct?

16  **A**    Correct.

17  Q    And what was the nature of those difficulties?

18  **A**    Matt had done something unethical, and I brought it to

19  Kerri's attention.  And he became upset with me for going above

20  his head about that situation.

21  Q    What had he done that was unethical?

22  **A**    He had started avoiding phone calls and text messages from

23  the therapists and was going through our secretary using our

24  secretary as the go-between kind of between him and us.  And

25  there was an emergency situation on a weekend.  The therapist

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

55

1    could not get in contact with Matt, so she ended up contacting

2    me.

3         So I helped her with a crisis situation.  I had tried to

4    call Matt, and he didn't answer the phone.  So I -- because of

5    the history of him going with the secretary, I ended up calling

6    the secretary.  And I said, Hey, I need to get in touch with

7    Matt.  And this was on a weekend.  And her words were, Yeah, I

8    just got off the phone with Matt.  He will -- he's about to

9    call this other therapist.

10         And there had already been some situations happening

11    between -- with him and the secretary.  But it was unethical

12    that he was talking to her about private client information and

13    not directly with the therapists themselves.  And so I had gone

14    above his head to Kerri to discuss that with her.

15    Q    That he -- okay.  So I just want to make sure that I got

16    this one part of it, that he had gone to the secretary who was

17    an employee of Life Strategies; correct?

18    A    Correct.

19    Q    Okay.  And so in the course of that conversation -- so is

20    this on a weekend?

21    A    Yes.

22    Q    In the course of this conversation on the weekend, how did

23    salary come up?

24    A    It wasn't during that weekend.  I had contacted Kerri

25    about that situation.  And then later when Matt found out I had

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

56

1   gone to Kerri, he started treating me poorly.  It didn't have

2   anything to do with me.  So I started regarding all my

3   questions to Kerri instead of Matt.

4   Q    So did someone tell you to take your questions to Kerri

5   Garrison instead?

6   **A**    No.  I decided that upon myself.

7   Q    And your reason for doing that was that you and Matt

8   weren't getting along?  Is that --

9   **A**    It became a hostile work environment.

10  Q    And so when did it come up about being salaried with Ms.

11  Garrison?

12  **A**    I'm thinking early January of '21.

13  Q    And what did you say to Ms. Garrison?

14  **A**    I said, Hey, I've been, you know, talking -- I had

15  previously been talking to Matt about becoming a salaried

16  employee, because Tracy is salaried.  You know, how can I

17  become a salaried employee?

18  Q    And what was her response?

19  **A**    We don't do that.

20  Q    Was that the only conversation you had with Ms. Garrison

21  directly about being salaried?

22  **A**    Yes.

23  Q    Did you have any other conversations with anyone else at

24  Life Strategies management about being salaried?

25  **A**    No.

Stacy Wihebrink

57

1   Q    Did you have any conversations with anyone at Life
2   Strategies management about being paid overtime?
3   **A**    No.
4   Q    Did you have any conversation with anyone at Life
5   Strategies management about being paid for scheduling,
6   compliance, research, or entering notes?
7   **A**    No.
8   Q    And by the way, in your discussions with Ms. Garrison
9   about salary, was there anybody else that participated in that
10  conversation?
11  **A**    Not that I'm aware of.
12  Q    Did you ever have any instances where you looked at your
13  paycheck and thought that it had been miscomputed in some way?
14  **A**    I don't think so.
15  Q    Did you ever speak with Shannon Ayers or Diane Yancey or
16  Kendra Fite about your paycheck?
17  **A**    Not to my knowledge.
18  Q    Ever talk to Nellie Caldwell about your paycheck?
19  **A**    No.
20  Q    Ever talk to Dr. Walters about your paycheck?
21  **A**    No.
22  Q    Ever talk to Dawn Mitchell about your paycheck?  And I
23  don't know if Dawn's time overlapped with you or not.  I think
24  part of it may have.
25  **A**    No.

