# Transcript of the Testimony of
# **Paul Bailey**

**Date:** March 22, 2023
**Case:** Wihebrink, et al. v. Life Strategies Counseling



Conway Court Reporting
Phone: 501-319-4807
Email: scheduling@conwaycourtreporting.com
Internet: www.conwaycourtreporting.com

Paul Bailey

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


STACY WIHEBRINK, Individually and on

Behalf of All Others Similarly Situated          PLAINTIFF


VS.                    NO. 4:21-cv-573-DPM


LIFE STRATEGIES COUNSELING, INC.                 DEFENDANT


ORAL DEPOSITION

OF

PAUL BAILEY III

TAKEN MARCH 22, 2023, AT 11:04 A.M.


Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas  72206


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:

MR. COLBY QUALLS

Sanford Law Firm, PLLC

Kirkpatrick Plaza

10800 Financial Centre Parkway, Suite 510

Little Rock, AR   72211


ON BEHALF OF THE DEFENDANT:

MR. MARK MAYFIELD

Womack, Phelps, Puryear, Mayfield & McNeil, P.A.

P.O. Box 3077

Jonesboro, AR   72403

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE. . . . . . . . . . . . . . . . . . . . 4

WITNESS:  PAUL BAILEY III

      Examination by Mr. Mayfield . . . . . . . . . . . . . 5

      Deposition Concluded . . . . . . . . . . . . . . . . 47

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . 48-49

SIGNATURE PAGE/ERRATA SHEET

E X H I B I T S

(NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

www.conwaycourtreporting.com

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

C A P T I O N

    ANSWERS AND ORAL DEPOSITION OF PAUL BAILEY III, a witness

produced at the request of the defendant, taken in the above-

styled and numbered cause on the 22nd day of March, 2023, at

11:04 a.m., at the law offices of Womack, Phelps, Puryear,

Mayfield & McNeil, 301 West Washington, Suite 300, Jonesboro,

Arkansas, pursuant to the Arkansas Rules of Civil Procedure.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

5

1                    P R O C E E D I N G S

2        THEREUPON,

3                        PAUL BAILEY III,

4              THE WITNESS HEREINBEFORE NAMED, having

5              been first duly cautioned and sworn by me

6              to testify to the truth, the whole truth,

7              and nothing but the truth, testified on his

8              oath as follows, to-wit:

9                          EXAMINATION

10   BY MR. MAYFIELD:

11   Q    Please state your full name for the record, sir.

12   **A**    Paul Bailey III.

13   Q    Mr. Bailey, my name is Mark Mayfield.  I represent Life

14   Strategies Counseling, Inc. in regard to a lawsuit that you

15   have opted into.  I have some questions for you today.  Have

16   you ever given a deposition before?

17   **A**    No, sir.

18   Q    Okay.  All right.  Well, and by the way, when I refer

19   -- instead of me saying Life Strategies Counseling, Inc. 400

20   times today -- not that it would be that many, but I'm just

21   saying, saying it a lot -- is it okay if I just say Life

22   Strategies?

23   **A**    Yes, sir.

24   Q    I know there's a -- I think it's Life Strategies of

25   Arkansas, and I don t know if it exists, doesn't exist, but

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

6

1    maybe down somewhere around West Memphis, something like that.

2    Have you ever worked for them?

3    **A**    No, sir.

4    Q    Okay.  So if I'm referring to Life Strategies, we'll know

5    it's the company, and I just won't have to go through the full

6    formal name, okay?

7    **A**    Yes, sir.

8    Q    Do you have a middle name?

9    **A**    No, sir.

10   Q    Okay.  Just a couple of things with respect to the

11   deposition, if you will, just so it will help the court

12   reporter and help us in the recording, if we don't talk over

13   with one another.  For that, if you'll let me finish my

14   question, I'll try to let you finish your answer, and we'll try

15   not to talk over one another.  If you don't understand

16   something I ask you, will you let me know, even if there's a

17   word I use or something like that?  Will you do that?

18   **A**    Yes, sir.

19   Q    Okay.  And you just did good there.  You've got to give

20   verbal answers because what's being put down, you know, doesn't

21   pick up head nods and doesn't pick -- and uh-huhs and uh-uhs or

22   huh-uhs are hard to read, so we try to avoid those if we can.

23   If you say that and it's something that's important, I'll try

24   to prompt you.  It just makes it easier from that standpoint.

25   We'll probably take -- we'll take a break at some point

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

7

1    probably somewhere towards the middle to the end.  May take

2    more than one break.  If for some reason you need to take a

3    break for whatever reason, then just let me know.  We'll try to

4    accommodate you with that.  I may have to finish a question or

5    some thought, but we'll try to do that.  We'll try to get you

6    to a point to where you can take a break as quick as you can,

7    okay?

8    A    Yes, sir.

9    Q    And then I don't think I'll ask you anything that's

10   embarrassing today.  It's not my intention to do that.  My

11   questions are really designed at obtaining information from

12   you.  So with that, have you ever gone by any other name other

13   than Paul Bailey III?

14   A    No, sir.

15   Q    What have you done to prepare for this deposition?  I'm

16   not talking about conversations you may have had with your

17   lawyers.

18   A    I haven't done anything.

19   Q    Not looked at any documents or anything like that,

20   correct?

21   A    No, sir.

22   Q    Haven't spoken to anyone other than your lawyers, either,

23   right?

24   A    No, sir.

25   Q    You provided Life Strategies, I think, a date of birth,

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

8

1    and so I'm not going to have you restate the date of birth, but

2    is the date of birth that you gave Life Strategies your

3    accurate date of birth?

4    **A**    Yes, sir.

5    Q    Where do you currently live?

6    **A**    Marion, Arkansas.

7    Q    What's your address?

8    **A**    603 Ford Road, Marion, Arkansas  72364.

9    Q    How long have you lived at that address?

10   **A**    Since November 2020.

11   Q    Where did you live before that?

12   **A**    232 Whispering Wind, Marion, Arkansas  72364.

13   Q    How long did you live at that Whispering Wind address?

14   **A**    Approximately three years.

15   Q    Did you live in Crittenden County before that?

16   **A**    Yes, sir.

17   Q    Okay.  How long have you lived in Crittenden County?

18   **A**    Since November 2013.

19   Q    Do you have any relatives in central Arkansas?

20   **A**    I think I have one cousin.

21   Q    Okay.  Where does that one cousin live?

22   **A**    In Little Rock.

23   Q    What's his name?

24   **A**    Jermaine Jefferson.

