Transcript of the Testimony of
**Shelby Barnhill**

**Date:** March 21, 2023
**Case:** Wihebrink v. Life Strategies Counseling



Conway Court Reporting
Phone: 501-319-4807
Email: scheduling@conwaycourtreporting.com
Internet: www.conwaycourtreporting.com

Shelby Barnhill

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


STACY WIHEBRINK, Individually and on

Behalf of All Others Similarly Situated          PLAINTIFF


VS.                    NO. 4:21-CV-573-DPM


LIFE STRATEGIES COUNSELING, INC.          DEFENDANT


ORAL DEPOSITION

OF

SHELBY BARNHILL

TAKEN MARCH 21, 2023, AT 1:14 P.M.


Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas  72206


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

```
                    A P P E A R A N C E S


    ON BEHALF OF THE PLAINTIFF:


    MR. COLBY QUALLS

    SANFORD LAW FIRM, PLLC

    10800 FINANCIAL CENTRE PARKWAY, SUITE 510

    LITTLE ROCK, ARKANSAS 72211

    colby@sanfordlawfirm.com


    ON BEHALF OF THE DEFENDANT:


    MR. MARK MAYFIELD

    WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.

    P.O. BOX 3077

    JONESBORO, ARKANSAS 72403

    mmayfield@wpmfirm.com
```

Shelby Barnhill

I N D E X

STYLE AND NUMBER  . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE  . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  SHELBY BARNHILL

      Examination by Mr. Mayfield  . . . . . . . . . . . . . 5

      Deposition Concluded   . . . . . . . . . . . . . . . 57

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . . 58

ERRATA SHEET

SIGNATURE PAGE

(NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

www.conwaycourtreporting.com

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF SHELBY BARNHILL, a witness produced at the request of the Defendant, taken in the above-styled and numbered cause on the 21st day of March, 2023, at 1:14 p.m., at the law offices of Sanford Law Firm, 10800 Financial Centre Parkway, Suite 510, Little Rock, Arkansas, pursuant to the Federal Rules of Civil Procedure.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

1                    P R O C E E D I N G S

2        THEREUPON,

3                        SHELBY BARNHILL,

4              THE WITNESS HEREINBEFORE NAMED, having

5              been first duly cautioned and sworn by me

6              to testify to the truth, the whole truth,

7              and nothing but the truth, testified on her

8              oath as follows, to-wit:

9                        EXAMINATION

10   BY MR. MAYFIELD:

11   Q    All right, please state your name for the record, ma'am.

12   **A**    Shelby Kay Barnhill.

13   Q    And is that K-A-Y?

14   **A**    K-A-Y, yes.

15   Q    Okay.  Ms. Barnhill, my name is Mark Mayfield.  I

16   introduced myself before we went on the record today.  I

17   represent Life Strategies Counseling, Inc. in a lawsuit that

18   has been filed by Stacy Wihebrink, and you opted in to that

19   case.  And so a couple of ground rules we'll go over

20   beforehand, it's my intention -- or my questions are designed

21   to get information from you.  And so I'm going to be relying on

22   the answers that you give me.

23        If I ask you something that confuses you in some way, then

24   please let me know that.  We'll try to get that corrected.  I

25   would ask you to wait until I finish my question to respond.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

6

1   That way she's not trying to figure out -- and the recording is

2   not trying to figure out who said what when.  Because it gets

3   pretty difficult to do that.  When you give answers, make sure

4   they're verbal.  Head nods and huh-uhs and uh-huhs don't read

5   very well.

6        We can take -- we'll take a break intermittently.  I don't

7   think we'll be here a super long time.  But if at some point in

8   addition to whatever break we take you need a break, just let

9   me know.  I may want to finish a line of questioning or a

10   thought in part so I don't forget it.  But we'll try to

11   accommodate you in that way.  And it's not my intention with

12   anything I'm asking you today -- I don't think I'll ask you

13   anything that might embarrass you, but it's not my intention to

14   do so.

15                  MR. MAYFIELD:  One other bit of housekeeping,

16            Mr. Qualls.  We had an agreement with Ms. Wihebrink

17            about relatives.  If it came up to be a jury matter,

18            can we do the same thing with Ms. Barnhill?

19                  MR. QUALLS:  Yes, we can.

20                  MR. MAYFIELD:  All right.

21   Q   (Mr. Mayfield continuing)  Have you ever given a

22   deposition before?

23   A    No, sir.

24   Q    Where do you live?

25   A    Maumelle, Arkansas.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

7

1    Q    And what is your address?

2    **A**    103 Zurie Circle, Maumelle, Arkansas 72113.

3    Q    And you might spell Zurie for us.

4    **A**    Z, as in zebra, U-R-I-E.

5    Q    You ever go by any other name other than Shelby Kay

6    Barnhill?

7    **A**    Yes.  Shelby Kay Durbin.  That's D as in dog, U-R, B as in

8    boy, I-N, as in nickel.

9    Q    Have you done anything -- other than talking with the

10   attorneys, have you done anything to prepare for this

11   deposition?

12   **A**    No, sir.

13   Q    Not looked at any documents or anything of that nature?

14   **A**    No, sir.

15   Q    You would have, within the context of your employment,

16   given your date of birth to Life Strategies in employment

17   documents.  I'm not going to ask you to state your date of

18   birth on the record, but I'm just going to ask you if the date

19   of birth that you gave to Life Strategies was your correct of

20   birth?

21   **A**    Yes, sir.

22   Q    Same thing to the extent you may have given them your

23   social security number?

24   **A**    Yes, sir.

25   Q    Where did you grow up?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

8

1   **A**   Benton, Arkansas.

2   Q    Did you go to school in Benton?

3   **A**   No, sir.  I went to Bauxite High School.

4   Q    What year did you graduate?

5   **A**   2012.

6   Q    What is your marital status?

7   **A**   Married.

8   Q    I assume Durbin is your -- was your name before you were

9   married; right?

10  **A**   Yes, sir.

11  Q    How long have you been married?

12  **A**   This November it will be four years.  So technically three

13  and a half.

14  Q    What's your husband's name?

15  **A**   Jerrod, J-E-R-R-O-D.

16  Q    And what does Jerrod do for a living?

17  **A**   He is a football coach at Pulaski Academy.

18  Q    Have you been married on any other occasion?

19  **A**   No, sir.

20  Q    Are you under the influence of any medication or other

21  substance that would affect her ability to give a true and

22  accurate deposition today?

23  **A**   No, sir.

24  Q    Do you have anything going on in your life that would

25  affect your ability to give a true and accurate deposition

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

9

1    today?

2    **A**    No, sir.

3    Q    I'm going to ask this question, don't mean anything by it.

4    Have you ever been convicted of a felony or a crime involving

5    dishonesty or false statement?

6    **A**    No, sir.

7    Q    Have you ever been involved in any other lawsuit other

8    than this one?

9    **A**    No, sir.

10   Q    During the time that you worked -- and by the way, I'm

11   going to refer to it as Life Strategies instead of saying Life

12   Strategies Counseling, Inc. every time, because that's just

13   going to clog up the record.  If I refer to Life Strategies,

14   can we agree that it's Life Strategies Counseling, Inc.?

15   **A**    Yes, sir.

16   Q    Okay.  You didn't work for the other Life Strategies at

17   any point in time, did you?

18   **A**    No, sir.

19   Q    Okay.  There's another one up in -- actually not too far

20   from Jonesboro, so that's why I wanted to ask.  During the time

21   that you worked for Life Strategies, did you use any social

22   media?

23   **A**    Yes, sir.

24   Q    What social media?

25   **A**    Instagram, Facebook, Snapchat.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

10

1   Q    Okay, your name on Instagram?

2   **A**    Mrs., M-R-S, SKBarnhill.

