IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

STACY WIHEBRINK, Individually
and on Behalf of All Others
Similarly Situated                                    PLAINTIFF

VS.                        NO. 4:21-CV-573-DPM

LIFE STRATEGIES COUNSELING, INC.                      DEFENDANT

_____

ORAL, ZOOM DEPOSITION

OF

CHERIE BUCKLEY

TAKEN MARCH 24, 2023, AT 10:03 A.M.

_____

# *Conway Court Reporting*

### *21043 Natalie Lane*

### *Little Rock, Arkansas 72206*

### *www.conwaycourtreporting.com*

### *"Spoken to written . . . word for word"*

*Conway Office: 501.679.1488*          *Little Rock Office:  501.319.4807*

_____

A P P E A R A N C E S

(ALL PARTIES APPEARING VIA ZOOM VIDEO CONFERENCE)

ON BEHALF OF THE PLAINTIFF:

MR. DANIEL FORD
SANFORD LAW FIRM
10800 FINANCIAL CENTRE PARKWAY, SUITE 510
LITTLE ROCK, ARKANSAS 72211
daniel@sanfordlawfirm.com


ON BEHALF OF THE DEFENDANT:

MR. MARK MAYFIELD
WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.
POST OFFICE BOX 3077
JONESBORO, ARKANSAS 72403
mmayfield@wpmfirm.com

3

I N D E X

STYLE AND NUMBER  . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES   . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE  . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  **CHERIE BUCKLEY**

     Examination by Mr. Mayfield. . . . . . . . . . . . . . 5

     Proceedings Concluded   . . . . . . . . . . . . . . . 58

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . . 59

E X H I B I T S

(NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT.)