Stacy Wihebrink

58

1   Q    Okay.  Did you make any written complaints or ask any

2   written questions about how your pay was computed?

3   **A**    No.

4   Q    What about any kind of written communications about

5   whether you should be receiving overtime?

6   **A**    No.

7   Q    This is a good point for a break.  We can take about five

8   minutes.

9              (WHEREUPON, after a break was taken, the

10              proceedings were resumed as follows, to-wit:)

11  BY MR. MAYFIELD:

12  Q    I wanted to ask.  If I've done my math right you're

13  claiming, what, 75 or so hours a week?  If you work from 7:00

14  to 7:00 and then two hours each night, that's 14 hours a day --

15  I'm sorry.  Strike that.

16      67 hours a week, I guess.  So 14 hours a day times five is

17  70, and then you take off three days where you took an hour for

18  lunch.  So 67, does that sound about right?

19  **A**    Between 55 and 60.

20  Q    Between 55 and 60, okay.  All right.  And so I'm trying to

21  figure out the difference between that and the other maybe --

22  do you know what the -- do you see what I'm doing?  Because I

23  took the 7:00 to 7:00, which is 12 hours, and then I added two

24  hours each night.

25  **A**    Uh-huh.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

59

1   Q    So where's the difference?  I know we've got three hours

2   for lunch.  But I'm trying to figure out the rest of it to get

3   between 55 and 60.

4   **A**    I don't know how to break that down for you.  All I know

5   is I've averaged about probably 55 to 60 hours of work each

6   week.

7   Q    In the Cabot office, how many MHPs were there in 2020 and

8   2021 that you worked around with any regularity?

9   **A**    Probably six.

10  Q    Were all six of those folks full time?

11  **A**    Yes.

12  Q    Did all six of those, as far as you know, work the kind of

13  schedule that you did, 7:00 to 7:00 and then a couple of hours

14  a night of paperwork?

15  **A**    Not everybody.  There were a few that have longer hours.

16  Q    Were there some that worked less?

17  **A**    Yes.

18  Q    Who worked longer hours do you think?

19  **A**    I don't know.

20  Q    Being a counselor, you're subject to certain -- you made

21  reference to certain ethical guidelines; correct?

22  **A**    Yes.

23  Q    Is one of those that you'll not claim that you worked

24  hours when you -- that you're not going to claim that you

25  worked during hours that you did not work; correct?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

1  **A**    Correct.

2  Q    That's why you -- but that's one of the ethical

3  principles; right?

4  **A**    Not to fraudulently bill is in the ACA code of ethics.

5  Q    Okay.  Do you think that would apply to the claiming time

6  that's more than what you actually worked for an employer

7  performing therapy services?

8  **A**    Yes.

9  Q    And same thing with trying to gather more compensation

10  than what you're entitled to; correct?

11  **A**    Correct.

12  Q    Did you have any responsibility to check your pay

13  statements?

14  **A**    Yes.

15  Q    And what was that responsibility?

16  **A**    Look at my pay statement.  If I thought that there was

17  some error in what I was being paid, to try to fix that.

18  Q    Have you made an estimate of the amount that you believe

19  Life Strategies owes you?

20  **A**    No.

21  Q    We talked about total hours.  For every hour that you

22  billed, do you have any kind of estimate of how long it would

23  take you to get all the other work done for an hour billed?

24  **A**    I mean, can you repeat that, please?

25  Q    Yeah.  Other than for the -- if I spent -- if you spent an

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

61

1   hour in a session or 53 to 60 minutes -- because 53 minutes is

2   an hour just -- right?

3   **A**   (Witness nodding head up and down.)

4   Q   Is that a yes?

5   **A**   Yes.