25   Q    Did you grow up in Crittenden County?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

9

1   **A**    I grew up in Arkadelphia, Arkansas.

2   Q    Okay.  And where did you graduate high school?

3   **A**    Arkadelphia High School.

4   Q    What year?

5   **A**    2002.

6   Q    What's your current marital status?

7   **A**    Single.

8   Q    Have you ever been married?

9   **A**    No, sir.

10   Q    Let me ask this before I get too far into it.  And I don't

11   mean anything by this but just need to ask the question.  Are

12   you under the influence of any medication or other substance

13   that would affect your ability to give a true and accurate

14   deposition today?

15   **A**    No, sir.

16   Q    Do you have anything going on in your life that would

17   affect your ability to give a true and accurate deposition

18   today?

19   **A**    No, sir.

20   Q    And again, not asking this to be rude, but just asking it

21   to cover this ground.  Have you ever been convicted of a

22   felony?

23   **A**    No, sir.

24   Q    Have you ever been convicted of a crime involving

25   dishonesty or a false statement?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

10

1   **A**   No, sir.

2   Q   Have you been involved in any other lawsuits?

3   **A**   No, sir.

4   Q   During the time that you worked at Life Strategies, did

5   you use any type of social media?

6   **A**   Yes, sir.

7   Q   What social media did you use?

8   **A**   Instagram.

9   Q   Any others?

10  **A**   I think Facebook.

11  Q   Anything -- any other social media during the time you

12  worked at Life Strategies?

13  **A**   No, sir.

14  Q   What was your name on Instagram?

15  **A**   Maybe Yo crimson desire.

16  Q   Okay.  So can you spell that out for me?

17  **A**   Y-o c-r-i-m-s-o-n d-e-s-i-r-e.

18  Q   Okay.  Is that an account that is still active?

19  **A**   Yes, it's still active.

20  Q   Okay.  What about what name did you go by on Facebook?

21  **A**   Sean Paul Wallace.

22  Q   And is Sean S-h-a-u-n or S-e-a-n?

23  **A**   S-e-a-n.

24  Q   S-e-a-n?  And is Wallace, is that W-a-l-l-a-c-e?

25  **A**   Yes.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

11

1  Q    Okay.  So where did the name Sean Paul Wallace come from?

2  A    Just something I made up.

3  Q    Okay.  Is Facebook the only time in which you've used that

4  name?

5  A    Yes, sir.

6  Q    Okay.  Let's take a look here at -- there's an index, and

7  here's some more additions to the notebook.  I'm going to be

8  referring to some pages in here.  We've got tabs on them, and

9  we'll try to keep them together.  We're going to give those to

10 your lawyer after we're done with the deposition, because he's

11 got -- already got a notebook to start with.  But let me get

12 over here and we're going to start with Exhibit 44, which it

13 should be the first one you've got there.  And you can flip the

14 tab over if you just want to set it -- yeah.

15 A    Okay.

16 Q    You can do that.  Okay.  All right.  And so do you

17 recognize the document that's marked as Exhibit 44?

18 A    Yes.

19 Q    And what is it?

20 A    My résumé.

21 Q    Do you know when this résumé was -- I believe this was

22 provided to Life Strategies.  Do you know when it was provided

23 to them?

24 A    It probably had to be provided maybe around 2013, because

25 that's when I first got the job.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

12

1    Q    Okay.  All right.  And so as I look at it, I just want to

2    cover some things here.  Bachelor's in 2006 from Henderson?

3    A    Yes, sir.

4    Q    And then you got your master's in 2010 from Henderson,

5    right?

6    A    Yes, sir.

7    Q    At the time you were working on a -- looks like you were

8    working on a doctorate in education, in higher education at the

9    Delta State University.  Did you complete that program?

10   A    No, sir.

11   Q    Was that something that, when you went to Life Strategies,

12   you intended to complete it or had you already decided you were

13   done with it by then?

14   A    I intended to complete.  I just didn't complete my

15   dissertation.

16   Q    Okay.  All right.  And you're not the first one.  And so

17   this -- let's see.  Did you prepare this document, Exhibit 44?

18   A    Yes, sir.

19   Q    So it has here -- okay, okay, I'm sorry.  I had to get

20   myself oriented.  Looks like in the way of work history that

21   your most immediate employment experience before Life

22   Strategies was at SAU Tech; is that right?

23   A    Yes, sir.

24   Q    And say the different things, you've got two spots,

25   academic leadership experience and then teaching experience.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

13

1    Are the descriptions under those accurate?

2    **A**    Yes, sir.

3    Q    And so -- and looks like there's some overlap because I

4    see this counselor/advisor is August 11th, 2011 -- or I'm sorry

5    -- August of 2011 until November of 2013.  And then it looks

6    like you were a freshman instructor -- freshman seminar

7    instructor during that same time period; is that right?

8    **A**    Yes.

9    Q    And also a portfolio development instructor during -- I

10   guess from August of 2012 to May of 2013?

11   **A**    Yes, sir.

12   Q    Okay.  What does GSTD stand for?

13   **A**    It was a type of portfolio that SAU Tech had to where law

14   enforcement -- I think law enforcement officers could get

15   credit for going to the academy.

16   Q    And then it looks like immediately before that you had

17   worked for Youth Bridge?

18   **A**    Yes, sir.

19   Q    And what did you do for Youth Bridge?

20   **A**    I was a substance abuse counselor and a case manager.

21   Q    And what period of time were you in that role?

22   **A**    From -- I think it was August of 2010 to like July 2011.

23   Q    Okay.  You also, during, I guess -- so part of that time

24   was as a substance abuse counselor and another part of it was

25   as a commitment case manager, right?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

14

1    **A**    Yes, sir.

2    Q    Okay.  What did you do before that?

3    **A**    I was a probation parole officer.

4    Q    And where was that?

5    **A**    Arkadelphia, Arkansas.

6    Q    Were you employed by the state in that job?

7    **A**    Arkansas Department of Community Correction.

8    Q    And then it looks like you had also done an internship

9    there at the Arkansas Department of Community Correction as

10   well, correct?

11   **A**    Yes, sir.

12   Q    Okay.  So just so I see and then looking at the dates in

13   some of this, I guess you'd been a probation and parole officer

14   and then somewhere towards the end you did your internship of

15   your time there, and then you left sometime, I guess, in August

16   of 2010 from the Department of Community Correction.  What

17   caused you to leave your job at the Department of Community

18   Correction?

19   **A**    I was going through a grad school program in the

20   University of Arkansas, so I was trying to look for a job up

21   near northwest Arkansas.