3   Q    What's your Facebook profile under?

4   **A**    Shelby Kay Barnhill.

5   Q    What about Snapchat, if you remember?

6   **A**    I don't have it anymore, but is, I believe,

7   ShelbyK_Durbin.

8   Q    Is that K-A-Y or --

9   **A**    Just K.

10  Q    Just K.

11  **A**    Yes, sir.

12  Q    And going back to your Facebook profile, was that Kay --

13  was that just K?

14  **A**    K-A-Y.

15  Q    Okay.  Did you use any of these forms of social media to

16  communicate with any of your coworkers at Life Strategies?

17  **A**    In regards to?

18  Q    In regards to your work.

19  **A**    No.

20  Q    What about in regards to your wages?

21  **A**    No.

22  Q    What about in regard to the terms or conditions of

23  employment?

24  **A**    No.

25  Q    All right.  Well, let's -- if you will, there's a notebook

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

11

1    there in front of you.  And I'll direct you to a couple parts.

2    And a lot of this doesn't concern you, but there are some

3    parts.  We'll go through this and kind of make sure.  It's an

4    open book kind of test.  If you will, turn to the tab that is

5    Number 21.  So if you'll grab 21 and pull that -- just pull it

6    open there.  Okay.  Do you recognize that document?

7    **A**    Yes, sir.

8    Q    Okay, and what is it?

9    **A**    My resume.

10   Q    Do you know when this resume would have been completed or

11   provided to Life Strategies?

12   **A**    It would have been in September.  I'm not quite sure of

13   the year.

14   Q    Okay.  I'm assuming it was provided in conjunction with

15   you applying for employment there; is that correct?

16   **A**    Yes, sir.

17   Q    Okay.  Let's -- we're just going to go through some things

18   in here.  I'll ask for a couple more details, but I figure it's

19   easier to do it as an open book test.  So bachelors in social

20   work from UALR?

21   **A**    Yes, sir.

22   Q    Masters in social work from UALR?

23   **A**    Yes, sir.

24   Q    And then I didn't see any other educational background;

25   right?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

12

1   **A**    That's correct.

2   Q    Okay.  And so let's talk a little bit about your license,

3   license for master of social work.  This award date, is there

4   -- is that when you first applied to get your license or --

5   **A**    That is the date of graduation.

6   Q    Okay.  And so is there any kind of associate or apprentice

7   point to social work before you become an LMSW?

8   **A**    No, sir.

9   Q    Okay.

10   **A**    The process is you go and take a licensed masters test,

11   and that is -- once you pass your exam, then at that point you

12   are awarded your license masters of social work licensure.

13   Q    Okay.  And I noticed too that the address on this -- on

14   Exhibit 21 is also the address you gave earlier.  How long have

15   y'all lived at that address?

16   **A**    Since 2018.

17   Q    Okay.  Where did you live before that?

18   **A**    I lived in Bryant.

19   Q    During the time that you were a younger adult, we'll say

20   it that way, did you live in Saline County?

21   **A**    Yes, sir.

22   Q    All right.  So I just want to look here for just a little

23   bit.  We have in work experience Wade Knox Child Advocacy

24   Center.  That would have been I guess before you got your

25   license; correct?  So you --

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

13

1   **A**   Yes, sir.

2   Q   -- weren't doing social work at that point?

3   **A**   No.

4   Q   And then The Pointe was just an internship; correct?

5   **A**   Yes, sir.

6   Q   And so then I guess if I'm reading this correctly, your

7   first job after as a -- after you had your license, it would

8   have been while you were at Saline Memorial; is that right?

9   **A**   Yes, sir.

10   Q   Did that -- having that licensure change your duties at

11   Saline Memorial?

12   **A**   No, sir.

13   Q   And at Saline Memorial, were you salaried, hourly?

14   **A**   Salary.

15   Q   And so why did you leave the job at Saline Memorial?

16   **A**   To seek additional employment.

17   Q   So did you quit?

18   **A**   I did.

19   Q   Okay.  And you went to work at UAMS.  What did you do at

20   UAMS?

21   **A**   I was a school-based mental health provider.

22   Q   And looks like you were there for about 19 months; is that

23   right?

24   **A**   Yes, sir.

25   Q   And so do the descriptions for Saline Memorial and UAMS

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

14

1   STRIVE Program, do they accurately describe what your job role

2   was?

3   **A**     Yes, sir.

4   Q     Okay.  At UAMS, were you hourly or salary?

5   **A**     Salary.

6   Q     Did you have to do any billing --

7   **A**     Yes.

8   Q     -- when you were at UAMS?  Would that include Medicaid?

9   **A**     Yes.

10   Q     And why did you leave the UAMS STRIVE Program?

11   **A**     I was terminated.

12   Q     Okay.  Why were you terminated?

13   **A**     I was terminated due to a disagreement between myself and

14   a parent.

15   Q     Okay.  And I'll tell you -- I'll start this off just to

16   make sure this part of it is clear.  It is not my intention,

17   whether it be with Life Strategies or someone else, to try to

18   draw out of you the names of parents or clients, whether they

19   be minors or they be adults.  And let me -- and so if I ask you

20   a question that you think calls for that, let me know that.

21   And we'll try to figure out a way around it.

22       If for some reason you inadvertently or if for some reason

23   we need to know the name, then we do have protections in place

24   and precautions that we can take that would protect

25   confidentiality and also protect health information.  So I just

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

15

1    feel like it's fair to know that on the front end, and that way

2    you're not as self-conscious.  And that way you know what I'm

3    trying to get at when I may ask something that may -- where we

4    may either misunderstand one another or you may think that's

5    pertinent information.  So who was your supervisor at UAMS?

6    **A**    I had three.

7    Q    Okay, who was the last one?

8    **A**    Jobeth Casados.

9    Q    How do you spell Casados?

10   **A**    C-A-S-A-D-O-S.

11   Q    Do you know when you began at Life Strategies?

12   **A**    Not the exact date.  I do know it was the month of

13   October.

14   Q    Did you disclose to Life Strategies that you had been

15   terminated at UAMS?

16   **A**    Yes.

17   Q    Who did you disclose that to?

18   **A**    Luke Sandlin who was the supervisor of the Little Rock

19   location.

20   Q    Okay.  I'll have you turn over the page to Exhibit 22 and

21   ask you if you recognize that document.

22   **A**    Yes.

23   Q    Okay.  On the second page of Exhibit 22, there is a

24   signature.  Can you tell us whether that's your signature?

25   **A**    Yes, it is.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

16

1   Q    That document bears a date of October 13th, 2020.

2   **A**    Yes, sir.

3   Q    And I believe we'll look at some other documents that I

4   think bear that same date.  We'll go through those in a minute,

5   but let me represent to you that October 13th date is what's

6   listed in the other documents.  Might that have been when you

7   began your employment or training with Life Strategies?

8   **A**    Yes, sir.

9   Q    Okay.  All right.  And so when you began with Life

10  Strategies, Exhibit 22 refers to an offer of employment as a

11  mental health professional at a billable hour rate of $42, and

12  there are some other contingencies.  Was that your

13  understanding of what you were going to be paid?

14  **A**    Yes, sir.

15  Q    Do you know of -- and by the way, let me ask this before I

16  get too -- was that rate ever raised any during the time that

17  you were at Life Strategies?

18  **A**    No, sir.

19  Q    Were you given any other document or told by anyone that

20  you would be paid other than on a billable hour rate?

21  **A**    No, sir.

22  Q    It also says that you had a $1,500 sign-on bonus.

23  **A**    Yes, sir.

24  Q    And it refers to that as being -- you have to complete two

25  years of employment.  Did you complete two years of employment

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

17

1   with Life Strategies?

2   **A**    No, sir.