4

 1                        C A P T I O N

 2          ANSWERS AND ORAL DEPOSITION OF **CHERIE BUCKLEY,** a witness

 3     produced at the request of the Defendant, taken in the above-

 4     styled and numbered cause on the 24th day of March, 2023, at

 5     10:03 a.m., via Zoom video conference, pursuant to the Federal

 6     Rules of Civil Procedure.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2        THEREUPON,
 3                   CHERIE BUCKLEY,
 4             THE WITNESS HEREINBEFORE NAMED, having
 5             been first duly cautioned and sworn by me
 6             to testify to the truth, the whole truth,
 7             and nothing but the truth, testified on her
 8             oath as follows, to-wit:
 9                        EXAMINATION
10   BY MR. MAYFIELD:
11   Q    Please state your name for the record, ma'am.
12   A    I'm sorry?
13   Q    Please state your name for the record, ma'am.
14   A    Cherie -- (signal interruption) --
15   Q    Yeah, that's not --
16             THE COURT REPORTER:  I didn't catch that.
17             MR. FORD:  Cherie, are you connected to the
18        wifi?
19             MR. MAYFIELD:  Let's go off for a second.
20             (WHEREUPON, after an off-the-record discussion,
21        the proceedings continued as follows, to-wit:)
22   Q    (Mr. Mayfield continuing)  Okay.  So, Ms. Buckley, we
23   stopped for just a minute, and you switched devices.  We're
24   actually conducting this deposition via Zoom, and so that makes
25   us do a couple little things.  One is, I'm going to try to wait
```

6

1   until you have stopped and finished your answer, and I'll ask

2   you to do the same thing with my questions; is that okay?

3   A    Okay.

4   Q    And just to -- have you ever given a deposition before?

5   A    No.

6   Q    If you don't understand something that I ask you, will you

7   let me know that?

8   A    Yes.

9   Q    And you're doing a great job of it, but please make verbal

10   answers.  Head nods, huh-uhs, and uh-huhs are not things that

11   we're going to pick up, because the court reporter is only --

12   is making a written record; okay?

13   A    Yes.

14   Q    Okay.  The -- I do think that the Zoom is being recorded,

15   but the audio and video is not something that either Mr. Ford

16   or I or you can use.  It's simply something in case the -- so

17   the court reporter can kind of have a backup to what she is

18   keeping today; okay?

19   A    Yes.

20   Q    And we'll be able to -- we'll probably take at least one

21   break during this.  Of course, we've already taken one, but

22   probably take one break, probably around midway through this.

23   If though at some point in time, either because of -- it could

24   even be something as simple as the weather, or if there was

25   something where you needed to take a -- take a break, let me

7

1  know, and we'll try to do that as soon as -- as soon as we can;

2  okay?

3  A    Yes.

4  Q    Okay.  And my intention today is to try to gather

5  information from you.  I don't think I will ask you anything

6  that will embarrass you.  However, if I do, please know it's

7  not my intention that I'm -- that I'm somehow trying to

8  embarrass you; okay?

9  A    Yes.

10  Q    All right.  And we kind of -- I skipped over this earlier.

11  I represent Life Strategies Counseling, Inc. in regard to the

12  lawsuit that's been filed against it, and you have opted in to

13  that lawsuit.  Instead of using the formal name, Life

14  Strategies Counseling, Inc., I'm just going to refer to it as

15  Life Strategies; is that okay with you?

16  A    Yes.

17  Q    Okay.  And you -- there's a -- I think there's a Life

18  Strategies of Arkansas; you've never worked for them, have you?

19  A    Not Life Strategies of Arkansas, no.

20  Q    But you have worked for Life Strategies Counseling, Inc.?

21  A    Yes.

22  Q    Okay.  All right.  All right.  With that, as Mr. Ford

23  correctly predicted earlier, if you would, please provide your

24  current address.

25  A    18114 Fawn Tree -- and that's "Fawn" with an "F" -- F-a-w-

8

1   n T-r-e-e Drive, Little Rock, Arkansas 72210.

2   Q    How long have you lived at that address?

3   A    I moved to that address in July of 2022.

4   Q    Where did you live before that?

5   A    17 Augusta Court, Apartment 104.  Still in Little Rock,

6   Arkansas 72210.

7   Q    How long did you live at the Augusta Court address?

8   A    Since August of 2017.

9   Q    In the past 10 years, have you lived in Pulaski County?

10  A    Yes.

11  Q    Do you have any relatives in -- I'm sorry.  You were about

12  to say something.

13  A    I thought about it.  In 2011 to 2014, so a little shot, I

14  lived in Saline County.

15  Q    Was that in Bryant?

16  A    Yes, the Bryant area.  Bryant-Alexander.

17  Q    Do you have any relatives in Central Arkansas?

18  A    Yes.

19  Q    Okay.

20            MR. MAYFIELD:  I know you weren't part of this

21       when I was -- when we had some of these other

22       depositions earlier in the week with Colby.  As I've

23       understood it, this matter is set with a -- for it to

24       be a bench trial.

25            Instead of me going through and asking about a

9

1          bunch of relatives, what I agreed with Colby is, is

2          that if we -- if for -- if one party's there that

3          change it to where they wanted a jury trial on some

4          part of this case and the Court allowed it, then we

5          could -- then instead of asking these questions, we

6          just have the -- you guys supplement with the

7          relatives that were in the relevant jury pool area;

8          is that okay?

9               MR. FORD:  That sounds fine to me.

10              MR. MAYFIELD:  Okay.  All right.

11    Q    (Mr. Mayfield continuing)  Ms. Buckley, we're doing that

12    just to avoid a whole host of questions; okay?

13    A    Yes.

14    Q    All right.  What -- did you go to school in the Central

15    Arkansas area?

16    A    I went to college in the --

17    Q    Okay.  What about high school?

18    A    No.

19    Q    Where are you from?

20    A    Arkadelphia, Arkansas.

21    Q    What is your marital status?

22    A    I'm divorced.

23    Q    When did you get divorced?

24    A    May of 2021.

25    Q    What's your ex-spouse's name?

1    A    Dale Cedric, D-a-l-e C-e-d-r-i-c, Daniels.

2    Q    How long -- where were you and Mr. Daniels married?

3    A    Pulaski County.

4    Q    When?

5    A    November 14th, 2015.

6    Q    Okay.  Have you been married on any other occasion?

7    A    I was married once before.

8    Q    Okay.  Who were you married to before?

9    A    James Gadlin, and that's G-a-d-l-i-n.

10   Q    How long were you married to Mr. -- what period of time

11  were you married to Mr. Gadlin?

12   A    July 2008.

13   Q    Okay.

14   A    The divorce date is -- I'm unsure of, but it was in 2010.

15   Q    And where was that divorce filed?

16   A    Pulaski County.

17   Q    Okay.  Have you been married on any other occasion?

18   A    No.

19   Q    Have you done anything to prepare for this deposition

20  today other than maybe talk to the -- to the lawyers at Sanford

21  Law Firm?

22   A    No more than go find my notebooks.  Other than that, no.

23   Q    Okay.  So what are -- what are your notebooks?

24   A    When I was working within that field, I generally kept,

25  like, a logbook of the different places and clients that I seen

11

1   on a daily basis.

2   Q    And so were you able to find those logbooks?

3   A    Some of them.

4   Q    Okay.  How many of them are there total?

5   A    I'm not sure.  I think I have two that I found right

6   offhand.  The other ones, because I moved, I'm not sure where

7   they're at.

8   Q    Okay.  And you indicated -- did you also write times of

9   different activities?

10  A    On that ledger, most of them have times, yes.

11  Q    Would that have included your starting time for work or

12  your stopping time for the day?

13  A    It starts -- the start time and the stop times for

14  sessions.  The days prior to getting to different areas is --

15  was already obvious for me.

16  Q    Okay.  I'm going to make a request for those documents,

17  and your attorneys will talk to you about that, about what that

18  means.  And they'll figure out whether there's something that

19  needs to be to be provided.

20       I will say, to the extent that it has HIPAA protected

21  information that would give personal identifying information of

22  patients or clients, I think we need to -- I don't -- I don't

23  -- I don't -- I'm not saying there's any ill intent in that,

24  but we need to -- may need to address that, as well.

25       Because from the company's standpoint, I'm sure there's

1   going to be some discomfort about having patient information

2   that is -- that they don't have control of from a security

3   standpoint.  I don't want to belabor that issue.  I just want

4   to tell you that it's out there, so we're going to need to

5   address that, as well.

6                    MR. FORD:  Yeah.  I'll just -- I'll state for

7            the record that Ms. Buckley provided those -- some