6   Q   Okay.  And so if you spent 53 to 60 minutes with a client,

7   how much time would it take you -- do you have some way of kind

8   of estimating how much time it would take you to do all the

9   other duties incidental to that task?  And let me put it in

10  these terms.  It might take you 15 minutes for each hour that

11  you billed.  It might take you 20 minutes for each hour you

12  billed or something else.

13  **A**   Total probably 30 minutes.

14  Q   Okay.  So 30 minutes to bill an hour?

15  **A**   30 minutes of extra paperwork to bill an hour.

16  Q   Well, but I'm talking about the scheduling and the other

17  things you did beforehand as well.

18  **A**   Okay.  Maybe 45 minutes per that hour if I take into

19  account appointment reminders, scheduling, and the included

20  paperwork.

21  Q   Okay, so -- all right.  We've sent some written questions

22  to you, and I just want to ask you about this people.  Who --

23  Kristi Johnson is another therapist?

24  **A**   Yes.

25  Q   And what do you understand Ms. Johnson knows about this

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

62

1   lawsuit?

2   **A**   I assume -- I don't know that she knows anything about it.

3   I have not spoken with her since I've left Life Strategies.

4   Q   You've listed her as a witness.  What do you -- what would

5   you think she would be a witness to?

6   **A**   Pay structure, hours worked, and communicating about pay.

7   Q   Renee Drennan is another therapist, same kind of thing?

8   **A**   Same.

9   Q   Tracy Polly.  You mentioned Ms. Polly.  Same kind of thing

10  with her as well; correct?

11  **A**   Correct.  She was the one that was paid salary.

12  Q   And then Amanda Howard?

13  **A**   She was my QBHP that I supervised.

14  Q   Marilyn Matthews?

15  **A**   She's another therapist.

16  Q   So same kind of thing as Ms. Johnson and Ms. Drennan?

17  **A**   Correct.

18  Q   Jeremy Trull?

19  **A**   He was a therapist there as well.

20  Q   Luke Sandlin?

21  **A**   He was my supervisor before Matt Davis.

22  Q   What do you think he's going to know about?  Just pay

23  structure, work?

24  **A**   Correct.

25  Q   Anything else?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

63

1   **A**    No.

2   Q    Matt Davis?

3   **A**    He's -- yes.

4   Q    And then Shannon Ayers?

5   **A**    She was HR.

6   Q    Did you seek to be promoted to a lead therapist?

7   **A**    I was offered.  I didn't seek.

8   Q    Okay, who offered?

9   **A**    Matt Davis.

10   Q    And so let me show you a document that's marked as Exhibit

11   16.  And so there's a part down there that says on February

12   22nd at 3:09 p.m., Stacy Wihebrink wrote, Good afternoon,

13   ladies.  And then there's more of a text.  Is that an email

14   that -- is that part of that -- of Exhibit 16 an email that you

15   sent?

16   **A**    Uh-huh.

17   Q    Do you -- is that a yes?

18   **A**    Yes.

19   Q    Do you know who that was sent to?

20   **A**    Kerri.

21   Q    And so it says in that, I would be greatly interested in

22   being considered for a lead therapist position.  Did you

23   receive a response to this email that's shown in 16?

24   **A**    Yes.

25   Q    And who responded?

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

64

1  **A**    Kendra.

2  Q    And what did she say?

3  **A**    Thank you for your kind words.  We appreciate you and all

4  the work you do as well.  We are certainly growing rapidly, and

5  we will keep you in mind for any future opportunities.  Thank

6  you for letting us know, Kendra.

7  Q    And so with that, was that before or after Matt Davis had

8  promised you a lead therapist physician?

9  **A**    This email was after Matt Davis had promised me a lead

10  therapist position.

11  Q    All right.  And so then let's look at Exhibit 17.  At the

12  time that you resigned -- is Exhibit 17 your resignation email?

13  **A**    Yes.

14  Q    At the time that you resigned, did you have other

15  employment lined up?

16  **A**    I did.

17  Q    Okay, and where was that?

18  **A**    The Pointe in Cabot.