22   Q    And so is that how you ended up in Rogers at Youth Bridge?

23   **A**    Yes, sir.

24   Q    And why did you leave the job at Youth Bridge?

25   **A**    Because I left the grad school program.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

15

1    Q    Okay.  And there's a -- then why did you leave your role

2    at SAU Tech?

3    A    Because I got my counseling license.

4    Q    So you would have gotten your counseling license in 2013?

5    A    Yes, sir.

6    Q    How did you end up making your way to Life Strategies?

7    A    I was looking for a job near -- somewhere closer to the

8    Memphis area, so I moved to Marion, and the girl that I was

9    talking to at the time, she wanted to live somewhere closer to

10   Memphis, and that was the closest job that I could find on the

11   Arkansas side, since I had an Arkansas counseling license.

12   Q    And maybe I should know this, but I don't.  So if you get

13   your license in Arkansas, does it not automatically -- you

14   can't transfer it to another state automatically?

15   A    No.  Different states have different requirements.

16   Q    Okay.  Let's take a look at Exhibit 45, if you just want

17   to flip the page there.  Do you recognize the document that's

18   marked as Exhibit 45?

19   A    Yes, sir.

20   Q    And what is it?

21   A    Looks like a job description.

22   Q    Okay.  Are the -- there's a list of duties and

23   responsibilities.  Do those fairly describe the job?  If you

24   have trouble reading them, I can give you something just a

25   little bigger if you want to look at it.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

16

1   **A**    I think this fairly describes it.

2   Q    And I will say, just in fairness, I think this was the

3   last one, maybe, you had signed.  There may be others that are

4   in the files and records presented, but is that your signature

5   on the second page of that document?

6   **A**    Yes, sir.

7   Q    Okay.  So -- and let's do one other thing, just so we get

8   our time right.  If you will flip several through to Number 51.

9   That document, I'll represent to you, is a thing with respect

10  to the personnel file that's done when you start.  It bears a

11  date of November 18, 2013.  Does that sound right in terms of

12  your date of hire?

13  **A**    Yes, sir.

14  Q    Okay.  That's all I had on that.  When you went to work at

15  Life Strategies, what were you told in terms of -- how were you

16  paid?

17  **A**    Paid per billable hour.

18  Q    Okay.  So during the entirety of your time that you were

19  at Life Strategies, were you paid by the number of billable

20  hours?

21  **A**    Yes, sir.

22  Q    Okay.  I also think that there -- did you do any kind of

23  group therapy?

24  **A**    Yes, sir.

25  Q    What about if you-all had training, do you know if you'd

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

17

1   be paid at a different rate for training hours?

2   **A**    I don't recall.

3   Q    When you went to work at Life Strategies, where did you go

4   to work?  Which office did you work from?

5   **A**    Osceola.

6   Q    And does the Osceola office also cover Marion or --

7   **A**    No, sir.

8   Q    Was there a -- being in the Osceola office, were you

9   covering -- well, what was kind of your territory?

10   **A**    Mississippi County.  I had to cover Blytheville, the

11   schools in Blytheville.  I had to cover the schools in Osceola.

12   I had to cover Rivercrest.

13   Q    And it looked like at some point in time you may have

14   tried to do some work in Marion for Life Strategies?

15   **A**    I think briefly I seen a few people in Marion when they

16   first opened up, but it wasn't my primary location.

17   Q    So really, your time was mostly spent in Mississippi

18   County, correct?

19   **A**    Yes, sir.

20   Q    Since you received your license in 2013, have you had any

21   kind of disciplinary action taken with respect to it?

22   **A**    No, sir.

23   Q    Have you ever had any instance where it was inactive or

24   suspended or not valid for one reason or another?

25   **A**    No, sir.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

18

1    Q    Where do you presently work?

2    A    Perimeter Behavioral Hospital in West Memphis.

3    Q    How long have you worked there?

4    A    PRN since 2016.  Full time since May of 2020.

5    Q    And so during the time that you were PRN with them, was

6    there any kind of -- I mean I know what PRN means, but I'm

7    wondering if there was -- maybe you worked weekends or you did

8    something that was kind of -- that was consistent?

9    A    Weekends.

10   Q    And just because I've not worked there, is that something

11   where you would -- what would a weekend consist of in terms of

12   work hours?

13   A    It could consist of maybe anything from 8:00 to 2:00.  It

14   just kind of depends on how busy the facility was and how many

15   patients we got in on the weekend.

16   Q    So it would be a shift type of thing, correct?

17   A    Wouldn't really be a shift.  It would just be when I got

18   my work done I'd go home.

19   Q    Okay.  All right.  What kind of job were you doing for

20   Perimeter as a PRN?

21   A    Group therapy, psycho-social assessments.

22   Q    As a full-time employee, do you do those same kind of

23   things?

24   A    Group therapy, psycho-social assessments, individual

25   therapy, family therapy, discharges.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

19

1   Q     Is that an inpatient facility?

2   **A**     Yes, sir.

3   Q     Does it also provide some outpatient services?

4   **A**     No, sir.

5   Q     Have you worked anywhere else since January of 2018?

6   **A**     Little odd jobs, like online therapy.

7   Q     Is there a particular provider of online therapy that

8   you --

9   **A**     I previously used to work for --

10   Q     -- use?

11   **A**     I previously used to work for BetterHelp.

12   Q     BetterHelp?

13   **A**     Yes, sir.

14   Q     Is that an online therapy provider?

15   **A**     Yes, sir.

16   Q     And what did you do for BetterHelp?  Just provide therapy

17   services?

18   **A**     Yes, sir.

19   Q     Did you work for BetterHelp at any point during the time

20   that you were also employed at Life Strategies?

21   **A**     No, sir.

22   Q     So the online therapy and the work with BetterHelp has

23   been, I guess, since you last worked at Life Strategies?

24   **A**     Yes, sir.

25   Q     Okay.  Any other professional or nonprofessional work that

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

20

1    you did or any work that you did, professional or

2    nonprofessional, where you'd earn money during the time that

3    you were at Life Strategies?

4    **A**    No, sir.

5    Q    Who was your supervisor at Life Strategies?

6    **A**    There was a couple of them.  Towards the end it was

7    Derrick Singleton.  It was like two more before him.

8    Q    Okay.  How long was Mr. Singleton your supervisor, if you

9    know?

10   **A**    Maybe about a year and a half.

11   Q    What types of therapy did you provide at Life Strategies?

12   **A**    Individual therapy, family therapy, group therapy.