3   Q    Did you have to pay that sign-on bonus back at any part?

4   **A**    No, sir.

5   Q    Okay.  Did anyone make demand on you for you pay to that

6   to them?

7   **A**    No, sir.

8   Q    Okay.  All right.  Let's skip over here to Exhibit 24 and

9   ask you if you recognize that document.  You can look through

10   the second page if you would like as well.

11   **A**    I think so.

12   Q    Do you recognize Exhibit 24?

13   **A**    Yes.

14   Q    And what document is that?

15   **A**    Job competencies of what I would be completing while I

16   worked for them.

17   Q    And on the second -- well, let's do it this way.  Look at

18   the essential duties.  And do you see any duties in there that

19   you did not perform?

20   **A**    No, sir.

21   Q    Do you see any duties on that list of job comp -- or

22   anything that's not on that job competencies form that you did,

23   maybe something that's in addition maybe not listed on there

24   but something that's in addition to what's listed?

25   **A**    I'll be really honest.  It's really difficult to see this

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

18

1    print.

2    Q    To read?  I'll tell you what.  Let me do this, because I

3    don't want it to be difficult.  I'm going to step around here,

4    if I may.

5    A    Sure.

6    Q    I'll try not to invade your space.  And you can hold it

7    and adjust it as you need to.  And you can actually --

8    A    Oh, fantastic.  Thank you so much.  I appreciate it.

9    Would you repeat your question one more time.

10   Q    Yeah.  I'm just wondering if there's anything listed under

11   essential duties and responsibilities -- or if there's anything

12   in addition that you did in addition to what's listed as

13   essential duties and responsibilities.

14   A    No, sir.

15   Q    All right.  So we'll go ahead and kind of skate through

16   these -- not skate through them but go through them.  Exhibit

17   25, if you'll turn to that next page.  I'll ask if that's your

18   signature at the bottom of that document.

19   A    Yes, sir.

20   Q    Were the topics that are listed by the X -- with the X's,

21   were those topics all covered with you?

22   A    Yes.

23   Q    Okay, either in orientation or in a handbook?

24   A    Yes, sir.

25   Q    And then there is an orientation schedule that's Exhibit

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

19

1    26 and ask you if on the first page of Exhibit 26 if those

2    items were -- the items that are X-ed were covered with you?

3    **A**    Yes, sir.

4    Q    Then turn to Page 1227, which is the second page of

5    Exhibit 26.  And were those subjects covered with you?

6    **A**    Yes.

7    Q    Okay, and is that your signature on that page?

8    **A**    I don't have a signature.

9    Q    Oh, wait.  26.

10   **A**    26.  Sorry.  I went over too far.

11   Q    It's okay.

12   **A**    Yes, that is my signature.

13   Q    You can even see it through the back of the copy.  That's

14   pretty good.  Okay.  Let's -- all right.  What was your

15   understanding of how your pay was going to be -- how you would

16   earn money that would be paid to you at Life Strategies?

17   **A**    You were compensated for the service that you provided.

18   Q    And it had to be a billable service; right?

19   **A**    That is correct.

20   Q    And the rate was this $42 per billable hour; correct?

21   **A**    Yes, sir.

22   Q    Did the billable hour rate include all the tasks necessary

23   to perform the job?

24   **A**    No.

25   Q    Were you supposed to be paid any more than the billable

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

20

1  hour rate for all the tasks necessary to perform that billable

2  hour?

3  **A**    That was not discussed, no.

4  Q    Okay.  And so what other tasks are involved in performing

5  a billable hour?

6  **A**    Speaking to school staff, speaking to parents, DHS

7  workers.  All of these services are required for an allotment

8  of time, and if you did not meet that allotted amount of time,

9  it's not considered a billable service.

10  Q    What other tasks would you have to perform incident to a

11  billable hour?

12  **A**    Aside from documentation, there was not any.

13  Q    And which office did you work out of?

14  **A**    Little Rock.

15  Q    And where was that office located?

16  **A**    Merrill, I believe.

17  Q    On Merrill Drive?

18  **A**    I believe so, yes, sir.

19  Q    What types of therapy did you provide?  And I'm talking

20  about individual, family, group.

21  **A**    Individual therapy, family therapy, group therapy, crisis

22  intervention, and master treatment plans, and intakes.

23  Q    Okay.  So did you provide any school-based therapy?

24  **A**    Yes.

25  Q    And was there a particular school that you covered?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

21

1   **A**    I had eight to ten schools.

2   Q    Okay.  In the Little Rock School District or --

3   **A**    Little Rock School District and Pulaski -- well, Maumelle,

4   which is a different school.

5   Q    Okay.  So was the school district work, was that the

6   majority of your work?

7   **A**    It was all of my work.

8   Q    It was all of your work.

9   **A**    Yes, sir.

10   Q    So even though you worked out of the Little Rock office,

11   you did most -- did you do any -- did you see any patients at

12   the Little Rock office?

13   **A**    Some.  Very few.

14   Q    And I said patients.  Do you call them patients or

15   clients?

16   **A**    Clients.

17   Q    Clients, okay.  And you referred to eight to ten schools.

18   How -- I mean, would you be at maybe one school all day, or how

19   -- or did it vary?

20   **A**    It did vary depending upon how many clients I had at that

21   one in particular school.

22   Q    You obviously have travel in between --

23   **A**    Yes, sir.

24   Q    -- the schools.  Would you try to set your schedule up

25   where you could sort of get the most out of it to --

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

22

1   **A**    Yes, sir.

2   Q    -- see as many people as you could at one place and then

3   go to the next place?

4   **A**    Yes, sir.

5   Q    Okay.  And so I'm assuming all the school work was all

6   minors; correct?

7   **A**    Yes, sir.

8   Q    And so was there any family therapy involved in school?

9   **A**    Not physically located in the school.  But outside of the

10  school, yes.

11  Q    And did you have any -- you mentioned that you did some

12  group work.

13  **A**    Yes.

14  Q    Did the group work fluctuate, or was it pretty consistent?

15  **A**    It was pretty consistent.

16  Q    Okay.  And so as I understand it, groups are per unit per

17  person?

18  **A**    Correct.

19  Q    And a unit is 15 minutes; correct?

20  **A**    Yes.

21  Q    Okay.  And so with a group, as I've understood it, it can

22  be no less than two people --

23  **A**    Uh-huh.

24  Q    -- but no more than ten?

25  **A**    Correct.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

23

1   Q    And you indicated that it was fairly consistent.  How many

2   groups do you think you had during the week, or how many

3   different groups did you have in a week?

4   **A**    It varied upon the school.  Some schools I did groups;

5   some schools I did not.

6   Q    Okay.  Was there any rhyme or reason to which schools you

7   could -- you would have groups and which you would not?

8   **A**    No.  A lot of my elementary schools I would do groups,

9   because a lot of my elementary school kids would have similar

10  diagnoses.

11  Q    How many of the eight to ten schools were elementary

12  schools, if you know?

13  **A**    I think six of them were elementaries.

14  Q    And so for an elementary school group, how long -- how

15  many units would that -- would a session typically be?

16  **A**    Anywhere from 30 to one hour, 30 minutes to one hour.

17  Q    Was there anything that would be typical in terms of size

18  of the group in terms of how many?

19  **A**    It depends on if they were there at school that day.

20  Q    Well, I understand that.  But if everybody was there that

21  was supposed to be -- and that may be a big if -- but if

22  everybody was there, what was kind of the -- what number would

23  you have in a group?

24  **A**    Seven.

25  Q    Okay.  So trending more towards the higher part, but I

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

24

1    guess on any given day you might have one or two or maybe more,

2    I don't know, that would not be there; is that right?

3    **A**    That is correct.

4    Q    Okay.  You referenced crisis intervention.  What kind of

5    crisis intervention work did you do?