8            reproductions of those logbooks to us yesterday.  We

9            haven't had a chance to review them yet, but we will,

10           and we'll produce what we can and discuss with you --

11                   MR. MAYFIELD:  Yeah.  And --

12                   MR. FORD:  -- what HIPAA information is

13           contained therein and what we need to do about that.

14                   MR. MAYFIELD:  -- how we navigate all of that.

15           Okay.

16   Q    (Mr. Mayfield continuing)  Ma'am, is -- are you under the

17   influence of any medication or other substance that would

18   affect your ability to give a true and accurate deposition

19   today?

20   A    No.

21   Q    Is there anything going on in your -- in your life that

22   would cause you to not be able to give a true and accurate

23   deposition today?

24   A    No.

25   Q    Okay.  And I'm going to ask you a question, and I'm asking

13

1    it so that I'll have it in the record.  I'm not trying to say

2    anything by asking this.  Have you ever been convicted of a

3    felony?

4    A    No.

5    Q    Have you ever been convicted of a crime involving either

6    dishonesty or a false statement?

7    A    No.

8    Q    Have you been involved in any other lawsuits?

9    A    No.

10   Q    Do you -- did you use any forms of social media while you

11   were working at Life Strategies?

12   A    Yes.

13   Q    What social media?

14   A    Facebook, Instagram.

15   Q    What name -- do you still have the Facebook account?

16   A    Yes.

17   Q    Okay.  What name is -- do you use on that account?

18   A    LaVette Buckley.

19   Q    And spell that, please.

20   A    L-a-V-e-t-t-e.

21   Q    Is that your middle name, ma'am?

22   A    Yes.

23   Q    And what about -- what is your -- do you still have your

24   Instagram account?

25   A    Yes.

14

1    Q    And what is the name on it, ma'am?

2    A    Riebuck, R-i-e-b-u-c-k, 0822.

3    Q    Did you use any other forms of social media while you

4    worked at Life Strategies?

5    A    No.

6    Q    Did you use any functions of any social media or any kind

7    of messaging app concerning your work hours at Life Strategies?

8    A    Repeat that question.

9    Q    Did you use any direct messaging or any messaging app

10   concerning your work hours at Life Strategies?

11   A    Not that I can recall.

12   Q    Okay.  Did you use any direct messaging or messaging app

13   to communicate concerning your wages, hours, or working

14   conditions at Life Strategies?

15   A    No.

16   Q    All right.  Let's -- where do you presently work?

17   A    I work for Argenta Counseling.

18   Q    What do you do for Argenta Counseling?

19   A    I'm a therapist.

20   Q    Is there an area where you're assigned as a therapist?

21   A    An area?

22   Q    Yes, ma'am.

23   A    I work at -- from the North Little Rock office, the 513

24   Main Street location, and I also work at the Saline County

25   office location.

15

1    Q    Is that a full-time or part-time job?

2    A    Full time.

3    Q    And when did you begin working with Argenta Counseling?

4    A    August 2021.

5    Q    And so when was the last point in time that you worked at

6    Life Strategies?

7    A    I'm trying to remember.

8    Q    And then -- let me see if I can help just a little bit

9    with this.  It looks like the last pay period where you had

10   hours with Life Strategies was in September of 2021.

11   A    I believe that's correct.

12   Q    What period of time were you at Life Strategies?

13   A    August 2019 to September 2021.

14   Q    Where did you work before that?

15   A    Before Life Strategies?

16   Q    Yes, ma'am.

17   A    New Beginnings Behavioral Health Services.

18   Q    What did you do for them?

19   A    Therapist.

20   Q    What were the dates you were employed there?

21   A    April -- no, I left -- I'm sorry.  I'm sorry.  October

22   2016 to April 2019.

23   Q    Why did you leave that position at New Beginnings?

24   A    The facility closed.

25   Q    Did you do any work between April of 2019 and August of

16

1    2019?

2    A    Yes.

3    Q    What work did you do?

4    A    I was a therapist.

5    Q    For whom?

6    A    NextStep Counseling.

7    Q    And where is NextStep Counseling located?

8    A    Little Rock.

9    Q    Who was your supervisor?

10   A    Luke Sandlin.

11   Q    And why did you leave NextStep Counseling?

12   A    To be a full-time independent therapist.

13   Q    And so did you go to Life Strategies to be a full-time

14   independent therapist?

15   A    When I went to working at Life Strategies, was a school-

16   based therapist, and I was unable to be a complete independent

17   therapist because of licensure.

18   Q    Okay.  So at NextStep, did you quit?

19   A    Yes.

20   Q    Where did you work before NextStep Counseling?

21   A    Life Strategies.

22   Q    Okay.  So you worked -- did you have two periods of time

23   that you worked for Life Strategies?

24   A    Did I give you the wrong dates for NextStep?

25   Q    Well, I don't -- I don't know.  You had indicated and --

1   that you're -- let me -- let me kind of put it in these terms.

2   That with New Beginnings, you had been there until April of

3   2019.  And then it was between April of 2019 and August 2019 --

4   and there's a gap, is why I was asking.

5   A    Oh, between --

6   Q    August of -- hold on just a second.  And August of 2019

7   was when you -- when I believe you started at Life Strategies.

8   So I was asking about that gap.

9   A    So that's the gap from April to August.

10  Q    August, yes.

11  A    No, I didn't work during that time of 2019.

12  Q    Okay.  All right.  Well, that makes a little more sense

13  then.

14  A    Okay.

15  Q    I think you might be off track a little bit, but I was

16  trying to see when we got there.  Okay.  And so I have down,

17  from just looking at some information, that you had been a

18  therapist at Dayspring Behavioral Health in Little Rock.

19  A    Yes.

20  Q    And that was between June of 2011 and September of 2015?

21  A    Yes.

22  Q    And then that before that, you had been a mental health

23  technician at Pinnacle Point Hospital from October of 2008 to

24  May of 2011?

25  A    Yes.

18

1    Q    And then a social services director at Northridge Health

2    and Rehabilitation from June of 2001 to June of 2005?

3    A    Yes.

4    Q    Okay.  And so let me go back and back up through this.

5    Why did you leave Dayspring Behavioral Health?

6    A    Differences with the supervisor.

7    Q    Did you quit?

8    A    Yes.

9    Q    And there's a gap between your time at Dayspring and New

10   Beginnings.  What did you do during that period of time?

11   A    That was -- should have been just for, like, a one-month

12   gap.

13   Q    Okay.  Well, according -- and I'll represent to you,

14   ma'am, that this is based on a -- what I believe to be a resume

15   that was pulled from your personnel file.  I can actually show

16   you.  Let me just go ahead and share that document with you

17   since you've got a bigger screen, and I'll try to make it big

18   enough to where you can see it; okay?

19   A    Yes.

20   Q    Okay.  And I suspect it's pretty small right now; right?

21   A    Yes.

22   Q    Okay.  I'll show you -- first of all, I'm going to make it

23   bigger.  Well, as soon as I did that, it kind of make

24   everything go by the wayside.  Show you, first of all, do you

25   see where it says -- it says "54" down where I've got the

19

1   cursor.

2   A    "54"?

3   Q    Yes, ma'am.

4   A    Yes.

5   Q    Okay.

6   A    I see it.

7   Q    So this is an exhibit.  And then I want to go up here.

8   Let's see.  We'll move up just a little bit.  And I know we

9   can't see the -- sorry.  Are you able to see the dates on the

10  different items?

11  A    Yes.  I see the discrepancy with --

12  Q    And I'm sorry.  I may have misread something, as I see it

13  bigger, and I apologize.

14  A    Okay.  When I left Dayspring, it should -- you know, I

15  believe it was September 2016.

16  Q    Okay.

17  A    But then I started New Beginnings not even a few weeks

18  later.

19  Q    I got you.  I got you.  Okay.  All right.  And so then let

20  me just kind of go back and see -- at Pinnacle Point, why did

21  you leave that job?

22  A    To go into therapy --

23  Q    Okay.

24  A    -- full time.

25  Q    So did you quit?

20

1    A    Yes.

2    Q    All right.  And then at Northridge Health and

3    Rehabilitation, did you quit that job?

4    A    Yes.

5    Q    Okay.  All right.  Let's -- next look is, we're at this

6    point.  Bachelor's at UALR in 2009?

7    A    Yes.

8    Q    You actually have another Bachelor's from Henderson, back

9    in '94.

10   A    Yes.

11   Q    What kind of work did you do before you decided to get

12   your social work degree?

13   A    Primarily the social service director positions.  I held

14   different ones at different long-term care facilities.

15   Q    Okay.  All right.  And so what caused you to go into -- to

16   want to get your -- another Bachelor's in social work?

17   A    The limitation that you have with a degree in Human

18   Services.