19  Q    Okay, what happened?  Did you go -- did you work that job?

20  **A**    I did not.

21  Q    What happened with that position?

22  **A**    When Matt Davis found out that I was resigning and where I

23  was resigning to, the very same day that he found out, The

24  Pointe rescinded their offer to me with no explanation.

25  Q    Okay.  And so when did Matt Davis find out that you were

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

65

1   going to The Pointe?

2   **A**   I accepted an offer on a Friday.  He found out that

3   following Tuesday.

4   Q   Do you know how he found out?

5   **A**   I do not.

6   Q   So is it your belief that Matt Davis called someone or

7   contacted someone at The Pointe?

8   **A**   It is.  He had made statements in regard to other

9   therapists that were seeking employment at The Pointe.  And

10  when I got my job offer, I was determined not to let him know

11  because of his behavior prior to that towards other therapists.

12  Q   So were there other therapists that left at the same time

13  you did to go to The Pointe?

14  **A**   Yes.

15  Q   Did those other folks go to work there?

16  **A**   Yes.  Kristi Johnson left and went to The Pointe.

17  Q   Did -- how did it happen that you and Ms. Johnson were

18  going to The Pointe at the same time?  Was it just a

19  coincidence?

20  **A**   Yes.  She had -- was looking for other employment,

21  mentioned that she was talking to The Pointe.  So I had

22  submitted an application to The Pointe.

23  Q   Did you talk with any of your coworkers about that you

24  were going to The Pointe?

25  **A**   I had talked with Renee and Kristi about it.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

66

1    Q    Do you have any idea of why it is that Kristi was working

2    at The Pointe, but you did not?

3    **A**    Because Kristi -- Matt did find out about -- well, Matt

4    had a vendetta against me, I believe, and not Kristi.  But he

5    was upset that he felt The Pointe was recruiting all of his

6    therapists, and he made comments about having a word with the

7    supervisor over at The Pointe.

8    Q    When you resigned from Life Strategies, did you believe

9    that you have been treated unfairly with respect to your

10   compensation?

11   **A**    No.

12   Q    And so I'd ask you to turn to Exhibit 20.  And Exhibit 20

13   was a document that I think was produced with your responses to

14   some written questions that we sent.

15   **A**    Uh-huh.

16   Q    I don't want to go through this document line by line.  I

17   don't think that's something we need to do in this

18   circumstance.  But what is it that this document -- can you

19   kind of tell us what this document is about and kind of

20   summarize it a little bit for me?

21   **A**    I had -- I was talking to her about, you know, giving my

22   two weeks' notice, that I did not tell anybody where I was

23   going to work.  Two days after I accepted the job offer, which

24   was that Tuesday, that when Danny came into my office and let

25   me know that -- where I was going to work, that later that

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

67

1   afternoon The Pointe rescinded their offer and that I had

2   already asked Kerri to speak with the other therapists about

3   what was happening at the office and to investigate.  Because

4   it became a hostile work environment.  And that's about it.

5   Q    Okay.  And so did you, before you resigned -- was there

6   any instance where you met with any members of management about

7   your -- about how you were conducting yourself in the office?

8   **A**    What do you mean?

9   Q    Did you have any kind of meeting where there was some

10  discussion about whether what you were doing during your time

11  at the office met the standards of the company?

12  **A**    Yes.

13  Q    And who was that with?

14  **A**    Matt, Luke.  And at one time I requested Kerri and Kendra

15  to be present in a meeting between all of us.  Because two

16  weeks after I made a complaint about Matt -- or, well, two

17  weeks after I told Matt that I was the one who called Kerri,

18  that it wasn't Renee that called Kerri -- because he thought it

19  was Renee that had turned him in -- I told him it was me.