13   Q    Did you do any work in any of the schools?

14   **A**    Yes, sir.

15   Q    Which school districts?

16   **A**    Osceola, Blytheville, Rivercrest.  But I think I went for

17   a short brief in Marion and West Memphis.

18   Q    In 2019 and 2020, did you have a -- and let's talk about

19   first during the school year, did you have a regular kind of

20   typical schedule that you tried to follow?

21   **A**    Yes, sir.

22   Q    And what was that?

23   **A**    Like 7:00 to 3:00.

24   Q    7:00 a.m. to 3:00 p.m.?

25   **A**    Yeah, somewhere around there.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

21

1  Q    And so -- and with the -- I can see that as kind of

2  corresponding some to school hours.  Would most or all that

3  time -- or would most of that time be spent in the schools?

4  A    Yes, sir.  Mostly in schools or you know, driving, you

5  know, to different --

6  Q    Going between?

7  A    Yes, sir.

8  Q    And would you spend -- other than your drive time, would

9  you spend your days during the school year in the schools?

10  A    I don't understand.

11  Q    Okay.  All right.  What I was trying to make sure of is

12  that you -- I guess was that you were doing school-based work

13  in the schools as opposed to going to a home or going to an

14  office would be -- so during the school day, your time giving

15  therapy would be in the schools themselves, not in an office

16  and not at someone's home, correct?

17  A    It mostly was in the school.  Every once in a while I

18  would have to go to a home or closer to the office.

19  Q    Okay.  Did you have a -- you talked about the schedule.

20  Was that 7:00 a.m. to roughly 3:00 p.m. five days a week?

21  A    Yes, sir.

22  Q    Did you take any breaks -- well, strike that.  I'll ask

23  that in a little bit.  Did you have a -- I'm going to go to

24  this school first and then -- well, let me ask you this way.

25  Would you spend the whole day at any one school?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

22

1  **A**    It would kind of depend on the students' schedules.  They

2  had different pull-out periods, so I couldn't just pull them

3  out anytime that I wanted to.

4  Q    Right.  And so would you try to set it where -- and I'll

5  just use this as a for instance.  Monday I'm going to be in

6  Blytheville and I'm going to try to get the folks that I need

7  to see in Blytheville all done that day.  Would you do anything

8  like that?

9  **A**    Yes, sir.  I'd try to make sure I mapped out by the town

10  so I wouldn't have to continue going back and forth to

11  Blytheville from Osceola.

12  Q    Okay.  And so were you successful in doing that, where you

13  didn't have to -- where you kind of didn't have to drive around

14  quite as much?

15  **A**    Sometimes.  Sometimes I wasn't because sometimes you would

16  show up at the school and they weren't in class for some reason

17  or they missed that day or something was going on.

18  Q    What about when -- what about on school days?  We'll stick

19  with that for the point.  What did you do?  Did you do anything

20  work-wise after school was out?

21  **A**    Yes.  Normally I had to type notes at night.

22  Q    When you talk about notes, what kind of things are you

23  talking about?

24  **A**    You have to note what your sessions were about during that

25  day.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

23

1    Q    So like a progress note?

2    A    Yes, sir.

3    Q    How long would it take you to do a progress note on an

4    individual?

5    A    It could take anywhere from maybe about ten minutes or so.

6    Q    Same kind of time for family therapy note?

7    A    Yes, sir.

8    Q    What about group?

9    A    It would take longer for group notes, because you have to

10   put in more people in a group note.

11   Q    When you do the group notes, if you had -- whatever the

12   number was in a group -- as I've understood it, it's more than

13   ten -- more than two, up to ten, right?

14   A    Yes, sir.

15   Q    And so when you did a group, if there were, say, four

16   people in a group, would you do one note and just put it in

17   four different times, or would you do individual ones for each

18   person?

19   A    You would have to go in and check each person's name, and

20   then you would have to go in and change a quote within each

21   person's note.

22   Q    When you say change a quote, what do you mean by that?

23   A    Something they said during the group.

24   Q    Okay.  So you could use some parts of it but then you'd

25   have to note who was saying it, I guess, is what you're talking

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

24

1    about, right?

2    **A**    Yes, sir.

3    Q    Okay.  I got you.  In other words, if John and Bill were

4    in a group session, you might write what both of them said, but

5    you -- in John's note it would say John said this, and it might

6    not say that Bill said that, but then in Bill's note it would

7    say Bill said that, but it wouldn't say anything about John

8    since they're separate --

9    **A**    Yes, sir.

10   Q    -- people, right?

11   **A**    Yes, sir.

12   Q    Okay.  All right.  I think I'm understanding that part of

13   it.  What about -- was there any other paperwork that you would

14   do?  And when you said at night, I assume you were talking

15   about from home?

16   **A**    Yes, sir.

17   Q    And were there other documentation that you would prepare

18   at home?

19   **A**    You would prepare notes for the probation office.  You

20   would prepare notes to go to the doctor's office.

21   Q    Did you have to do intakes?

22   **A**    Yes, sir.

23   Q    What about treatment plans?

24   **A**    Yes, sir.

25   Q    And you would have to update those statement plans, what,

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

25

1   every 90 days?

2   **A**   Yes, sir.

3   Q   The notes for probation, how long would it take you to do

4   those, do one of those?

5   **A**   Anywhere from ten to maybe a little bit more, a little bit

6   -- maybe around ten minutes or something.

7   Q   What about for a doctor's office?

8   **A**   Probably about the same, maybe about ten minutes.

9   Q   Okay.  For an intake, would you prepare any of the

10  documentation while you were doing the intake?

11  **A**   Yes, sir.

12  Q   And how long would it take you total to enter an intake?

13  **A**   I would say maybe about an hour and a half to three hours.

14  Q   Okay.  Could you bill for an intake?

15  **A**   Yes, sir.

16  Q   How much could you bill?

17  **A**   At one time, two hours.  But then I think at one point

18  they maybe knocked it down to one hour.

19  Q   And when you say they, do you know if that was Life

20  Strategies or somebody that was paying them?

21  **A**   I think it was Medicaid.

22  Q   Okay.  All right.  What about preparing a treatment plan;

23  could you bill for it?

24  **A**   Yes, most of the time unless the person's Medicaid went

25  out.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

26

1  Q    And with respect to the treatment plan, how long would it

2  take you to do it?

3  A    Probably about 30 minutes.

4  Q    What about updating a treatment plan?  How long would it

5  take?