6    **A**    If a child was having a temper tantrum or a meltdown and

7    they were not able to be verbally de-escalated by a teacher,

8    principal, counselor at that time the school would contact me

9    and say, Hey, Ms. Barnhill.  Are you on school premise?  If you

10   are, so-and-so is having a meltdown.  Can you come assist?

11   Q    And so did you bill for that crisis intervention --

12   **A**    Yes, sir.

13   Q    -- separately?

14   **A**    Yes, sir.

15   Q    And you referred to master treatment plans.  I guess is

16   that a separate form of therapy?

17   **A**    It is not.  Their treatment plan provides an outline to

18   the client and the parents as to goals and objectives, as well

19   as frequency and how often you would be seeing their child.

20   Q    And with respect to the master treatment plan, were you

21   able to bill for the preparation of -- bill related to that?

22   **A**    Yes, sir.

23   Q    And how much would you bill them?

24   **A**    You could only bill whatever is required on the treatment

25   plan or however many total billable units were available.

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

25

1   Q    But actually doing the services that were either the

2   preparation of or incident to the treatment plan, could you

3   bill for that service?

4   **A**    Yes, sir.

5   Q    And do you know -- was there a limit on how much you could

6   bill for that service?

7   **A**    One hour.

8   Q    You also referred to intakes.  An intake is when you bring

9   in a new client; correct?

10  **A**    Correct.

11  Q    And how long does it take to perform an intake?

12  **A**    It depends on the provider.  But at that time we were

13  allotted, if I recall correctly, two hours.

14  Q    Two hours that you could bill?

15  **A**    Yes, sir.

16  Q    How long would it take you to do all the work necessary to

17  do an intake typically?

18  **A**    Some of that would depend upon the severity of the client,

19  documentation.  You only get compensated for two hours.

20  Sometimes it could take a little bit longer after the family

21  has left to complete that documentation.

22  Q    What about master treatment plans?

23  **A**    Also, again, it depends upon the severity, especially if

24  they have multiple diagnoses that need to be addressed.

25  Q    And I'm assuming with crisis intervention that that just

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

26

1    depended.  It could be a single 15 minutes.  It could be

2    longer.

3    **A**    Yes, sir.

4    Q    Okay.  Individual and family therapy sessions, would those

5    -- what would be the range of time for those?

6    **A**    30 minutes, 45 minutes, or 60 minutes.

7    Q    And it's my understanding regardless of which one of those

8    it was, there was a built-in portion of time that you could

9    have that, say, if you only met with someone for 53 minutes,

10   you could still bill for an hour; is that right?

11   **A**    That is correct.

12   Q    And did you have occasions where you would -- where you

13   might not be there for a full hour meeting with someone?

14   **A**    Yes, sir.

15   Q    And what did you use that time to do?  Was it see the next

16   patient or see the next client or do paperwork or what?

17   **A**    See the next client.

18   Q    Okay.  As I understood it -- understand it, you couldn't

19   have your times overlap.  You couldn't say -- except for groups

20   obviously where you were -- that was the purpose.  But for

21   anything that was individually based, the times could not

22   overlap between two people; right?

23   **A**    That's correct.

24   Q    So who was your supervisor at Life Strategies?

25   **A**    Luke Sandlin.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

27

1  Q    Did you have any kind of training on any type of

2  reoccurring basis with Life Strategies?

3  **A**    No, sir.

4  Q    Do you know if you were ever paid for any training?

5  **A**    No, sir.

6  Q    Did you have time off at Life Strategies?

7  **A**    Not until August of 2021.

8  Q    And so you would get time that you could take, and it

9  would be paid; is that right?

10  **A**    In August of 2021, yes.

11  Q    Okay.  What about holidays?  Were you paid for holidays?

12  **A**    No, sir.

13  Q    Did you see clients outside of the school year?

14  **A**    Yes.

15  Q    And outside of the school year, where would you see

16  clients?

17  **A**    At their home or via telehealth.

18  Q    And let's kind of get to that point.  I guess after the

19  pandemic began, y'all had the authorization to do some

20  telehealth.  And -- so which I assume -- was that something --

21  and I guess how much telehealth you did probably varied with

22  time; is that true?

23  **A**    Yes, that is correct.

24  Q    And so summer of 2020, was it mostly telehealth?

25  **A**    Depended upon the family.  A lot of my families I had

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

28

1    built rapport with, they would allow me to come to their home.

2    Q    And do you know how to break that down in terms of

3    percentage-wise or --

4    A    No, sir.

5    Q    Okay.  Then in 2021, did you still have some telehealth

6    then?

7    A    Yes, sir.

8    Q    And, again, you don't know on the percentage-wise?

9    A    No, sir.

10   Q    When you would try to schedule clients, were they mostly

11   in the Little Rock area, Little Rock and Maumelle?

12   A    Yes, sir.

13   Q    Would you -- I'm assuming in doing that scheduling, were

14   you able to kind of set what the schedule would be?

15   A    Yes, sir.

16   Q    And so I'm assuming you looked at it and tried to figure

17   out who was closest to whom so that you wouldn't have to travel

18   as far?

19   A    Yes, sir.

20   Q    Did you have instances where you would see multiple

21   members of one family?

22   A    Yes, sir.

23   Q    Did you do any of the therapy at the office?

24   A    Some.

25   Q    And, again, I'm going to ask you this.  Maybe you can't do

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

29

1    it.  But can you quantify what would have been done at the

2    office versus what would have been done somewhere else or been

3    done in the home?

4    **A**    As far as therapeutic services or --

5    Q    Yes.

6    **A**    Yes.  Some would be individual services, because the

7    parents would prefer that I meet them at the office.  And some

8    would be okay with family therapy.

9    Q    But in terms of what percentage-wise, you don't know?

10   **A**    No, sir.

11   Q    Okay.  Let's go back just a second, and we'll come back to

12   kind of this point.  When you were hired and you were going

13   through orientation, did you have any discussion with Mr.

14   Sandlin or someone else about how your compensation would be

15   figured?

16   **A**    Not to my knowledge.

17   Q    Did you have any discussion with Mr. Sandlin or some other

18   member of management about what items you would be paid for?

19   **A**    No, sir.

20   Q    Did you have any discussion with Mr. Sandlin or some other

21   member of management about that your pay would be based on

22   billable hours?

23   **A**    Yes.

24   Q    Okay.  And who was that with?

25   **A**    Mr. Sandlin and Ms. LeAnn who was over the other employee

Shelby Barnhill

30

1   orientation in Jonesboro.

2   Q    And would that have been LeAnn Dickinson?

3   **A**    That is correct.

4   Q    And what did Ms. Dickinson tell you?

5   **A**    That we would be compensated for the hours that were

6   completed by the therapist, completed being fully billed within

7   the computer system.

8   Q    Did Ms. Dickinson discuss what the definition of a

9   billable hour was?

10  **A**    Yes.

11  Q    Were you paid consistent with what Ms. Dickinson

12  described, as far as you know?

13  **A**    Can you elaborate?

14  Q    Yeah.  Was there something that Ms. Dickinson told you

15  that you would be paid that wasn't paid?

16  **A**    No.

17  Q    Was there something -- and I'm going to do the flip side

18  of it.  Was there something that Ms. Dickinson told you

19  wouldn't be paid that you were paid?

20  **A**    No.

21  Q    So you also indicated that Mr. Sandlin said something that

22  gave you some explanation about your pay.  When was that?

23  **A**    When I came in for the interview.

24  Q    And what did he tell you?

25  **A**    That whenever I come in as an LMSW, my pay rate would be

Shelby Barnhill

31

1   $42 an hour and that if while under their employment if I got

2   my LCSW, or licensed clinical social work, that it would then

3   be increased to an LCSW's pay rate.