19   Q    Did you want to do something where you were licensed and

20   you could provide therapy?

21   A    I wanted to do something that allowed me to work with

22   people in a more advanced field, yes.

23   Q    Okay.  And, of course, I guess, you also got your Master's

24   at UALR.  Is that something you have to get that additional

25   education so that you can -- you can have the license that you

21

1  were seeking?

2  A    Yes.

3  Q    Do you consider that to be a professional position?

4  A    Yes.

5  Q    And have you ever had any disciplinary action taken with

6  respect to your -- any professional license?

7  A    No.

8  Q    Has your license has ever been invalidated or out of -- or

9  had something with it, maybe for -- or maybe even gone

10  inactive?

11  A    It was inactive from, I want to say, 2012 to December of

12  2012, pending testing.  And that was for the more advanced

13  license.

14  Q    And what is that more advanced license, ma'am?

15  A    The LMSW.

16  Q    And you believe that started in December of 2012?

17  A    The LMSW started in December of 2012, yes.

18  Q    And before that, what license did you have?

19  A    It was a provisional license, a PLMSW.

20  Q    And what period of time did you have that?

21  A    From June 2011 to June 2012.

22  Q    Do you know any of the other persons that are either

23  parties or have opted in to this lawsuit?

24  A    No.

25  Q    I took a deposition of a fellow by the name of Paul Bailey

1  the other day, and I think he was also -- maybe lived or went

2  to school in Arkadelphia, but maybe you all were different time

3  frames.  But you didn't know him; right?

4  A    No.

5  Q    Have you talked to any of the other persons that are

6  involved in this -- any other persons that have either opted in

7  or that are parties to this lawsuit outside the presence of any

8  attorneys?

9  A    No.

10 Q    All right.  I'm going to show you a document that we'll --

11 is marked as Exhibit 56.  And let me get you over here.  You

12 can see the number over there on the side of the page?

13 A    It's blurry.

14 Q    Okay.  Let me -- let me get it a little bit more and get

15 us over to that part.  Okay.  Can you see it now?

16 A    It says "Exhibit 56" on the side?

17 Q    Yes, ma'am.

18 A    Yes.

19 Q    Okay.  And so I wanted to look at this document, and I'm

20 going to flip to the second page of Exhibit 56.  And there's a

21 signature and acceptance date; is that your handwriting?

22 A    Yes.

23 Q    Notice here that the -- that this looks to be an offer

24 letter.  And I'm going to try to make it centered here, but you

25 were offered employment at a billable hour rate of $42 per

1   hour; is that right?

2   A    Yes.

3   Q    Were there any other terms or conditions about how you

4   were going to be paid when you went to work at Life Strategies?

5   A    The billable hours is what we got paid for, yes.

6   Q    Okay.  All right.  And I believe, if I -- if I remember

7   correctly, that at some point in time your rate increased up

8   from $42; is that right?

9   A    Yes.

10  Q    And do you know what circumstances there were that caused

11  it to increase?

12  A    I don't recall.

13  Q    Okay.  All right.  All right.  While we're looking at

14  documents here, let me see if I can get through a couple

15  others, if I can see the page a little better.  Unfortunately,

16  you'll just give me one second.  Okay.  Let's see.  Make it a

17  little bigger to where you can see it, hopefully.  Show you a

18  document that is marked as Exhibit Number 57 and ask you if you

19  recognize that document.

20  A    Yes.

21  Q    Okay.  And what is that?

22  A    That list of job -- the job description.

23  Q    Okay.  For a mental health professional?

24  A    Yes.

25  Q    And was that the job you held at Life Strategies?

24

1   A    Yes.

2   Q    All right.  And on the second page of that exhibit, is

3   that your signature and handwriting out to the right, by the

4   date, above "employee," and out to the right where it says

5   "date"?

6   A    Yes.

7   Q    Okay.  Then I'll show you a document that's marked as

8   Exhibit 58.  I just want to know if that's your signature on

9   that document.

10  A    Yes.

11  Q    All right.  Can you see the different categories of topics

12  that have X's by them?

13  A    Yes.

14  Q    Were those items that were covered in your training and

15  orientation?

16  A    Yes.

17  Q    Okay.  Let me show you Exhibit 59, and let me ask you if

18  that's your signature on that document.

19  A    Yes.

20  Q    So did you actually -- when you began to work at Life

21  Strategies, did you go to Jonesboro for training?

22  A    Yes.

23  Q    And there's a list of items -- let me make it -- in

24  Exhibit 60 of different things that are representative and

25  covered in your -- in your training in Jonesboro.  Can you see

25

1   those things with the X's?

2   A    Yes.

3   Q    Okay.  Were those items that were covered in your

4   training?

5   A    Yes.

6   Q    Okay.  And we'll go to the next page, and there's some

7   more X's.  And same question, were those items by the X's the

8   things that were covered in your training?

9   A    Yes.

10   Q    And is that your signature on Exhibit 60?

11   A    Yes.

12   Q    All right.  I think that covers the things that perhaps

13   show you something, so maybe the rest of this will go a little

14   easier for that.  Did your role -- you referred to a billable

15   hour.  What was a billable hour?

16   A    The time that you actually seen a client that you could

17   bill for.

18   Q    Okay.  And so if all you did is saw the client during that

19   hour and you did nothing else, would you get paid?

20   A    Yes.

21   Q    Even if you didn't fill out any paperwork?  You'd get paid

22   even if you didn't fill out paperwork?

23   A    You have to do the note in order to get paid --

24   Q    Yes, ma'am.

25   A    -- for the billable hour, yes.

26

1   Q     So the note was a task that had to be done to get paid for

2   the billable hour; right?

3   A     Right.

4   Q     And what happened if you didn't do the note?

5   A     You didn't get paid for the service.

6   Q     Okay.  Were there other things you would have to do before

7   a session with a client to be prepared for it?

8   A     Yes.

9   Q     If you didn't do those things, then you risk that a client

10  might not show up because they didn't know they had an

11  appointment; right?

12  A     If I didn't do those things, it just --

13  Q     You didn't skip --

14  A     -- depends on what those --

15  Q     Yeah.  If you didn't schedule it, then you wouldn't expect

16  somebody to show up, if something wasn't -- if the person

17  didn't know it was scheduled; correct?

18  A     It's different when it's school-based.

19  Q     Well, okay.  So -- but you still had to ask at the school

20  to get the person to -- who you needed to see; right?

21  A     Yes.

22  Q     You would need to look at notes or documents beforehand to

23  know what the goals are with respect to the person's treatment;

24  correct?

25  A     At times.

1  Q    Would you spend any time thinking about what techniques
2  you might use during the session to help achieve whatever goals
3  you're trying to achieve with client?
4  A    Yes, at times.
5  Q    You indicated that you did the school-based work.  What
6  schools were you assigned to during the time you were at Life
7  Strategies?  And then let's start with districts, and we'll go
8  down from -- we'll go back from there.
9  A    Okay.  For Pulaski County School District, it was Mills
10 Middle and Mills High School; College Station Elementary;
11 Landmark Elementary; briefly, Daisy Bates Elementary; before
12 the Jacksonville split, Howard Perrin Elementary; Jacksonville
13 Middle School; Murrell Taylor Elementary; and I believe that
14 was it for Pulaski County.
15 Q    Did you do any school-based at -- in any other school
16 districts?
17 A    For a charter school, eStem.
18 Q    And which --
19 A    (Inaudible) --
20 Q    Yeah, I'm sorry.  I --
21 A    I'm trying to think.  It's two different sets of eStem.  I
22 can't recall what it's actually called, but it was more
23 downtown, off Sixth Street.  But it was that elementary and
24 that middle school, eStem Elementary and Middle School.
25 Q    Were there any other districts where you did school-based

28

1  mental health?

2  A    Little Rock School District, and I was only at the school

3  briefly, too.  But I cannot recall the name of the school.  I

4  can't believe that.

5  Q    You were briefly at a school in the Little Rock School

6  District; is that what I'm understanding?

7  A    Yes.

8  Q    Do you know where the school was?

9  A    Cammack Village.

10  Q    Okay.  So with respect to -- what was your -- did you have

11  a regular, typical schedule when school was in session?

12  A    I typically try to sort schools out by area, because the

13  area is so vast, that which I cover.

14  Q    Okay.  And so what time would you -- would you start at

15  one of the schools?

16  A    It varies, because we have the opportunity to make our own

17  schedule.  Typically, I would try to leave the mornings, if I