20       Then two weeks after that I got a final reprimand letter

21  when I had never received a verbal reprimand nor a written

22  reprimand.  And so at that time I requested a meeting with

23  Kendra and Kerri and Luke, which we conducted via Zoom.  And

24  then they agreed to have a meeting with all of us, including

25  Matt.

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

68

1   Q    Did Life Strategies handle that situation satisfactorily

2   to you?

3   **A**    It did not.

4   Q    How long was that from then until the time that you

5   resigned?

6   **A**    That was in February.  I resigned in April.

7   Q    And I think -- and when was the complaint to the board in

8   relation to your resignation?

9   **A**    That was in February.  The end of January, beginning of

10  February.

11  Q    Okay.  All right.  Is there any other amount of time that

12  you worked that we haven't discussed at least in general?  Any

13  other specifics or things that maybe we didn't talk about in

14  terms of the hours that you worked?

15  **A**    Other than the time spent standing up for myself and

16  trying to, you know, refuse -- or rebut accusations made

17  against me, no.

18  Q    You also provided some tax returns in response to some

19  written discovery that we sent.  These tax returns, however,

20  did not have any W-2s or 1099s.  Do you have those?

21  **A**    I assume I do.

22  Q    Well, I'm just -- I mean, because, you know, the tax

23  return has a lot of your information, your husband's

24  information mixed together.  So I'd ask you to get those W-2s

25  for '20 and '21, provide those to your attorneys, and they'll

Conway Court Reporting

Stacy Wihebrink

69

1    provide them to me if I'm entitled to them.  Have I been polite

2    and courteous to you today?

3    **A**    Yes, sir.

4                    MR. MAYFIELD:  All right.  Thank you, ma'am.

5            That's all the questions I have.

6                    MR. QUALLS:  None from me.

7                    (WHEREUPON, the proceedings were concluded in

8            the matter at 1:00 p.m.)

9                        (WITNESS EXCUSED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Conway Court Reporting

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

70

1                    C E R T I F I C A T E

2    STATE OF ARKANSAS    )

3                         )ss

4    COUNTY OF POPE       )

5

6        I, AMANDA R. BROWN, Certified Court Reporter #741 and

7    Notary Public, do hereby certify that the facts stated by me in

8    the caption on the foregoing proceedings are true; and that the

9    foregoing proceedings were reported verbatim through the use of

10   the voice-writing method and thereafter transcribed by me or

11   under my direct supervision to the best of my ability, taken at

12   the time and place set out on the caption hereto.

13

14       I FURTHER CERTIFY, that I am not a relative or employee of

15   any attorney or employed by the parties hereto, nor financially

16   interested or otherwise, in the outcome of this action, and

17   that I have no contract with the parties, attorneys, or persons

18   with an interest in the action that affects or has a

19   substantial tendency to affect impartiality, that requires me

20   to relinquish control of an original deposition transcript or

21   copies of the transcript before it is certified and delivered

22   to the custodial attorney, or that requires me to provide any

23   service not made available to all parties to the action.

24

25

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

71

1        WITNESS MY HAND AND SEAL this 3rd day of April, 2023.

2

3        _____

4     AMANDA R. BROWN, CCR

5     Certified Court Reporter #741

6     My Commission Expires:  6-21-29

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

25                    www.conwaycourtreporting.com

Conway Court Reporting

Stacy Wihebrink

72

ERRATA SHEET

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

_____   _____ Page ____ of ____

          WITNESS                    DATE

STACY WIHEBRINK

95e5c600-67ff-4d34-a21a-e3d8d0d16a79

Stacy Wihebrink

73

SIGNATURE PAGE

I, STACY WIHEBRINK, do hereby certify that I have read the foregoing 69 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 21st day of March, 2023, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief.  Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.


_____            _____

          DATE                                        WITNESS



****************************************************************

STATE OF _____  )

COUNTY OF _____  )

     SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the _____ day of _____, 2023.


                                    _____

                                              NOTARY PUBLIC

MY COMMISSION EXPIRES:


_____