6  A    Are you talking about the master treatment plan or the

7  treatment plan with --

8  Q    The master treatment plan.

9  A    The master treatment plan normally probably would take

10  maybe about 45 minutes.  The treatment plan review probably

11  would take maybe about thirty minutes.

12  Q    So approximately how many days out of the week would you

13  have to do paperwork in the evenings?

14  A    Probably at least four or five.

15  Q    And would the time -- how long would it take you in the

16  evenings to do the paperwork?

17  A    It could take anywhere from maybe about an hour and a

18  half.

19  Q    Outside of time when school was in session -- let's switch

20  to that for just a moment.  What would your schedule be like

21  then?

22  A    Outside of like when school was out, maybe about 9:00 to

23  5:00.

24  Q    Five days a week?

25  A    Yes, sir.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

27

1   Q    Since school was not in session, where would you do

2   therapy?

3   A    Normally at their house.

4   Q    And again, did you try -- in setting up therapy, try to

5   set them where folks were -- if folks lived close -- if one

6   client lived close to another client, you would try to

7   coordinate it so it would -- you wouldn't have to drive as

8   much, I assume?

9   A    Yes, sir.

10  Q    And could you -- was it such that you could check and

11  again say on Tuesdays I'm going to be in the area around Wilson

12  and try to see the folks that I have down around there?

13  A    Most of the time it depends on the schedules.

14  Q    Okay.  But you'd try to minimize the travel between

15  cities, I would think?

16  A    Yes, sir.

17  Q    Okay.  Did you do any of your therapy at the office?

18  A    If they were an insurance client.

19  Q    And you-all's office was in Osceola?

20  A    Yes, sir.

21  Q    Did you have an office in Blytheville for a period of

22  time?

23  A    It wasn't particularly my office, but you know, I have

24  seen people in Blytheville.

25  Q    Okay.  So you could use that, too?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

28

1   **A**    Yes.

2   Q    And was Blytheville -- seeing people in Blytheville in the

3   office the same kind of thing, typically folks with private

4   insurance?

5   **A**    Yes, sir.

6   Q    Do you have a breakdown as -- between Blytheville,

7   Osceola, and Rivercrest as to what the percentages of clients

8   you had kind of connected to each of those areas?

9   **A**    The majority were in Osceola.  I probably would say -- I

10  probably would say maybe at least 60 percent, then maybe 20 in

11  Blytheville and 20 in Rivercrest.

12  Q    Okay.  So again, when school was out and you were seeing

13  folks, when would you do your notes?

14  **A**    Normally in the evening time.  I did most of my driving

15  and seeing people in the day.

16  Q    Were you one that, as you were seeing people or as you

17  were maybe stopped -- I know you weren't doing it while you

18  were driving, but would you write out, you know, maybe start

19  someone's note or anything like that?

20  **A**    I wasn't able to.  I didn't have access to internet.

21  Q    And so when school was not in session and you would do it

22  in the evenings, was it roughly the same amount of time?

23  **A**    Yes, sir.

24  Q    Same number of days a week in terms of doing paperwork?

25  **A**    Yes, sir.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

29

1   Q     What about breaks?  Did you have any breaks either with
2   school or when kids weren't in school?
3   A     Normally I'd try to take maybe like a 30-minute lunch.
4   Q     Were you able to do that most days?
5   A     Probably most days, yeah.
6   Q     And during lunch, would you like either bring something
7   for lunch or what would you do on that?
8   A     Most of the time I'd bring something.
9   Q     And you'd just take some time and just kind of give
10  yourself kind of a full break; is that right?
11  A     I mean I'd sit down and eat.
12  Q     Okay.  All right.  Would you try to do work during your
13  lunchtime?
14  A     I mean I might would look over documents.
15  Q     So did you have like paper documents with you?
16  A     Yes, sir.
17  Q     How often would you do that?
18  A     Maybe about three days a week.
19  Q     And would your lunch schedule -- or would your taking
20  lunch be about the same when school was not in session?
21  A     To my -- would it be at the same time or --
22  Q     Well, no, not exactly at the same time.  I thought there
23  might be some difference there.  But would you still take lunch
24  when school was not --
25  A     Yes.

Paul Bailey

30

1   Q      -- in session?

2   **A**    Yeah, I would.

3   Q      What was -- did the billable hour change any during the

4   time that you were at Life Strategies?

5   **A**    When I was an LAC it was 52.  When I was an LPC it was 55.

6   Q      And I guess the rate -- okay.  So when you're an LAC means

7   licensed associate counselor, right?

8   **A**    Yes, sir.

9   Q      So when you were in that associate role it was 52 per

10  billable hour, right?

11  **A**    Yes, sir.

12  Q      And when you were an LPC or licensed professional

13  counselor, it was 55?

14  **A**    Yes, sir.

15  Q      Did the rates vary any between your Mississippi County

16  work and your Crittenden County work?

17  **A**    No, sir.

18  Q      During the time that you were at Life Strategies, did the

19  way that your pay was calculated -- did it change any as far as

20  you know?

21  **A**    Not --

22  Q      I mean I know the rate changed, but --

23  **A**    Not that I'm aware of.

24  Q      And did -- while there may have been some small changes in

25  how you had to go about doing things for something to be

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

31

1    billable, was it generally the same type of thing that you

2    billed in units and you got paid based upon the number of units

3    that were billed?

4    **A**    Yes, sir.

5    Q    And we haven't talked about group very much, but as I

6    understand it the way that you were paid was different for

7    group than it was for individual or family therapy, correct?

8    **A**    Yes, sir.

9    Q    Let's talk about group for just a second.  How was that

10   done?  How did it -- how was it determined what you'd get paid

11   for group therapy?

12   **A**    You get paid so much per unit, per the amount of kids that

13   was in the group.   I can't remember exactly.  It might have

14   been something like $5.00 per unit, so -- or it might have been

15   something less than that.  So like if you had ten kids in a

16   group at $5.00 per unit, you could get paid maybe like $50.00

17   per whatever, per unit.  And every unit was like 15 minutes.

18   Q    Right.  How many groups would you typically have during a

19   week?

20   **A**    Not normally --

21   Q    And let me back up and say, in 2019 and 2020.  Let's not

22   talk about the other time before then.  But what would be the

23   kind of frequency that you would have group in those years?

24   **A**    Normally it would just be during the summertime.  We would

25   do group mostly during the summertime.  We didn't have group

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

32

1    that much during the school year.

2    Q    And during the summertime when you had group, how many

3    groups might you have -- would you have in a week typically?