4   Q    And so let me see if I can ask it this way.  Are you

5   claiming overtime in this case?

6   **A**    Yes, sir.

7   Q    Okay.  And are you in saying that saying that your basic

8   pay, the pay for the hours that you billed, was paid

9   incorrectly?

10  **A**    Yes, sir.

11  Q    And how was it paid incorrectly?

12  **A**    There was work outside of the billable hour that was not

13  compensated for.

14  Q    And what items are you talking about?

15  **A**    Meeting with families, counselors, school staff, as well

16  as documentation.

17  Q    And you're saying that that was not part of the $42 per

18  billable hour?

19  **A**    That is correct.

20  Q    Who promised you that you would be paid for those items

21  you just mentioned in addition to what you were paid for the

22  billable hour?

23  **A**    I don't recall.

24  Q    Did anyone make that -- say that to you?

25  **A**    I do not recall.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

32

1   Q    And I appreciate that answer.  Are you saying that someone

2   did, and you don't recall that it was?  Or are you saying that

3   you don't know of anyone that said something like that?

4   **A**    I don't remember off the top of my head who would have

5   informed me of that information.

6   Q    Do you know when that might have been told to you?

7   **A**    No, sir.

8   Q    Do you have some document or other -- or some electronic

9   communication that told you you would be paid for documentation

10  and for other things with families outside of the billable

11  hour?

12  **A**    No, sir.

13  Q    Did you ever complain to anyone at Life Strategies that,

14  Hey, I'm not being paid for these items?  I think I ought to be

15  compensated for those.

16  **A**    My supervisor.

17  Q    And did you complain -- and so that would have been Mr.

18  Sandlin?

19  **A**    Yes, sir.

20  Q    And when did you complain to Mr. Sandlin?

21  **A**    I don't have a specific date in mind.

22  Q    Was it by -- was it an in-person conversation?

23  **A**    Yes, sir.

24  Q    And was there anyone else present?

25  **A**    No, sir.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

33

1   Q     And what did you say to Mr. Sandlin?

2   **A**     I don't remember off the top of my head exactly what was

3   said.

4   Q     Okay, what was the substance of the conversation?

5   **A**     It would be nice to be compensated for additional time

6   that I spent with these families that is not in -- which is

7   not, I guess, in the same billable time span as an individual

8   family or crisis.

9   Q     And what was the substance of what Mr. Sandlin said?

10  **A**     He didn't really have anything to say at that point.

11  Q     So are you saying he didn't say anything?

12  **A**     Yes, sir.

13  Q     And so did you take whatever his response was as meaning

14  that he agreed with you?

15  **A**     No, sir.

16  Q     Did you take it that you were going to be paid for those

17  times?

18  **A**     No, sir.

19  Q     Do you believe that you had a contractual -- or had an

20  agreement with Life Strategies for them to pay you for that

21  time?

22  **A**     In the contract, no.

23  Q     If you believed -- did you believe while you were working

24  at Life Strategies that you were supposed to be paid for those

25  items?

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

34

1   **A**   Yes.

2   Q   And by paid I mean that you were supposed to be paid some

3   hourly rate.

4   **A**   No.

5   Q   I'm not talking about overtime.  I'm talking about an

6   hourly rate for those times.

7   **A**   No.

8   Q   Okay.  So are you saying that you had -- that if you

9   worked -- you met with a family and it wasn't billable and you

10  spent an hour doing that, are you claiming that Life Strategies

11  had some obligation to pay you some base rate of pay for that

12  time, not overtime -- not an overtime premium but some basic

13  rate of pay?

14  **A**   Yes.

15  Q   And what was that basic rate of pay?

16  **A**   $42 an hour.

17  Q   And what basis -- what do you base that assertion on?

18  **A**   The contract that was signed whenever I first started with

19  Life Strategies.

20  Q   But the contract that you signed says per billable hour,

21  and you just said it's not billable; right?

22  **A**   An hour with a family is a billable service.

23  Q   Well, but you know what a billable hour is.

24  **A**   Yes.

25  Q   You were told that.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

35

1  **A**    Yes.

2  Q    Was it unclear to you in some way what a billable hour was

3  when you were working at Life Strategies?

4  **A**    No.

5  Q    Do you know anything about how a regular rate is

6  calculated?

7  **A**    No.

8  Q    Okay.  What -- during the school year, what was -- did you

9  have kind of a regular schedule that you tried to follow?

10  **A**    Yes.

11  Q    And what was that regular schedule?

12  **A**    I would be at the school whenever the school bell rang,

13  and I would leave the school whenever the school day was over.

14  Q    Okay.  So what time -- did it vary between the schools?

15  **A**    Yes, sir.

16  Q    So what's the earliest?

17  **A**    Earliest would have been 7:30 to 2:30.

18  Q    Okay.

19  **A**    And another school --

20  Q    Let's do it this way.  What would have been the latest?

21  **A**    Latest would have been 3:45.

22  Q    Do you know what time the school would have started that

23  ended at 3:45?

24  **A**    8:00 p.m. -- or sorry -- 8:00 a.m.

25  Q    8:00 a.m.  Okay.  Would you do -- in the interest of

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

36

1   efficiency, would you try to hit those schools that started at

2   7:30 and be there first to have those as your morning or your

3   first things if you could and then try to maybe push the ones

4   that were -- that ended -- the one that ended at 3:45 later in

5   the day?

6   **A**    Yes.

7   Q    Were you able to do that?

8   **A**    Yes.

9   Q    And how many days out of the week were you able to do it

10  that way?

11  **A**    Five days a week.

12  Q    So are you claiming that you would work from 7:30 until

13  3:45 every day of the week?

14  **A**    I'm claiming I worked more than that.

15  Q    I'm not saying that.  I'm saying are you were claiming

16  that you were at a school between 7:30 and 3:45 every day of

17  the week?

18  **A**    Yes, sir.

19  Q    You didn't do that on school holidays; correct?

20  **A**    No, sir.

21  Q    On things like Christmas holiday and summer break, I guess

22  you would try to schedule with the families?

23  **A**    Yes.

24  Q    And we'll talk about that schedule in a minute.  I just

25  want to stick to the school -- to school time first of all.

Shelby Barnhill

37

 1   After you finished at the school, would you have more therapy

 2   outside of the school that you would provide?

 3   **A**     Yes, sir.

 4   Q     What time did you normally work until?

 5   **A**     It varied.

 6   Q     Okay.  By day of the week or --

 7   **A**     By client, client needs.

 8   Q     So you didn't have a set time that you were trying to stop

 9   by; correct?

10   **A**     No, sir.

11   Q     Did you have a goal as to I want to work until at least

12   this time every day if I can?

13   **A**     No, sir.

14   Q     Did you spend any time after your -- whatever your school

15   or therapy hours were working on notes?

16   **A**     Yes, sir.

17   Q     And would you do notes at home?

18   **A**     At home or at the office.

19   Q     How often would you do notes kind of after your --

20   whatever your regular workday was?

21   **A**     Daily and on the weekends.

22   Q     How -- so five days plus a week?

23   **A**     Yes, sir.

24   Q     And how many hours a day would you spend doing notes,

25   again I'm going to say, outside of your office hours -- or

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

38

1   outside of your office/school -- outside of your therapy hours?

2   Let's say it that way.

3   **A**    Is this per day or per week?

4   Q    Per day.

5   **A**    Per day?  About two and a half to three.

6   Q    What about on weekends?

7   **A**    Two and a half to three.

8   Q    Two and a half to three on Saturday and Sunday?

9   **A**    Yes, sir.

10  Q    During the week, did -- you didn't have any therapy on the

11  weekends, did you?

12  **A**    Sometimes I did.

13  Q    Would that be anything other than crisis?

14  **A**    Yes.