18  had to attend an IEP or a 504 meeting before I started

19  sessions.  So generally between, I would say, 10:00 and 11:00.

20  Q    When you say "IEP" and "504 meetings," where those

21  meetings for clients?

22  A    Yes.

23  Q    And so -- and I'm just trying to make sure that I

24  understand.  Would you try to do those before 10:00 a.m.?

25  A    At most times, I would.

29

1    Q     So if you had an IEP or a 504 meeting, what time would
2    that mean you get to the school?
3    A     During those times, between 7:30 and 8:30.
4    Q     All right.  How often did you have IEP or 504 meetings?
5    A     They weren't that frequent.  I would probably say, at
6    times -- at most times, one to two, every two months
7    Q     Okay.  If you didn't have an IEP or a 504 meeting, would
8    you try to start around 10:00 a.m.?
9    A     Yes.
10   Q     Okay.  And if you started -- well, regardless of what time
11   you started, what time would you normally finish at the
12   schools?
13   A     At the schools, generally there until school ends,
14   depending on what school.
15   Q     Okay.  What was kind of the range of when schools ended?
16   A     Yes.  The elementary schools up here generally get out
17   between 2:20 and 2:40, and the high schools and middle schools
18   tend to get out, like, 3:40 to, like, 4:05.
19   Q     And so, again, just trying to kind of get an
20   understanding.  After you were done at whatever schools, would
21   you -- would you do any more work that day, after school got
22   out?
23   A     Yes.
24   Q     Okay.  What work would you do?
25   A     I would still have family sessions, and then I would still

30

1  do different individual sessions after school let out.

2  Q    And so what time would you kind of wrap up for the day,

3  generally?

4  A    Every day was different.  Sometimes I didn't finish until

5  8:00 at night.  A good day for me was to be done by 6:00.

6  Q    And is this five days a week?

7  A    At most times, yes.

8  Q    Did you keep any record of start time or stop times?

9  A    My record consists of the times that I billed

10  individually.

11  Q    Okay.

12  A    And generally, that last billing time was, like, my stop

13  time for billing.

14  Q    For the -- and, again, we'll stay with the school year for

15  the moment.  But during the school year, when school was in

16  session, if you had individual or family afterwards, would you

17  do that at an office, in homes, both?

18  A    You're talking about for school times?

19  Q    No, I'm talking about outside of school time, after

20  school.

21  A    Most of those sessions were conducted in the homes.

22  Q    Did you take any breaks during the day?

23  A    It depends.  Sometimes I was allowed to break, sometimes I

24  wasn't.  It depended on the kids that I needed to see.

25  Q    So with breaks, did you take, like, a meal break any?

31

1    A    Most times, once I got started, I didn't take a meal

2    break --

3    Q    Okay.

4    A    -- honestly, for me.

5    Q    You indicated there were some other breaks.  What would

6    you do during those breaks?

7    A    Those breaks were brief.  Just sitting, being able to sit

8    down for 10 minutes.

9    Q    All right.  Okay.

10   A    And then moving on again, the next patient.

11   Q    Did you have to do any work in the -- or, did you do any

12   work in the evenings, after your day was done or before you

13   went to work the next day?

14   A    There's always notes and treatment plan reviews.  So in

15   June, when I have that free time, once I'm home, I have to

16   enter notes or I have to do treatment plan reviews.  That was

17   still work for me, yes.

18   Q    Okay.  So how long would you spend -- would you do that

19   every evening or morning or sometime --

20   A    Right.

21   Q    Okay.  Now --

22   A    Not every -- I'm sorry.

23   Q    Go ahead.  You were about to say, Not every --

24   A    No.  If I did start on some notes, at times, I would start

25   because I would generally -- me, personally -- get home late.

32

1    And so once I get home to sit down, I might put in a few notes,

2    but most of the time I spent putting in my notes were weekends.

3    Q    So during the week -- well, let me kind of see if I can

4    get this and understand this.  So during the week, are you

5    saying -- well, I'm sorry.  Let me start over.  During the day

6    -- let's start with that, first of all.  Would you enter any

7    part of your notes during the time during the day?

8    A    Most of the time, no.

9    Q    And am I understanding that during the -- well, on

10   weekdays, you generally didn't do note work then; right?

11   A    Right.

12   Q    You would wait and do it on the weekends; correct?

13   A    Most of the time, yes.

14   Q    All right.  And so was that entering it in electronically?

15   A    Yes.

16   Q    And how would you describe the time that you spent doing

17   notes on weekends?

18   A    Depending on how many I had to put in, hours.  I can start

19   -- I would say, anywhere from six to eight hours on the

20   weekends, based on the number of notes that I have.

21   Q    And so let's talk about some of the -- some of the

22   specifics with respect to some therapy.  You did individual

23   therapy, family therapy, and you also did group; right?

24   A    Yes.

25   Q    Were there any other forms of therapy that you provided

33

1   while you were employed at Life Strategies?

2   A    No.

3   Q    With respect to group therapy, did you have any groups

4   during the school year?

5   A    Yes.

6   Q    About how many groups would you have during the week?

7   A    It varied.

8   Q    How were you paid for group therapy?

9   A    You got paid a certain amount per child in the group,

10  depending on how long you held the group.  So in 15-minute

11  increments, I want to say -- actually, when they changed it, I

12  didn't keep up with it.  So I actually don't recall.  But

13  typically, my group was anywhere from 40 to 45 minutes, and

14  each kid -- got paid a different billable amount that they was

15  in the group.

16  Q    So you were paid and should have been a set amount per

17  child, per 15-minute -- which I think is referred to as "units"

18  -- you were paid -- you might be paid a different rate based on

19  what child it was; correct?

20  A    Yes.  Generally, the group rate is the same for all the

21  children.

22  Q    Okay.  Well, I misunderstood that.  So with respect to the

23  groups, what -- as I understand it, a group can't be any less

24  than two, but can't be any more than ten.

25  A    For the number of children, yes.

1   Q    Yes, ma'am.  And so what was the number of children that

2   you would typically have in a group?

3   A    It varied.  It's difficult to just put a -- pin a number

4   on it, because some kids might be at school, some might not be

5   at school.  Some might be doing testing or in a core subject,

6   so those kids can get pulled out from group.  But I guess the

7   average size is anywhere from four to ten.

8   Q    Okay.  What about -- did you also have to attend to

9   staffings with Life Strategies?

10  A    Yes.

11  Q    Did you get paid for that?

12  A    We got paid for the hour that we was there.

13  Q    Okay.

14  A    I want to say, $25.

15  Q    Okay.  What about for training?

16  A    I really can't recall any training that I did, other than

17  CPR.  But I can't -- I don't recall if it was paid.  If it was,

18  it was at the $25 amount.

19  Q    Do you know whether you got paid for any training?

20  A    I don't recall that.  They gave us that non-billable rate

21  for the time which we was there for the CPR, and I believe I

22  did get paid for that CPR training.

23  Q    Did you have paid time off that was available to you

24  through Life Strategies?

25  A    Yes.

35

1    Q    How long would it take you to enter a progress note for

2    individual or family therapy?

3    A    Depending on what was going on with that particular

4    client, all the clicking, anywhere from five to eight minutes

5    per note.

6    Q    What about with the group therapy?

7    A    Again, depending on how many people that you had in that

8    group, that note varied.

9    Q    Okay.

10    A    It wasn't a quick note, because a group note is a note for

11    every individual, an individual note for everyone that was in

12    that group.

13    Q    And so with respect to that, you wouldn't develop a kind

14    of a, you know -- you do the first one for the first person in

15    the group, and then you just have to modify that one for some

16    of the -- for the other people in the group?

17    A    The only template that I used was that description of the

18    group.  How each person participated in the group was

19    different, so I had to type that individually.

20    Q    And --

21    A    The only thing that stayed the same was the group

22    description.

23    Q    Okay.  So did you do that based on your memory?

24    A    Of the group during that time, most times, yes.

25    Q    So if I've understood you --

36

1   A    Most times -- go ahead.

2   Q    If I understood you right, you were keeping a -- you were