4    A    I think we had them daily or maybe -- I would say maybe

5    four days a week.  I don t know if we did it on Friday.

6    Q    And was your group size -- did it -- would you try to get

7    it up to ten if you could?

8    A    It never really normally got to ten.  You might have had

9    maybe five to maybe seven.

10   Q    Five to seven would kind of be typical; is that --

11   A    Yes, sir.

12   Q    Okay.  And you said, I think, but I want to make sure that

13   I got it clear.  That $5.00 -- you got $5.00 per every 15

14   minutes per child, so the more children there were in the group

15   the more you got paid per unit, right?

16   A    Yes, sir.

17   Q    Okay.  All right.

18            MR. MAYFIELD:  We haven't been going quite an

19        hour, but let's stop and take a little bit of a break

20        here, okay?

21            (WHEREUPON, after a break was taken, the

22        proceedings were resumed as follows, to-wit:)

23   Q    (By Mr. Mayfield)  Mr. Bailey, did Life Strategies --

24   well, let me back up and ask it this way.  Did you have to

25   schedule your own appointments with clients?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

33

1  **A**    Yes, sir.

2  Q    And since a lot of this was school based, could you do

3  that with the school, or did you have to get in touch with the

4  students to get that done?

5  **A**    Normally I would walk into the front office and ask for

6  the secretary to pull the student out of class.

7  Q    So you could kind of keep up with that and do that, that

8  way.  You talked about -- what tasks did it take to complete an

9  hour of individual therapy?

10  **A**    What tasks?

11  Q    Yes, sir.

12  **A**    What do you mean?

13  Q    Well, what did you have to do to get that billable hour

14  done?  We talked about one thing, which is scheduling, but I'm

15  just trying to, you know, kind of from the start -- I've got

16  one hour with this one student.  What things would you have to

17  do relative to that student, if that person was already an

18  existing client?

19  **A**    Normally you would just go in.  You would look at the

20  master treatment plan.  You would look at the objective and you

21  know, talk about something maybe within that objective.  So

22  like if it was maybe some coping skills, maybe come up with

23  some different coping skills that they could use.  Or maybe if

24  it was dealing with anxiety, trying to work on some cognitive

25  behavioral therapy in order to maybe try to change, you know,

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

34

1    their negative thought process to a more positive thought

2    process.  So it kind of depended on, you know, what the client

3    came into therapy for.

4    Q    You had to use your training to be able to do that?

5    A    Yes, sir.

6    Q    Did you consider that role to be one that was professional

7    in nature?

8    A    Yes, sir.

9    Q    Indeed, the designation bears the word professional,

10   doesn't it?

11   A    Yes, sir.

12   Q    And I'm assuming no two students were exactly the same?

13   A    Yes, sir.

14   Q    And so -- and you would use the treatment plan -- are you

15   saying you would be using that during the session?

16   A    Yes, sir.  I'd be using the treatment plan in order to try

17   to work on achieving certain goals and objectives.

18   Q    So before you would look at the treatment plan -- well,

19   strike that.  So okay, you've gotten to the end of your session

20   with the patient.  Are you in a position now where that can be

21   submitted to whoever the payer is and billed?

22   A    No, because I would have to get into the system which is,

23   you know, electronic, and at the school we didn't have access

24   to the internet.

25   Q    All right.  So you would have to do the note work that you

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

35

1    were talking about earlier?

2    **A**    Yes, sir.

3    Q    Anything else that you would have to do to be able to bill

4    for an hour of therapy?

5    **A**    Sometimes like maybe if a kid didn't have prior

6    authorization, we might would have to call the family in order

7    to get them to go to the doctor in order to get that so that we

8    could bill on the kid.

9    Q    Anything else that you would have to do?

10   **A**    Kind of like how you said earlier, treatment plan

11   reviews -- well, I mean but they were billable.

12   Q    Okay.  Did anyone at Life Strategies tell you that they

13   knew you were -- well, first of all, did anybody at Life

14   Strategies -- did you tell anybody that you were able to do

15   your notes at night?

16   **A**    Did they tell you you were able to do --

17   Q    Did you have to tell anybody that you were doing your

18   notes at night?

19   **A**    No, sir.

20   Q    Did anyone in management ever ask you about when you were

21   doing your notes?

22   **A**    I'm not aware.  I don't recall.

23   Q    Did anyone at Life Strategies tell you or send something

24   to you that said, you're going to get paid for working in the

25   evening doing the notes?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

36

1    **A**    Not that I recall.

2    Q    Okay.  What you were paid by Life Strategies and what you

3    understood you would be paid was based on the billable hours,

4    correct?

5    **A**    Yes, sir.

6    Q    Have you attempted to estimate how much you believe Life

7    Strategies owes you in wages?

8    **A**    No, sir.  I leave that up to the lawyer.

9    Q    Okay.  Are you -- and I haven't asked this specifically,

10   but are you seeking overtime pay?  Is that what you're seeking?

11   **A**    I'm seeking just whatever, I guess, the law firm feels is

12   just.

13   Q    But you don't have an idea whether that's $100, $1,000,

14   $10,000, $100,000, right?

15   **A**    No, sir.

16   Q    Do you know any of the other persons that are parties to

17   the case or have opted in?

18   **A**    No, sir.

19   Q    Have you talked to anybody else that is a part of the

20   lawsuit?

21   **A**    No, sir.

22   Q    Let's look -- Exhibits 52 -- let's start with 52.  This is

23   some information concerning payroll and the direct deposits

24   that were done for you.  I see here on this that the address is

25   listed as being in Gurdon.  That -- was that an address you had

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

37

```
1    sometime when you were in Arkadelphia?

2    A    Yes.  That's my mom's address.

3    Q    Okay.  So that was your mailing address?

4    A    Yes, sir.

5    Q    Okay.  Okay.  Well, that makes sense, then.  I'll tell you

6    something about Gurdon after we're off the record.  So in any

7    event, how would you get -- in 2019, 2020, how would you get

8    information on what you had been paid or how much you had

9    earned?

10   A    I think they would send out like -- every pay period they

11   would send out something showing how many billable hours you

12   had.

13   Q    So was that something that came with your paycheck, or was

14   it separate?

15   A    It was separate.

16   Q    Was it like an e-mail?

17   A    Yeah, it was an e-mail that showed how many billable hours

18   you had, like if for some reason you weren't able to get paid

19   for billing someone.

20   Q    Okay.  So kind of almost like an exception report or

21   something like that?

22   A    Yeah.

23   Q    Okay.  And so that was how you knew how many hours you had

24   billed, right?

25   A    Yes, sir.
```

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

38

1   Q    Okay.  And did you -- how did you get the information on

2   what your pay was?