15  Q    Okay, what kind?

16  **A**    Individual, family.

17  Q    On a weekend, what determined whether you had -- you saw

18  somebody on a weekend?

19  **A**    Client need.

20  Q    And did you have any kind of regularity of schedule with

21  weekend times?

22  **A**    No, sir.

23  Q    Okay.  Was there a time that you would say, well, gosh,

24  I'm going to work Saturday from 10:00 until -- 10:00 a.m. until

25  2:00 p.m. or anything you tried to do with any kind of

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

39

1   regularity on the schedule with that?

2   **A**     No, sir.

3   **Q**     It was just whatever you felt like you needed to do;

4   correct?

5   **A**     Yes, sir.

6   **Q**     Okay.  Did you take any lunch breaks on any of the days

7   that you worked?

8   **A**     No, sir.

9   **Q**     Did you take any other breaks on any of the days that you

10  worked?

11  **A**     A bathroom break.

12  **Q**     Okay.  Anything else?

13  **A**     No, sir.

14  **Q**     Do you have an estimate of how long -- how much you would

15  work in an average week?

16  **A**     Anywhere from 60 to 70 hours a week.

17  **Q**     And how did you arrive at that number?

18  **A**     Based off how many clients I would have a day.

19  **Q**     And how many clients would you have a day?

20  **A**     Anywhere from ten to 14 clients a day.

21  **Q**     Okay.  And how do you use ten to 14 a day to calculate to

22  come up with 60 to 70 hours?

23  **A**     You would utilize the billable hours of .15 times however

24  many units you saw that child for.

25  **Q**     And I guess I'm -- okay.  So are you saying that you could

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

40

1   take your billable hours, and there would be ten to 14 billable

2   hours a day?

3   **A**    Yes, sir.

4   Q    And just so I'm clear on this, when you're saying ten to

5   14, are you saying seven days a week?

6   **A**    Five to six days a week, yes, sir.

7   Q    Five to six.  But you're not claiming that you were seeing

8   folks six days a week -- seeing 14 clients every day six days a

9   week?

10  **A**    No, sir.

11  Q    And it looks like, if I'm doing the math right in my head,

12  that you had more that were closer to ten than you would have

13  14?

14  **A**    Yes, sir.

15  Q    And you're not including, if I've understood you correctly

16  -- are you including any of this -- any non-billable time in

17  any of this?

18  **A**    In?

19  Q    In the 50 to -- I'm sorry -- in the 60 to 70 hours a week

20  estimate?

21  **A**    That is some of the non-billable services.  Yes, sir.

22  Q    Okay, so I'm -- I guess I'm confused then.  I thought that

23  you were saying you had ten to 14 billable hours a day.

24  **A**    That is correct.

25  Q    Okay.  And so let's kind of put it in these terms.  I'm

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

41

1   not trying to talk you into anything.  I just want to make sure

2   I understand this.  So 60 -- I mean, it can be any number of

3   things.  But just to do some simple math, it could be five

4   12-hour days.  It could be six ten-hour days.

5       70 would obviously be -- you could be seven ten-hour days.

6   You could be some combination, a mixture of things.  It could

7   be five 14-hour days.  And so are you saying -- I guess what

8   I'm trying to get is, are you saying that in a week you may

9   have as many as 70 billable hours in a week?

10  **A**   Not necessarily.

11  Q   Are you saying -- well, how many hours on average do you

12  think were billable hours -- that term is defined by Life

13  Strategies -- in a week?

14  **A**   Anywhere from 50 to 60 hours a week.

15  Q   Okay.  You were full time; correct?

16  **A**   Yes, sir.

17  Q   Did you receive health insurance through Life Strategies?

18  **A**   After three months, yes.

19  Q   How did you -- I'll tell you what.  Let's take a break.

20  We've been going a little over an hour.

21              (WHEREUPON, after a break was taken, the

22          proceedings were resumed as follows, to-wit:)

23  BY MR. MAYFIELD:

24  Q   Let's -- is there any kind of rule of thumb or ratio that

25  you would use to estimate for every hour that was a billable

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

42

1    hour I had this much work on top of the billable hour?

2    A    No, sir.

3    Q    Did you have any disputes with Life Strategies about how

4    your total compensation was calculated, meaning disputes that

5    you voiced to them?

6    A    Yes.

7    Q    Okay.  And who was that with?

8    A    Ms. Shannon Ayers I believe is her name.

9    Q    And do you know approximately when this was?

10   A    Just throughout my time at Life Strategies.

11   Q    And what was the nature of your -- I mean, how many times

12   -- you said this throughout your time.  When was the first time

13   it happened?

14   A    I do not remember off the top of my head.

15   Q    What was the nature of the question or concern?

16   A    The amount of billable hours that I had submitted did not

17   match up with my paycheck even after taxes had been taken out.

18   Q    Okay.  And so how did Ms. Ayers respond?

19   A    She did say that it would be put back on my next check

20   after that.

21   Q    Was it?

22   A    To my understanding, yes.

23   Q    Were there any other occasion -- and by the way, was that

24   by -- was that phone conversation?

25   A    Phone call.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

43

1    Q    Okay.  No emails or anything like that?

2    A    Not to my knowledge, no, sir.

3    Q    And by the way, I'm guessing from that you would check

4    your pay stub?

5    A    Yes.

6    Q    And did that pay stub list the number of billable hours

7    that you had?

8    A    I do not recall.

9    Q    How then -- how did you know then that your pay didn't

10   match what you had for your billables?

11   A    Because I would look at the total amount billable hours

12   that I had and multiply that by the billable rate and then look

13   at just kind of what the taxes and stuff were for Arkansas and

14   do some math.  By the end of it, if I had questions, I would

15   reach out to Ms. Shannon.

16   Q    Was that something you did regularly with your --

17   A    Absolutely.

18   Q    -- paycheck?  Did you have any other occasions where it

19   was -- where you thought it was off?

20   A    Not off the top of my head.

21   Q    If you did, I'm assuming you would follow the same kind of

22   thing --

23   A    Yes.

24   Q    -- to follow through with that?

25   A    Yes.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

44

1    Q    And y'all would try to figure it out between you?

2    A    Yes.

3    Q    Okay.  Were there any other instances where you voiced

4    some -- and by voiced, I mean you may have written somebody

5    about this or made some kind of electronic communication where

6    you voiced some dispute, disagreement, or concern about your

7    paycheck?

8    A    Not in regards to billable hours, no.

9    Q    Okay.  What kind of concerns did you express concerning

10   your paycheck?

11   A    There was a situation where I had enrolled in short-term

12   disability.  And based off of the benefits that were provided,

13   there was a conversation between myself and I believe Ms.

14   Shannon where they had suggested that I was not paying enough

15   for the short-term disability.  And I then had to pay them back

16   the amount that had not been taken care of originally.  And I

17   believe, if my memory serves me correct, it was somewhere

18   between 50 to $60 every paycheck that I had to pay them back.

19   Q    Over how many paychecks?

20   A    That I don't remember.  I do remember that it was for a

21   few months, and I was very peeved.

22   Q    Okay.  And so I want to make sure I understand this part

23   of it.

24   A    Sure.

25   Q    Are you talking about the -- how much you paid to have

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

1    short-term disability?

2    **A**    Yes.  Per paycheck per their benefits, it would cost X

3    amount of dollars.  And I received an email from Ms. Shannon

4    stating that I had not been the appropriate amount for that --

5    **Q**    Had not been withheld?

6    **A**    That is correct.

7    **Q**    Okay.  And so what period of time were you out on

8    short-term disability?

9    **A**    I was not out at all.  It was just me --

10   **Q**    Oh, it was just the withholding?

11   **A**    Yes, sir.

12   **Q**    Oh, okay.  I'm sorry.  I misunderstood.