3   just keeping in your memory -- or, were you -- were you keeping

4   in your memory what you had done during that previous week of

5   individual and family therapy?

6   A    I had a brief notebook.  I have a book that I keep my

7   times in, and I have a book that I keep brief notes in to alert

8   me to what was going on during that session or that group.

9   Q    Is that the same logbook that we were talking about

10  earlier?

11  A    No.  When I finished with those, I disposed of those.

12  Q    Okay.  So this is a separate set of documents?

13  A    Yes.

14  Q    And you don't have any of those anymore?

15  A    No.

16  Q    What about how long would it take to complete a master

17  treatment plan?

18  A    That also varied, the time that you had to complete a

19  master treatment plan.

20  Q    Well, what would be kind of typical for that?

21  A    If it was simple, you'd use the 30 minutes that you had.

22  If it was more complex or they had more problems, which meant

23  more objectives, it took a little longer.

24  Q    When you completed a treatment plan, was any part of the

25  doing of that paperwork billable?

37

1   A     Yes.

2   Q     How much?

3   A     I believe it was two units, 30 minutes.

4   Q     What about if you updated a treatment plan?  Would there

5   be -- would it be billable?

6   A     Same thing, yes.

7   Q     Up to two units?

8   A     Yes.

9   Q     And how long would it take you to complete an update to a

10  treatment plan?

11  A     The update was a little bit, because you generally had to

12  talk to that person or the family to make sure that things were

13  updated, and then you updated the treatment plan.  But the

14  actual time putting in the actual treatment plan, 20 to 30

15  minutes.

16  Q     Did you have to do intakes?

17  A     Yes.

18  Q     And were intakes billable?

19  A     Yes.

20  Q     Okay.  How long could you bill up to for an intake?

21  A     That, I'm definitely trying to recall if it was an hour or

22  two for an intake.  I want to say it was a billable hour.  I

23  don't really recall.  I don't recall exactly what it was.

24  Q     And so with an intake, how long would it take to do the

25  paperwork for that?

38

1    A     For me?

2    Q     Yeah.

3    A     It was different.  Most of my intakes were done in the

4    area that of which I covered.  I didn't get internet, so unlike

5    some people that can do their intake directly and put it in the

6    computer, I had to do mine via paperwork and then come home and

7    put the intake in.  So mine actually took a little longer.  It

8    was like actually doing it twice.

9    Q     And so here's one thing I want to make sure that I

10   understand in this as we've been talking through this.  If you

11   did someone's treatment plan -- and so I'm thinking that to do

12   that master treatment plan, that you had to meet with a person;

13   is that right?

14   A     Yes.

15   Q     Or family -- or it may have been family members as well,

16   if it was a minor?

17   A     Uh-huh.

18   Q     You'd have -- is that a yes?

19   A     Yes.

20   Q     First time you did that -- you've done that.  You're doing

21   good.  And we're about to take a break.  I just want to get

22   this part of it.  Okay.  So if you met with the family, were

23   you able to bill for the time meeting with the family to go

24   over the master treatment plan?

25   A     Yes.  You have to meet with the family.

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807
www.conwaycourtreporting.com

1    Q    And so how --

2    A    During the time at which a -- during the time at which the

3    billing is, it -- like I said, it varied.  And so when we did

4    the treatment plan, sometimes the conversations with the family

5    wasn't within the allotted amount of time that you got to bill

6    for, so you still had to make it fit.

7    Q    That's what I was trying to get to, is that with -- and

8    that's what I'm trying to understand in this, is -- and then

9    maybe if you get the sequence, it'll help me on that.  If I've

10   got a treatment plan with the with the Jones family that I --

11   that I've got to do, and it's a master treatment plan, am I

12   going to have to do that paperwork before I meet with the Jones

13   family?

14   A    No.  You can still meet with them and still do the

15   paperwork.

16   Q    Okay.  So you'd have the meeting with them, and let's say

17   that that meeting lasted 45 minutes -- or, let's say that it

18   lasted 50 minutes.  How much could you bill?

19   A    For the master treatment plan, 30 minutes.

20   Q    So you weren't able to bill for that 50 minutes that you

21   met with the family; is that right?

22   A    Right.

23   Q    You could only bill for preparing the paperwork?

24   A    Yes.  Well, you bill during the time that which you was

25   given the information for the paperwork.  And so once you, you

1   know -- and then you go home and -- for me, I had to go home

2   and then put in the paperwork.

3   Q    Okay.  And so that's what I was trying to get to.  So if

4   you met with the Jones family on Monday, and you did their

5   master treatment plan, you -- would you put down the two units

6   on Monday, or would you put it on, say, Saturday, if you did

7   your master treatment plan paperwork on it then?

8   A    Most of the time, intakes and master treatment plans

9   needed to be put in the same day.

10  Q    Okay.  So would you do that -- when would you do those,

11  then?

12  A    Most the time, when I -- after I got back home.  Those are

13  some of the circumstances that of which I had to do paperwork

14  in the evenings.

15  Q    Okay.  But the billing for that would be noted on --

16  should be, in most instances, noted on the day that you

17  actually met with the family; right?

18  A    Right.

19  Q    Okay.  All right.

20              MR. MAYFIELD:  That's probably a good point to

21         take a break, so let's take about 10 minutes; okay?

22              THE WITNESS:  Yes.

23              (WHEREUPON, after a break was taken, the

24         proceedings were resumed as follows, to-wit:)

25  Q    (Mr. Mayfield continuing)  We're back on the record.  Ms.

41

1   Buckley, do you have an estimate of how many hours a week total

2   you worked during the time that you were at Life Strategies?

3   A    No, not an official record.

4   Q    And I -- and you haven't tried to estimate how many hours

5   it might be; correct?

6   A    No, not as of yet.

7   Q    If someone were to ask you during the time that you were

8   there, Oh, well, how long does it take -- how much time does it

9   take you during the week to get your work done, what would you

10  tell them?

11  A    Does that includes billable hours and non-billable hours?

12  Q    It includes all the work that -- all the time it takes to

13  get the job done.

14  A    Anywhere from 40 to 60.

15  Q    Were you full time with Life Strategies?

16  A    Yes.

17  Q    Did you have health insurance?

18  A    Yes.

19  Q    Let's talk about the -- outside of -- we've talked about

20  time when school was in session, about what a normal day or a

21  day or a normal week was -- would be like, in terms of job

22  duties.  When school was not in session, what was your schedule

23  like then?

24  A    Me, personally, I tend not to go to people's houses super

25  early in the morning, and so I would still start up between --

42

1   and it just depends on the schedules that the families had.

2   Anywhere from 10:00 in the morning to 6:00 or 7:00 at night,

3   when I can catch the families at home.

4   Q    Would you take breaks -- any breaks during the day?

5   A    During the time when school was out, sometimes there would

6   be breaks, because someone might not be at home during that

7   time.

8   Q    Okay.  I'm assuming, whether it was school or not school,

9   that you would try to put things as -- put things back to back

10  to the extent you could; right?

11  A    Yes.

12  Q    Okay.  And then I'm guessing, as you're traveling to

13  houses, too, that you'd try, if you could, to have -- to go to

14  residences that were closer to one another to the extent you

15  could.

16  A    Yes, that's what I tried to do.

17  Q    Yes, ma'am.  And so, as we were talking about breaks,

18  would you take, like, a lunch break?

19  A    If I had enough time, I would try to grab something to

20  eat.

21  Q    Okay.  And how long would the lunch breaks be?

22  A    It's always -- am moving.  Go through a drive-through,

23  pick it up, eat as I went to the next home.

24  Q    Okay.  And so if you had a break in between sessions,

25  would you have instances where your break would be more than 30

43

1   minutes?

2   A   At times, when school was out.  At times, it would occur

3   that I would have longer breaks as I wait for someone to get

4   home or a parent to get off from work, depending on what it

5   was.

6   Q   What would you do during those breaks?

7   A   It depends on where I was at, so it would vary.  Sometimes

8   I might have time to go by the office, get some needed

9   paperwork or complete some paperwork.  And then if it was a