3   A    I think it was a system that we could log into.

4   Q    Were you one that you just kept on going and didn't really

5   look at that very often, if at all, or were you one that looked

6   at it every time?

7   A    I looked at it occasionally.

8   Q    Okay.  Just not all the time?

9   A    No, sir.

10  Q    Did you ever have any instance where you looked at

11  it -- and by the way, what information do you recall as being

12  in there?

13  A    I just recall maybe like the -- maybe the client name, how

14  many units you billed on them.

15  Q    Back up just a second.  For your like pay stub or

16  something like that, would it have the client information?

17  A    No.

18  Q    Okay.  All right.  That's what I wanted to get to is for

19  that pay information would it have things like gross pay?

20  A    Yes, sir.

21  Q    Have your net pay?

22  A    Yes, sir.

23  Q    Would it have your deductions?

24  A    Yes, sir.

25  Q    Did it list the number of regular billable hours you had?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

1   **A**    Yes, sir.

2   Q    Okay.  What about the staffing hours you might have had,

3   if any?

4   **A**    I think it -- well, with some staffing I think it did.

5   Not all staffing.

6   Q    What about training?

7   **A**    Maybe.  I think so.

8   Q    Okay.  You said that some staffing was on there and some

9   wasn't.  What do you mean by that?

10   **A**    Like if we went to a regular staffing that was like Life

11   Strategies staffing, we would get paid.  But maybe if we went

12   to -- had to go to the probation office for maybe like a

13   monthly staffing, I don't think we got paid for --

14   Q    Oh, okay.

15   **A**    -- seeing the probation office.

16   Q    Okay.  All right.  Did you get paid time off?

17   **A**    Yes, sir.

18   Q    You didn't use it very often, did you?

19   **A**    Used it sometimes.

20   Q    Some, but -- okay.  Let's just take a look here and we'll

21   just look at this -- actually, we'll move the photo, too.  If

22   you'll turn -- there's pages that have numbers on the bottom of

23   them.  If you'll look at 428.  And by the way, were you full

24   time or part time?

25   **A**    Full time.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

40

1   Q    Okay.  And do you know what it had to be, to be full time?

2   A    I think you had to be a little over maybe like 20 hours a

3   week.

4   Q    Okay.  And so on this -- I'm looking at the -- looks like

5   the pay period September 5th through the 18th of 2019 is what

6   we're looking at here on page 428 of Exhibit 52.  And so it

7   looks like a two-week period, doesn't it?

8   A    Yes, sir.

9   Q    And so during that two-week period, you had 49 1/2 regular

10  hours, correct?

11  A    Yes, sir.

12  Q    And then another hour of staffing, it looks like.

13  A    Yes, sir.

14  Q    Do you see that?  And then the staffing, do you see where

15  on the staffing the rate is different than the regular rate,

16  the regular billed time rate?

17  A    Yes, sir.

18  Q    Okay.  Let's turn to Exhibit 23.  Looks like you-all have

19  changed payroll providers or Life Strategies changed payroll

20  providers, so this is from 53 -- the record is from a different

21  company.  And if you will, turn to -- we'll just pick one.

22  We'll do 441 of Exhibit 53.  And that one has 48 1/2 regular

23  hours, but as I look there, it looks like that's 216 to 219,

24  which, yeah, lo and behold, that's two hours, but I think you-

25  all were paid semi-monthly at that point.  If you want to look

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

41

1    at the next page, you can see March is March 1 through March

2    15.  Do you see that on there?

3    A    Yes, sir.

4    Q    Okay.  So if that's what that represented, do you have any

5    argument that it changed at some point to semi-monthly --

6    A    No.

7    Q    -- get paid -- okay.

8    A    No, sir.

9    Q    Two times a month is what I meant.  That's -- sometimes

10   people have trouble with that.  So in this page 441 of Exhibit

11   53, it looks like the regular hours were 48 1/2 and then the

12   training hours were -- it says train.  I don t know if that's

13   training or staffing, but there were four of those.  Do you see

14   that on there?

15   A    Yes, sir.

16   Q    Okay.  All right.  Did you, in '19 or '20, have any

17   instance -- well, let me strike that.  Did you have any

18   instances while you were employed that you looked at your pay

19   stub or you looked at this exception report and you thought, I

20   didn't get paid for the right number of hours billed?

21   A    Yes, sir.

22   Q    Okay.  How did you take care of that?

23   A    Sometimes you would e-mail somebody in billing, and like

24   maybe you would see somebody, and you didn't know their

25   Medicaid was out, so -- and you'd e-mail them and you know,

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

42

1   they would say, they're Medicaid.  That was the reason maybe

2   why you didn't get paid for, you know, those hours.

3   Q    Okay.  Were the folks that you dealt with at Life

4   Strategies, were they responsive when you asked those

5   questions?

6   **A**    Yeah, they would respond.

7   Q    Did you have any instance where you looked at your

8   paycheck and you thought your paycheck was wrong?

9   **A**    Yes, sir.

10  Q    And how many times do you think -- did that happen any in

11  2019 or 2020?

12  **A**    I don't recall.  I mean I think it happened.  I can't

13  recall if it happened in those years.

14  Q    That time?  What did you do -- how many times do you think

15  that happened in the six or seven years you were there?

16  **A**    I mean I would say maybe four, five.

17  Q    Okay.

18  **A**    It's kind of hard to --

19  Q    And in those instances, would you do the same kind of

20  thing, check in and see what the issue was?

21  **A**    Yeah, normally I would just -- if I had a question, I'd

22  e-mail them and just ask them, you know, whatever the question

23  was that I had at the time.

24  Q    Okay.  And typically you would be able to -- it's

25  something you would get worked out, right?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

43

1   **A**   I ain't going to say get worked out, but --

2   Q   Well, you know what I mean.  Well, what would you say?

3   **A**   I mean they would tell you why they didn't pay you.

4   Q   Okay.  All right.

5   **A**   Yeah.

6   Q   But if they had something where they thought that you

7   hadn't been paid and you were supposed to be, did you ever have

8   any instance like that?

9   **A**   I can't recall.

10   Q   Okay.  Did you ever complain to anyone that you weren't

11   getting paid for some of the time that you were working?

12   **A**   Maybe staff.  Not administration.

13   Q   Okay.  Ever make any claims to anyone in administration

14   that you should be getting overtime?