13   **A**    No, that's okay.

14   **Q**    So I'm glad I asked.  Okay.  I'm going to show you -- I'd

15   ask you to turn to Exhibit 30.  These are some summaries of the

16   payroll that we provided in discovery for Life Strategies.  I

17   think -- let me make sure.  I think you were all -- one

18   employer -- looks like you were paid on a semi-monthly basis.

19   So, like, this first page of Exhibit 30 is the pay period

20   beginning on October 1st and ending on October 15th.  Do you

21   see that?

22   **A**    Yes, sir.

23   **Q**    Okay.  And so this one actually I think refers to your

24   sign-on bonus.  Is that --

25   **A**    That's --

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

46

1    Q    It looks like.  And so let's turn to the next page.  Let's

2    see if we can get something other than -- well, that looks like

3    another training week.  So did you have a set amount that you

4    were paid for training?

5    A    Yes.

6    Q    And doesn't look like you billed any hours during the time

7    that you were doing the training; right?

8    A    No, sir.

9    Q    Okay.  So then let's go to this next one.  It's got 20

10   hours at $42 an hour.  Do you see that for that regular line?

11   A    Yes, sir.

12   Q    And so -- and then it's got a reference to hour and a half

13   of what's called staff field three.  Do you know what that is?

14   A    Staffing.

15   Q    How often did you all have staffing?

16   A    We tried to do it once a month.

17   Q    And you would be paid -- if the records reflected that you

18   were paid $25 an hour for the staffing time, is that consistent

19   with what you understood?

20   A    Yes, sir.

21   Q    And so when you got -- like, if you got this pay -- when

22   you got the paycheck for this week, did it have the hours on

23   it, if you know?

24   A    I do not know.

25   Q    Okay, all right.  Would it have your gross pay?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

47

1  **A**   Yes.

2  Q   And would it have your deductions?

3  **A**   Yes, sir.

4  Q   Okay.  And then your net, I guess, at least?

5  **A**   Yes, sir.

6  Q   Okay.  Do you know how Life Strategies determined whether

7  a person was full time or not?

8  **A**   Not off the top of my head.  I do not recall, no, sir.

9  Q   Other than the sign-on bonus, did you get any other

10  bonuses?

11  **A**   No, sir.

12  Q   The time that you would spend after therapy hours, for

13  lack of a better term -- well, let me put it this way.  When

14  you had to enter note information in, that was all done

15  electronically; right?

16  **A**   Yes, sir.

17  Q   When you might work on evenings and weekends on doing

18  notes, that was done electronically; correct?

19  **A**   Yes, sir.

20  Q   You didn't keep paper notes of any type, did you?

21  **A**   No, sir.

22  Q   Everybody does their things a little differently.  I

23  understand there was some kind of 10:00 p.m. deadline for

24  getting information in.  Did you -- were you one of the -- did

25  you have some set way that you tried to keep from missing that

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

48

1    10:00 p.m. deadline, or was it just I'm doing this regularly

2    when I can?

3    **A**    I had my own little routine, I guess, if that's what you

4    want to call it.

5    **Q**    I started talking about this earlier, and I didn't get to

6    it.  During the summer, did your hours change in terms of when

7    you would start seeing people?

8    **A**    Yes.

9    **Q**    And what time would that typically be?

10    **A**    It would vary upon the child.

11    **Q**    I understand.

12    **A**    For adolescents it would start later.  If it was

13    elementary kids, it would -- I would typically start around

14    8:00 a.m.

15    **Q**    And what about your stop time for the day?  Would that

16    vary any?

17    **A**    It would.

18    **Q**    Okay.  Get done earlier, later?

19    **A**    It varied.

20    **Q**    It varied?

21    **A**    Yes, sir.

22    **Q**    Okay, all right.  Well, can -- and I'm not trying to put

23    words in your mouth.  But can you say whether you worked --

24    well, I worked a little less in the summer than I did during

25    the school year, or I worked more?  I mean, I don't know.  I'm

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

49

1    just trying to --

2    **A**    I would say I probably worked more --

3    Q    Okay.

4    **A**    -- just because the kids were out of school.  So I would

5    have a little bit more access to their parents than I might

6    have during the school time.

7    Q    Do you think that you worked more than most of your

8    coworkers?

9    **A**    Absolutely.

10   Q    And do you have any idea of how much more?

11   **A**    I do not.

12   Q    Okay.  What -- why is it that you think that?  Is it based

13   on billable hours?  Is it based on something else or --

14   **A**    I had a lot of clients.

15   Q    Okay.  Did you ever talk with others and kind of compare

16   how many clients people carried versus how many you were

17   carrying?

18   **A**    Yes.

19   Q    Okay.  And you could figure out from that that you were

20   handling -- you had more of a workload than others did;

21   correct?

22   **A**    Yes.

23   Q    So if you were the person that had the -- do you think --

24   I mean, I don't know.  Do you know any of the other people that

25   are opt-ins in this lawsuit?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

50

1    **A**    I do not.

2    Q    You don't know who they are?

3    **A**    No.

4    Q    Do you know Ms. Wihebrink?

5    **A**    No, I do not.

6    Q    Okay.  And so -- well, let me ask it this way.  We talked

7    about billing more.  Do you think you were more efficient in

8    doing the non-billable tasks than others?

9    **A**    Whenever you say efficient, what do you mean by that?

10   Q    Meaning you -- maybe you -- maybe if it -- and we'll get

11   to this.  Maybe you could do a note faster than somebody else

12   could.

13   **A**    I think my strategy might have been different than other

14   people.

15   Q    Okay.  What you mean by your strategy?

16   **A**    Time management.

17   Q    Okay.

18   **A**    Whenever I would have a client in a session, then if they

19   were completing something that I had asked them to, per their

20   therapeutic intervention, I would start a note.  And that way

21   whenever they were done, I would already have in my brain

22   exactly what it was that we had -- what I did versus their

23   client's response.

24   Q    For just a regular treatment, for a progress note?

25   **A**    Yes.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

51

1    Q    For a progress note if you saw -- you know, you go through

2    a day, and you've seen ten people or you've seen 14 people that

3    day.  And you're at home at night, and you're finishing up the

4    stuff you have to do on a progress note.  And you -- I mean,

5    you know and sense this.  But -- so how long would it take you

6    to do the rest of what you needed to do on a progress note, on

7    a single progress note?  I know we've talked about the total

8    time, but I'm just trying to get kind of individually.

9    A    It depends on if there's any additional information that

10   was needed.  There's a lot of button clicking for that program

11   that we used.

12   Q    Okay.  And so two minutes, five minutes, ten minutes,

13   more?  I mean --

14   A    I would say, I don't know, five to ten minutes.

15   Q    Okay.  Were you aware of anyone in the Little Rock office

16   that billed more than you did?

17   A    No, sir.

18   Q    Were you aware of anyone in any other office that billed

19   more than you did?

20   A    No, sir.

21   Q    Okay.  Have you made any attempt to calculate how much you

22   believe you were underpaid?

23   A    No, sir.

24   Q    How would you go about doing that?

25   A    I have no earthly idea.  I don't even know where to start.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

52

1    Q    So you don't have a total amount that you're saying that

2    Life Strategies owes you?

3    **A**    No, sir.

4    Q    You didn't have -- for most of what we've talked about

5    I've heard you mention Luke Sandlin.

6    **A**    Uh-huh.

7    Q    And I've heard you mention Shannon Ayers.

8    **A**    Uh-huh.

9    Q    Is there -- is that a yes?

10   **A**    Yes, sir.  Sorry.

11   Q    Is there some -- one of your coworkers that you think,

12   well, that person saw what I did or heard something that was

13   said by Life Strategies that would be able to back up what

14   you're claiming in this suit?