10   long span, which hardly ever occurred, I would use that time

11   and go home.

12   Q   Okay.  How often -- you said it wouldn't occur that often.

13   How often would it occur that you'd go home?

14   A   Very rarely.  My clients lived in a great, vast area, and

15   so if it was an area that might have been close to mine, I

16   would go, if I had, like, hours in between that I would have a

17   next session.  But maybe once or twice every three to four

18   months.  Not often.

19   Q   What about where you would have more than 30 minutes, how

20   often would that happen when school was out during a week?

21   A   That seemed to not happen too much.  It just depended on

22   if that client was at home or the next client was at home.

23   Most of that time, it was spent driving, because it took me

24   anywhere from 15 to 30 minutes just to drive to the next

25   client.

44

1   Q    So you didn't -- did you have clients that were primarily

2   -- did you have clients that were primarily concentrated in the

3   Landmark and College Station areas?

4   A    No.

5   Q    Okay.  But you had a number that were in those areas,

6   didn't you?

7   A    Yes.

8   Q    Okay.  And what about the Otter Creek and Colonel Glenn

9   area?  Have you ever --

10  A    I only had a few that was in that area.  Only -- in fact,

11  in the Otter Creek area, I only had two that was in that area.

12  Q    Okay.  Did you do any group therapy when school was out?

13  A    For a small amount of time before Covid, I was able to do

14  a group during the summer.  But after that, no.

15  Q    Let's talk about that, too.  During Covid, what percentage

16  of your time was spent doing telehealth or teletherapy?

17  A    None.

18  Q    None?

19  A    None.

20  Q    You did all of it in person?

21  A    Yes.

22  Q    So what about when the children weren't in school?  And

23  let me -- let me ask that question better.  During Covid and

24  while school was in session, were there times that you would

25  have to seek and do therapy with school children outside of the

45

1    school?

2    A    Yes.

3    Q    And so you still did those sessions in person?

4    A    Yes.

5    Q    You did no -- from what I'm hearing, you did no telehealth

6    or teletherapy?

7    A    None.

8    Q    Was that your choice or the company's directive?

9    A    It was an option to do the telehealth.  What I tried to

10   explain to my company during that time, majority -- I mean, 85

11   percent of my clients live in a rural area.  Internet services

12   are awful.

13   Q    Okay.

14   A    They could not get on with telehealth services.  So that's

15   why I was still going out to the homes.

16   Q    And that's why you still do it that way?  Okay.  And I

17   kind of circled back around, and I wanted to make sure, when

18   you say there was a brief period before Covid that you did

19   group therapy outside of when school would be in session, how

20   long is that brief time?  Weeks, months?  I'm just trying to

21   figure it out.

22   A    Are you saying, outside of school?

23   Q    Well, I'm saying -- yes, ma'am.  You said you did -- as I

24   understood it, you did some group before Covid, when school was

25   not in session?

46

1   A    Yes.  It was probably no more than a month, too.

2   Q    Okay.  And what percentage of the clients that you saw

3   were Medicaid?

4   A    All my clients were Medicaid.

5   Q    And so for your time to be paid, you had to comply with

6   Medicaid rules; is that right?

7   A    Yes.

8   Q    And that meant that your -- the time of the sessions could

9   not overlap; is that correct?

10  A    Yes.

11  Q    And that meant that the charting for the client had to be

12  in compliance; correct?

13  A    With the Medicaid regulations, yes.

14  Q    How did you -- well, strike that.  How did you learn how

15  much you had been paid for your work at Life Strategies?

16  A    Repeat that.

17  Q    How did you learn what you had been paid while you were at

18  Life Strategies?

19  A    Pretty much comparing the total amount of hours that I had

20  to what I got paid.

21  Q    Okay.  And so my question -- let me try to ask it a little

22  more direct.  Did you receive a pay stub?

23  A    Yes.

24  Q    How would you get that pay stub?

25  A    It would be put in my mailbox at the office.

47

1   Q    Did you do any -- did you have anything where you would

2   get your pay information electronically?

3   A    It was a system that you could look at for the pay stubs

4   with also PTO time.

5   Q    But you got -- as I think I'm hearing you say it, you got

6   yours by -- with an envelope that was at the office; correct?

7   A    Yes.

8   Q    Okay.  Would that pay stub have your gross pay on it?

9   A    Yes.

10   Q    Your net pay?

11   A    Yes.

12   Q    The withholdings that you had?

13   A    Yes.

14   Q    The regular hours that you had?

15   A    Yes.

16   Q    Group units that you had?

17   A    It didn't break it down into group units.

18   Q    It didn't?

19   A    All of that was specific on the billable hours.

20   Q    Under the regular -- for the billable hours?

21   A    Uh-huh.

22   Q    And then what about staffing or training?  Would that be

23   indicated on there?

24   A    Yes.

25   Q    Are you claiming that you should be paid some hourly

48

1   amount beyond what was paid for the billable hour?

2   A    If it was work that was still under the realm of the

3   services that I provided, yes.

4   Q    You don't believe that the billable hour was a task-based

5   form of compensation; is that your testimony?

6   A    The billable hours was paid -- was just for services that

7   of which you had the client for you.  But it was still other

8   work that was still added --

9   Q    Okay.

10  A    -- outside of the billable hours.

11  Q    And so what rate are you saying you should be paid at for

12  the time outside of the session?

13  A    I haven't determined the rate.

14  Q    Okay.  Was there anything that was said to you or that --

15  or that was provided to you that said, You're going to be paid

16  for doing notes on weekends, or, You're going to be paid for

17  scheduling clients, or, You're going to be paid for driving

18  time?  Was there anything that was provided to you saying how

19  that would be done?

20  A    No.

21  Q    Was there someone that told you, Hey, we paid you for the

22  billable -- Life Strategies pays you for the billable hour, but

23  they also pay you for other tasks that go along with the

24  billable hour?

25  A    No.

49

1    Q    Did you have any disputes with Life Strategies about how

2    your total compensation was calculated?

3    A    At times, I questioned certain events that may have

4    occurred, that I was out longer, that -- how could I have

5    gotten paid for some of them?

6    Q    How many instances of that -- did that occur?

7    A    I don't recall how many times it happened.

8    Q    Was there someone you would have a discussion with?

9    A    Yes.

10   Q    Who was that?

11   A    My supervisor.

12   Q    Who was that?

13   A    Luke Sandlin.

14   Q    And so I just want to kind of understand what you're

15   referring to.  Are you -- would it be something where you would

16   look at your -- at some document and think, Well, I didn't get

17   paid for this billable hour?

18   A    I had an instance that I was at a home several hours, and

19   I was questioning how could I get paid related to that, due to

20   the crisis circumstance.

21   Q    And so did you talk with Mr. Sandlin about that?

22   A    Yes.

23   Q    And what did he tell you?

24   A    He advised me how to do notes to get some of the time

25   compensated, but all of the time wasn't, I know, for that

50

1    particular instance.

2    Q    So all of the time for that crisis situation was not

3    billable; is that right?

4    A    Right.

5    Q    Do you know when that was?

6    A    June 2020.

7    Q    Do you know how long you spent at that client's home in

8    that crisis situation?

9    A    Over eight hours.

10   Q    So did it cause you to have to cancel other folks you were

11   going to see that day?

12   A    It cost me -- had to -- I had to, yes, reroute and

13   reschedule other people during that time.

14   Q    Did you -- either you or Mr. Sandlin put anything in

15   writing about that instance, as it related to your pay?

16   A    No.

17   Q    What were the nature of the other instances that you had

18   -- where you had discussions with Life Strategies, where you

19   disputed something about -- or, where you thought something

20   about your check was not correct?

21   A    Different times relating to having to attend meetings for

22   clients.  IEP, 504 meetings.

23   Q    Those meetings were not billable; is that correct?

24   A    Yes.

25   Q    Yes, they -- and I asked the question poorly.  You

51

1    couldn't bill for IEP meetings?

2    A    No.

3    Q    You could not bill for 504 meetings?

4    A    No.

5    Q    And so you brought -- sounds like you brought more than

6    one instance up of that, of not being able to get paid for

7    those.

8    A    At different times, yes.

9    Q    Okay.  And so what was Mr. Sandlin's response?