15   **A**   Not administration, no.

16   Q   How did you find out about this lawsuit?

17   **A**   I think they sent something to the address on file.

18   Q   Do you have an idea of what percentage of your patients

19   were -- or your clients were Medicaid versus private pay?

20   **A**   The majority of them were Medicaid.

21   Q   When you say the majority, are you saying just over 50

22   percent or are you saying 75 percent?

23   **A**   I would probably say 80 percent on Medicaid.

24   Q   Okay.  Do you know who the persons were that you dealt

25   with in administration on any of the billing issues?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

44

1   **A**    I can't recall their names.

2   Q    Do you know who you dealt with in administration on any

3   payroll issues if you had any?

4   **A**    I can't recall their names.

5   Q    Did you ever talk to Nellie Caldwell about your pay?

6   **A**    I don't think I -- I mean I might have talked to her about

7   billing but I don't think I talked to her about my pay.

8   Q    Did you ever talk to Dawn Mitchell about your pay?

9   **A**    No, sir.

10   Q    Did you ever talk to Dr. Walters about your pay?

11   **A**    No, sir.

12   Q    Ever talk to Kendra Fite about your pay?

13   **A**    Maybe about billing or something like that.  I don t

14   remember talking about pay.

15   Q    Ever talk to Shanna Ayers about your pay?

16   **A**    Not that I recall.

17   Q    Ever talk to Diane Yancey about your pay?

18   **A**    Not that I recall.

19   Q    Did you file a tax return for 2019?

20   **A**    Yes, sir.

21   Q    Did you file a tax return for 2020?

22   **A**    Yes, sir.

23   Q    Do you have those returns?

24   **A**    I don t know if I have a saved copy of them.

25   Q    Okay.  What about your W2s?  Do you know where they are?

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

45

1   **A**   They might be at my mom's house.  I can check and see.

2   Q   Okay.  I would ask you to look and see if you have those,

3   and if you have them, then get those for those two years, '19

4   and '20, to your attorneys, and they'll determine whether I'm

5   entitled to get them.  We've talked about some of the different

6   aspects of scheduling and reviewing material and entering notes

7   and that type of thing, and some we've talked about in

8   different pieces.  But for individual, family, and group

9   therapy, were kind of the steps in the process roughly the

10  same?

11  **A**   Yes, sir.

12  Q   And except for the differences in what it might take you,

13  say, for entering notes, you told us a group might take a

14  little bit more than an individual therapy note.  For the times

15  for individual, family, and group therapy, the time it took you

16  to do the different aspects of the job, were they roughly the

17  same?

18  **A**   Individual and family.  Group took a little bit longer.

19  Q   Okay.  And I was talking about not just notes but also the

20  stuff you might do before you sat down with a client.

21  **A**   Oh, group a little bit longer because I had to prep for

22  it.

23  Q   Okay.  How long would that prep take?

24  **A**   It could take maybe 20, 30 minutes.  You have to try to

25  find material to try to do group on.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

46

1    Q    And as I've understood it, that 20 or 30 minutes was not

2    something that you could bill; is that correct?

3    A    Yes, sir.

4    Q    Let me ask this.  I asked that as a negative.  You could

5    bill for the group session?

6    A    Yes.  But you couldn't bill for the prep time.

7    Q    Okay.  Thank you for making that clearer and making sure I

8    didn't make a mess of that.  Do you have any other professional

9    licenses other than your LPC?

10   A    No, sir.

11   Q    I asked you about talking with people about your pay.  It

12   sounds like if you had any -- did you have any instance where

13   you sent someone an e-mail or a text  message or some other

14   kind of electronic message about overtime, someone in

15   administration?

16   A    No, I don't think so.

17   Q    What about the amount of pay you received, make any

18   e-mails that -- other than maybe where there was an exception

19   or something like that, you e-mailed about the billing?

20   A    No, sir.

21   Q    Have I been polite and courteous to you today?

22   A    Yes, sir.

23   Q    All right.

24              MR. MAYFIELD:  That's all the questions I have.

25          Thank you, sir.

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

47

1             THE WITNESS:  All right.  Thank you.

2             MR. QUALLS:  No questions from me.

3

4             (WHEREUPON, the proceedings were concluded in

5        the matter at 12:21 p.m. on March 22, 2023.)

6                  (WITNESS EXCUSED)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

48

```
 1                    C E R T I F I C A T E
 2   STATE OF ARKANSAS    )
 3                        )ss
 4   COUNTY OF SHARP      )
 5
 6       I, Melanie Heath, Certified Court Reporter #870 and Notary
 7   Public, do hereby certify that the facts stated by me in the
 8   caption on the foregoing proceedings are true; and that the
 9   foregoing proceedings were reported verbatim through the use of
10   the voice-writing method and thereafter transcribed by me or
11   under my direct supervision to the best of my ability, taken at
12   the time and place set out on the caption hereto.
13
14       I FURTHER CERTIFY, that I am not a relative or employee of
15   any attorney or employed by the parties hereto, nor financially
16   interested or otherwise, in the outcome of this action, and
17   that I have no contract with the parties, attorneys, or persons
18   with an interest in the action that affects or has a
19   substantial tendency to affect impartiality, that requires me
20   to relinquish control of an original deposition transcript or
21   copies of the transcript before it is certified and delivered
22   to the custodial attorney, or that requires me to provide any
23   service not made available to all parties to the action.
24
25
```

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

49

1          WITNESS MY HAND AND SEAL this 5th day of April, 2023.

2

3

4

5                    MELANIE HEATH, CCR

6

7                    Certified Court Reporter #870

8

9                    My Notary Expires:  11-18-32

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

25                 www.conwaycourtreporting.com

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

50

```
                         ERRATA SHEET
     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:

     Page        Line        Change:

                             To:

                             Reason:
```

_____   _____ Page _____ of _____
          WITNESS                          DATE

     * PAUL BAILEY III *

35f1cf2a-a3a5-4636-ae31-c2851c1540b3

Paul Bailey

51

SIGNATURE PAGE

I, PAUL BAILEY III, do hereby certify that I have read the foregoing 47 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 22nd day of March, 2023, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief.  Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.

_____                    _____

              DATE                                           WITNESS


****************************************************************

STATE OF _____ )

COUNTY OF  _____ )

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the _____ day of _____, 2023.


                                       _____

                                                      NOTARY PUBLIC

MY COMMISSION EXPIRES:


_____

35f1cf2a-a3a5-4636-ae31-c2851c1540b3