15   **A**    No, sir.

16   Q    Did you have any discussions with Diane Yancey, if you

17   know who that is?

18   **A**    The name rings a bell, but that's about it.

19   Q    What about Kendra Fite?

20   **A**    The name rings a bell.

21   Q    Okay.  Kerri Garrison?

22   **A**    The name rings a bell.

23   Q    Dawn Mitchell?

24   **A**    No.

25   Q    Dr. Walters?

Shelby Barnhill

53

1   **A**    No.

2   Q    Now, were there some times where you were paid overtime?

3   **A**    Not to my knowledge.

4   Q    Let's go -- we're going to look in Exhibit 30.  We're

5   going to look at August 16th.  I'll try to find you -- we can

6   take the one that's on Page 37.  Do you see the numbers down at

7   the bottom, LSCI 37?

8   **A**    Ah, yes.

9   Q    I don't know if you can -- it might help you skate

10  through.

11  **A**    Okay.

12  Q    So according to this, there was 488.25 looks like paid at

13  a rate of $63.  And it has the word overtime over beside it.

14  **A**    Uh-huh.

15  Q    Do you see that?

16  **A**    Yes, sir.

17  Q    Does that refresh your recollection any as to whether you

18  were paid overtime?

19  **A**    I guess so.

20  Q    Well, and I mean, do you think that this is inaccurate in

21  some way?

22  **A**    No.  I just don't recall what would have been considered

23  overtime.

24  Q    Okay.  And so then if you look at the next page, there's

25  also overtime listed on Page 38.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

54

1    **A**    Okay.

2    Q    And so you just don't -- I mean, with those you just

3    didn't recall whether that had happened or not; right?

4    **A**    Right.

5    Q    Do you have copies of your pay stubs or --

6    **A**    I do not.

7    Q    You just looked at it at the time and then would -- you

8    wouldn't save a copy.  You would just go on to the next

9    thing --

10   **A**    Yes, sir.

11   Q    -- right?  Okay.  Let's take a few minutes.  I may be

12   done.

13              (WHEREUPON, after a break was taken, the

14         proceedings were resumed as follows, to-wit:)

15   BY MR. MAYFIELD:

16   Q    When did you last work for Life Strategies?

17   **A**    I believe my end date was October -- no, that's not

18   accurate.  The last date was September.

19   Q    Let's take a look at Exhibit 27.  Maybe that will help us.

20   So who's Paul Castillo?

21   **A**    Paul Castillo was the intake coordinator for the Little

22   Rock location.

23   Q    And so it looks like an email to some others that you had

24   told him that you had accepted a lead position with Pinnacle

25   Pointe?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

55

1   **A**    That's correct.

2   Q    And that you had worked -- your last day would be October

3   1st?

4   **A**    Yes, sir.

5   Q    And so did -- then let's look at Exhibit 28.  I guess you

6   actually followed that up with an email; is that right?

7   **A**    Yes.

8   Q    And is Exhibit 28 -- does that contain the text of the

9   email that you sent?

10   **A**    Yes, sir.

11   Q    What kind of work did you do at Pinnacle Pointe?  The same

12   kind of therapy?  Or you were lead I guess?

13   **A**    So I do the clinical director position, but I also do some

14   school-based therapy as well.

15   Q    Okay, so you've been -- have you been promoted since you

16   got there?

17   **A**    No.  I was hired on as a supervisor -- a clinic

18   supervisor.

19   Q    Okay.

20   **A**    But I also still do some school-based therapy.

21   Q    When you said clinical director, I thought you meant over

22   the whole company.

23   **A**    No, sir.

24   Q    That's why I was asking.

25   **A**    Just the Cabot location.

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

56

1    Q    Okay.  So are you actually commuting now from Maumelle to

2    Cabot?

3    **A**    Yes, sir.

4    Q    Okay.  Have you ever served in the military?

5    **A**    No, sir.

6    Q    Has -- have you ever had any disciplinary action taken on

7    your license as an LMSW?

8    **A**    No, sir.

9    Q    Ever had a time where your license was not active or was

10   not valid for one reason or another?

11   **A**    No, sir.

12   Q    Did you file tax returns during the time that you worked

13   for Life Strategies?

14   **A**    Yes.

15   Q    Do you have copies of those returns?

16   **A**    I believe so.

17   Q    Do you have W-2s for the years you worked for Life

18   Strategies?

19   **A**    I believe so.

20   Q    Did you work anywhere else during the time that you worked

21   at Life Strategies?

22   **A**    Yes.

23   Q    Where at?

24   **A**    Purple Cow in North Little Rock.

25   Q    In what period of time did you work at Purple Cow?

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

57

1    **A**    I think just the summer while I was at Life Strategies,

2    and then I stopped.

3    Q    So, like, the summer of '21?

4    **A**    Yes, sir.

5    Q    What did you do at Purple Cow?

6    **A**    I was a waitress.

7    Q    And how many hours a week would you work at Purple Cow on

8    an average?

9    **A**    Just the weekends.  So ten to 15 hours maybe.

10   Q    I'm going to ask this, but I'm pretty sure it's not you.

11   So if I misput this in my notes, then forgive me.  Did you have

12   any instance where you had to have some -- I mean, some money

13   held out of your paycheck for some debt or anything like that?

14   **A**    No, sir.

15   Q    Okay, all right.  That's what I -- when I looked at this,

16   I realized it wasn't you, but I just needed to make sure.  Have

17   I been polite and courteous to you today?

18   **A**    Yes, sir.

19             MR. MAYFIELD:  All right.  Thank you, ma'am.

20          That's all the questions I have at this time.

21             MR. QUALLS:  No questions from me.

22             (WHEREUPON, the proceedings were concluded in

23          the matter at 2:49 p.m.)

24                     (WITNESS EXCUSED)

25

Conway Court Reporting

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

58

1                    C E R T I F I C A T E

2    STATE OF ARKANSAS    )

3                         )ss

4    COUNTY OF POPE       )

5

6       I, AMANDA R. BROWN, Certified Court Reporter #741 and

7    Notary Public, do hereby certify that the facts stated by me in

8    the caption on the foregoing proceedings are true; and that the

9    foregoing proceedings were reported verbatim through the use of

10   the voice-writing method and thereafter transcribed by me or

11   under my direct supervision to the best of my ability, taken at

12   the time and place set out on the caption hereto.

13

14      I FURTHER CERTIFY, that I am not a relative or employee of

15   any attorney or employed by the parties hereto, nor financially

16   interested or otherwise, in the outcome of this action, and

17   that I have no contract with the parties, attorneys, or persons

18   with an interest in the action that affects or has a

19   substantial tendency to affect impartiality, that requires me

20   to relinquish control of an original deposition transcript or

21   copies of the transcript before it is certified and delivered

22   to the custodial attorney, or that requires me to provide any

23   service not made available to all parties to the action.

24

25

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

59

1        WITNESS MY HAND AND SEAL this 3rd day of April, 2023.

2

3    _____

4    AMANDA R. BROWN, CCR

5    Certified Court Reporter #741

6    My Commission Expires:  6-21-29

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

25             www.conwaycourtreporting.com

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

60

ERRATA SHEET

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

_____   _____  Page _____ of _____

            WITNESS                       DATE

SHELBY BARNHILL

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d

Shelby Barnhill

61

SIGNATURE PAGE

I, SHELBY BARNHILL, do hereby certify that I have read the foregoing 57 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 21st day of March, 2023, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief.  Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.

_____          _____

          DATE                                     WITNESS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF _____ )

COUNTY OF _____ )

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the \_\_\_\_\_ day of _____, 2023.


                              _____

                                        NOTARY PUBLIC

MY COMMISSION EXPIRES:


_____

493a91f7-fd5e-4d5f-b577-c45a3b4fbc8d