10   A    That, you know -- do what I needed to do for the client.

11   Q    And what did you take that to mean?

12   A    For me, I was going to do what I needed to do for the

13   clients.  If it means giving them the needed services or

14   special accommodations, then I was going to attend the meeting.

15   Q    Okay.  Did Mr. Sandlin say anything to you, That's part of

16   what you've been paid for?

17   A    No.

18   Q    Okay.  You understood though from that, that you weren't

19   going to get any more money other than what was paid for the

20   billable hour, for the actual -- for what was paid for the

21   billable hour; correct?

22   A    I knew that I wouldn't get paid.

23   Q    Did you have any other types of things that you either

24   inquired about or that you questioned about your -- about your

25   check?

52

1    A    Not that I can recall.

2    Q    Did you have any other discussions or questions about your

3    compensation?

4    A    Not that I can recall, not any others.

5    Q    Did you ever tell anyone at Life Strategies that you

6    thought you should be paid overtime?

7    A    Not that I can recall directly.

8    Q    You certainly don't have any note or letter or email or

9    text where you made that that type of claim; correct?

10   A    Right.  Correct.

11   Q    Did you also -- during the time that you were there, in

12   addition to getting a pay stub, did you have access to

13   information about what items were billed and that you were --

14   A    You can look into the note documentation system, and you

15   can get a review of what has been billed per client or per your

16   caseload.

17   Q    Did you -- did you ever check that against what you were

18   paid?

19   A    At times, yes.

20   Q    Okay.  Ever have any instance where that was -- where what

21   was reflected in that system was different than what you -- or,

22   where you thought it was different than what was being paid to

23   you?

24   A    That was just for entering the individual note status.  Of

25   course, dealing with insurance, if it was paid, you know, when

53

1  the claims came through, that's a different type of system.

2  But if I put that note in, that was there, and I was able to

3  use that to count and compare it with mine also.

4  Q    You didn't have any kind of exception report or something

5  like that, that would show you maybe ones that were not

6  billable for whatever reason; correct?

7  A    Correct.

8  Q    So what was Mr. Sandlin's title?

9  A    He was the Clinical Director for the Little Rock office.

10 Q    Was your understanding that if Life Strategies couldn't

11 bill for an hour of your services, you wouldn't get paid for

12 those services?

13 A    Yes.

14 Q    Were you trained in how to enter notes?

15 A    Yes, that was part of the training.

16 Q    Your ethics as a -- as a social worker require that you

17 only claim the time that you -- that you worked; correct?

18 A    I'm trying to think of the code for that particular

19 situation.

20 Q    But there are ethical rules that say you can't overbill;

21 right?

22 A    Overbill certain clients to an extent, yes, without a

23 necessity.

24 Q    There are ethical rules that say you can't say, I worked

25 twelve hours, when you only worked eight?

54

1    A    Right.

2    Q    Do you have any documentation or other records to show

3    what hours you worked?

4    A    I have -- like I said, I kept a log of the different

5    clients that I seen on certain days and that billable time.

6    Q    And that's the log you provided to Mr. Ford?

7    A    Part of it, yes.

8    Q    And have you -- well, are there other -- is there other

9    information of -- that you still have concerning your time at

10   Life Strategies?

11   A    No.  Just those ledgers that I have on hand.  After a

12   certain time or extent, my personal ones that had my personal

13   notes related to them, those were separate.  And as I entered,

14   I destroyed those.

15   Q    Did you provide those to Mr. Ford already?

16   A    Not -- just part of it.  Not everything completely.

17   Q    Well, I'm going to ask you, as it relates to Life

18   Strategies -- and if they -- if there's any documentation that

19   suggests what the time is or that contains any personal

20   identifying information of others, that you provide that to Mr.

21   Ford or his office.

22   A    Yes.

23            MR. MAYFIELD:  And I'm requesting those, Mr.

24       Ford, but I just want to make that part of it clear.

25   Q    How did you find out about this lawsuit?

55

1    A    Over a year ago.

2    Q    No.  How was it that you learned of it?

3    A    I got information in the mail.

4    Q    And you believe that was approximately a year ago that you

5    got that information?

6    A    I believe so.

7    Q    Have you had any discussions about compensation with

8    Kerrie Garrison?

9    A    I don't recall who that is, no.

10   Q    Okay.  Have any discussions about compensation or overtime

11   with Don Mitchell?

12   A    No.

13   Q    Have any discussions about compensation or overtime with

14   Kendra Fite?

15   A    No.

16   Q    Have any discussions about compensation or overtime with

17   Nellie Caldwell?

18   A    No.

19   Q    Have any discussions about compensation or overtime with

20   Shannon Ayers?

21   A    No.

22   Q    Have any discussions about compensation or overtime with

23   Dianne Yancey?

24   A    No.

25   Q    With the work that you do for Argenta now, are you paid

56

1  salaried or hourly?

2  A    It's a negotiated rate.

3  Q    A negotiated rate per what?

4  A    Session.

5  Q    Okay.  So similar kind of thing, billable hour, base pay;

6  right?

7  A    Yes.

8  Q    All right.  Are you paid at that job for time preparing

9  your note or scheduling or attending meetings?

10  A    With this job, primarily was contracted.  And it just

11  recently switched over, and so we are compensated in advance

12  for services that we provide.

13  Q    Is it -- is the -- is the calculation of the compensation

14  based upon the negotiated rate for the sessions?

15  A    Negotiated rate for some sessions, but also negotiated

16  time for billing and phone calls, scheduling.

17  Q    And how is that -- what's -- is there a difference between

18  what's negotiated for billing and phone calls versus session?

19  A    Yes.

20  Q    And how does that compare to -- does -- how does the stuff

21  outside of the sessions that's negotiated compare to what's

22  negotiated for the sessions?

23  A    How is it what now?

24  Q    How does it compare?  More, less, about the same amount?

25  A    The amount that you get for a session is more than what

57

1   you get for the non-billable amount.

2   Q    Is it based upon time?

3   A    It's not based -- it's automatic -- excuse me.  It's

4   automatically added into your base pay, so it doesn't have a

5   time.  It's just a time that was allotted when negotiating your

6   base pay.

7   Q    Is it based upon the task, then?

8   A    You're talking about each individual task?

9   Q    I'm talking -- I mean, it could be each individual task.

10  It could be a collection of some tasks.

11  A    I'm not sure how they actually did that base.

12  Q    And so here's a -- here's what I want to understand.  So

13  you're saying that with this company, you're getting paid and

14  -- well, so -- okay.  So what are you getting paid for a

15  session?

16  A    It's private insurance.  It's not Medicaid.

17  Q    Okay.

18  A    Each person's session is different, based on what the

19  insurance will compensate you.  So if --

20  Q    Okay.  So give me a range.

21  A    Most sessions I billed at 225 to 130.

22  Q    Okay.  And so what about -- do you get additional money if

23  you say, Well, I had to do notes for that session.

24  A    That's part of the base pay that they negotiated.  They

25  added time for notes, phone calls, and scheduling.

58

1   Q    Do you get additional pay -- okay.  So you addressed that.

2   So the 130 to 225 is something -- is a typical thing, is paid

3   for all of the things involved in that; correct?

4   A    Right.

5   Q    And you negotiated that as a whole; right?

6   A    Yes.

7   Q    Ma'am, have I been polite and courteous to you today?

8   A    I'm sorry.  What did you say?

9   Q    Have I been polite and courteous to you today?

10  A    Yes.

11            MR. MAYFIELD:  Thank you, ma'am.  That's all the

12       questions I have at this time.

13            MR. FORD:  I'll reserve any questions for trial.

14       Thank you.

15           (WHEREUPON, the proceedings were concluded in

16       the matter at 11:55 a.m. on March 24, 2023.)

17                (WITNESS EXCUSED)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF ARKANSAS          )

                          )ss

COUNTY OF BENTON           )


    I, ALLISON RASMUSSON, Certified Court Reporter #833 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.


    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

60

WITNESS MY HAND AND SEAL this 7th day of April, 2023.


_____

ALLISON RASMUSSON, CCR

Certified Court Reporter #833

My Commission Expires:  11-26-30