# Transcript of the Testimony of
# **Jennifer Williamson**

**Date:** March 21, 2023
**Case:** Wihebrink v. Life Strategies Counseling



Conway Court Reporting
Phone: 501-319-4807
Email: scheduling@conwaycourtreporting.com
Internet: www.conwaycourtreporting.com

Jennifer Williamson

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


STACY WIHEBRINK, Individually and on

Behalf of All Others Similarly Situated            PLAINTIFF


VS.                    NO. 4:21-CV-573-DPM


LIFE STRATEGIES COUNSELING, INC.                  DEFENDANT


ORAL DEPOSITION

OF

JENIFER WILLIAMSON

TAKEN MARCH 21, 2023, AT 3:02 P.M.


Conway Court Reporting

21043 Natalie Lane

Little Rock, Arkansas  72206


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:


MR. COLBY QUALLS

SANFORD LAW FIRM, PLLC

10800 FINANCIAL CENTRE PARKWAY, SUITE 510

LITTLE ROCK, ARKANSAS 72211

colby@sanfordlawfirm.com


ON BEHALF OF THE DEFENDANT:


MR. MARK MAYFIELD

WOMACK, PHELPS, PURYEAR, MAYFIELD & McNEIL, P.A.

P.O. BOX 3077

JONESBORO, ARKANSAS 72403

mmayfield@wpmfirm.com

Jennifer Williamson

I N D E X

STYLE AND NUMBER  . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE  . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  JENIFER WILLIAMSON

       Examination by Mr. Mayfield  . . . . . . . . . . . . 5

       Deposition Concluded   . . . . . . . . . . . . . . 46

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . . 47

ERRATA SHEET

SIGNATURE PAGE


   (NO EXHIBITS WERE IDENTIFIED OR ATTACHED TO THIS TRANSCRIPT)

Jennifer Williamson

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF JENIFER WILLIAMSON, a
witness produced at the request of the Defendant, taken in the
above-styled and numbered cause on the 21st day of March, 2023,
at 3:02 p.m., at the law offices of Sanford Law Firm, 10800
Financial Centre Parkway, Suite 510, Little Rock, Arkansas,
pursuant to the Federal Rules of Civil Procedure.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

5

```
 1                    P R O C E E D I N G S
 2          THEREUPON,
 3                        JENIFER WILLIAMSON,
 4              THE WITNESS HEREINBEFORE NAMED, having
 5              been first duly cautioned and sworn by me
 6              to testify to the truth, the whole truth,
 7              and nothing but the truth, testified on her
 8              oath as follows, to-wit:
 9                        EXAMINATION
10   BY MR. MAYFIELD:
11   Q    Please state your full name for the record, ma'am.
12   A    Jenifer Kay Williamson.
13   Q    Okay.  And just so I'll make sure, Jenifer, is that one N
14   or two?
15   A    One N.
16   Q    One N, okay.  I wanted to make sure I got that right.  How
17   many times people get that wrong?
18   A    Oh, a lot.
19   Q     I figured as much, and I don't mean -- I'm not making
20   light of that.  I just figured that -- figured it had happened.
21   My name is Mark Mayfield.  I represent Life Strategies
22   Counseling, and I'm going to have some questions today of you.
23   The main thing that I want is that -- to make sure that you
24   understand my question.
25        If I ask you something and you don't understand it, don't
```

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

6

1   try to answer it.  Tell me you don't understand it.  I'll try

2   to clarify it so that we can make sure.  Because we're relying

3   on the information to understand the case better, understand,

4   you know, your point of view and what you have to say.

5       It'll help us if you'll wait until I finish my question.

6   I'll try to wait until you finish the answer unless -- you

7   know, and I have these people that give, like, five-minute

8   answers to a two-sentence -- to a five-word question.  I might

9   stop you in that situation just because it may be that I've not

10  communicated what I'm asking very well.  But, otherwise, I'll

11  try to stay out of your way.  And it just makes it easier on

12  our court reporter.  I'd ask you to give verbal answers.

13  **A**   Okay.

14  Q   Head nods don't pick up on the recording.  And huh-uhs and

15  uh-huhs don't read worth anything sometimes.  The court

16  reporters try really hard, but it's a challenge for them.  And

17  so we shouldn't be here super long time.  We can take a break.

18  We'll take one -- we'll probably take one break for sure.  But

19  if at some point you need another break for some reason or

20  another, I'll work with you try to accommodate that.

21      Sometimes I'm trying to complete a thought or complete a

22  line of questioning, so we may go on.  But, otherwise, I

23  promise you it's not aimed at making you uncomfortable when you

24  need to take a break.  That's not my intention.  I don't think

25  I'll ask you anything that embarrasses you.  My question is not

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

7

1   -- my questions are really designed to get information from

2   you.  Have you ever given a deposition before?

3   **A**    No.

4   Q    And have you ever gone by any other name other than

5   Jenifer or Kay Williamson?

6   **A**    No.

7   Q    Ever served in the military?

8   **A**    No.

9   Q    Have you done anything to prepare for this deposition?

10  And I'm not talking about maybe meeting or talking with the

11  lawyers.  I'm just talking about anything else.

12  **A**    No.

13  Q    Have you reviewed any documents in preparation for the

14  deposition?

15  **A**    No.

16  Q    I'm going to be asking some questions today about Life

17  Strategies Counseling, Inc.  Is it okay if I just say Life

18  Strategies?

19  **A**    Yes.

20  Q    Okay.  There's actually another Life Strategies.

21  **A**    Oh.

22  Q    It's a different company up in northeast Arkansas or kind

23  of east Arkansas.  But you didn't ever -- you never worked for

24  that company; right?

25  **A**    No.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

8

1    Q    Okay.  And so if I ask you Life Strategies, we're talking

2    about Life Strategies Counseling, Inc.?

3    **A**    Yes.

4    Q    All right.  Did -- when you -- if you gave Life Strategies

5    your date of birth when you became -- after you became

6    employed, did you give them the accurate date of birth?

7    **A**    Yes.

8    Q    Okay.  And accurate social security number?

9    **A**    Yes.

10   Q    And that way we don't have to put the date of birth and

11   social security number in the record.  Where do you currently

12   live?

13   **A**    I currently live in Washington, Arkansas.

14   Q    You didn't begin that with Historic Washington, Arkansas;

15   right?

16   **A**    No, I didn't.

17   Q    Okay.  And so what's your address?

18   **A**    926 Highway 73 West, Washington, Arkansas 71862.

19   Q    How long have you lived in Washington, Arkansas?

20   **A**    About 50 years.

21   Q    Okay.  So, now, is that Hempstead County?

22   **A**    It is.

23   Q    I'm going to go ahead and ask this, because I'm hoping the

24   answer is really simple.  But if it's not, then I'll go a

25   different direction.  Do you have any relatives in the central

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

9

1   part of the state?

2   **A**   Yes.

3   Q    Okay, all right.

4             MR. MAYFIELD:  Can we have the same agreement

5         with her as we do with the others that we --

6             MR. QUALLS:  Yes.

7   Q    (Mr. Mayfield continuing)  I don't want go through and ask

8   you about all the relatives if it's not necessary.  There's a

9   way it might become necessary.  But if it does, we'll work that

10  out between the attorneys, and then they'll work it out with

11  you; okay?

12  **A**   Okay.

13  Q    That will keep us from asking about five pages of

14  questions.

15  **A**   Okay.

16  Q    So -- not five literal pages but five pages of transcript.

17  Okay.  What is your marital status?

18  **A**   Married.

19  Q    And your spouse's name?

20  **A**   Shaletta, S-H-A-L-E-T-T-A, Williamson.

21  Q    How long have you and Shaletta been married?

22  **A**   When did we get married?  Seven years ago.

23  Q    Seven, okay.  And that's approximate; right?

24  **A**   Approximately.

25  Q    Approximately seven years ago, okay.  Okay.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

10

1   **A**   Don't tell her.

2   Q   Does Shaletta work outside the home?

3   **A**   She does.

4   Q   And what does she do for a living?

5   **A**   She's a quality behavior health profession.

6   Q   Who for?

7   **A**   Therapeutic Family Services.

8   Q   Okay.  Have you been married on any other occasion?

9   **A**   No.

10   Q   Have you been involved in any other lawsuit?

11   **A**   Not that I recall.

12   Q   Okay.  I'm going to ask you a few questions, and I'm not

13   stating or implying anything by asking these questions.  Are

14   you under the influence of any medication or other substance

15   that would affect your ability to give a true and accurate

16   deposition today?

17   **A**   No.

18   Q   Do you have anything going on in your life that would

19   affect your ability to give a true and accurate deposition

20   today?

21   **A**   No.

22   Q   Okay.  And, again, don't mean anything by this.  But have

23   you ever been convicted of a felony or a crime involving

24   dishonesty or false statement?

25   **A**   No.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

11

1   Q    During the time that you worked at Life Strategies, did

2   you use any social media?

3   **A**    Yes.

4   Q    Okay, what social media?

5   **A**    Facebook.

6   Q    Any others?

7   **A**    Nothing consistently.

8   Q    Okay.  So what was your -- do you still have a Facebook

9   account?

10   **A**    Yes.

11   Q    Okay.  What was your name on Facebook at the time you

12   worked for Life Strategies, or what name did you -- were you

13   under on Facebook?

14   **A**    Kay Williamson.

15   Q    Kay Williamson.  Is that still how it is today?

16   **A**    Yes.

17   Q    Okay.  All right.  There's a notebook in front of you.

18   And I'm going to ask you to go to the tab that's Number 31.

19   And you can open it all the way up, if that's easier for you,

20   however you want to handle it.

21   **A**    Okay.

22          MR. MAYFIELD:  Which, by the way, before I

23          forget this, we -- the attorneys have copies of

24          duplicate sets of the exhibits.  We don't want to put

25          the exhibits in the record with the record.  We'll

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

12

1              send you a copy if that will make it convenient for

2              you, and we can work all that out.  We can send it

3              electronically where y'all can have it if you -- if

4              there's something you need or something you need to

5              refer to.

6                   THE COURT REPORTER:  Okay.

7                   MR. MAYFIELD:  Is that all right?

8                   MR. QUALLS:  Yes.

9                   MR. MAYFIELD:  Okay.  All right.

10  Q   (Mr. Mayfield continuing)  Okay.  Let's kind of look

11  through this.  I think what we have here as Exhibit 31 is maybe

12  a resume for you that I guess had been updated at some point in

13  time; is that right?

14  A   Yes.

15  Q   Okay.  So it looks here like in looking at this that at

16  the point in time this was done, you had started at Life

17  Strategies on June the 3rd of 2019?

18  A   That sounds correct.

19  Q   Okay.  And whenever this -- you don't know when this was

20  submitted, do you?

21  A   I have no idea.

22  Q   Okay.  You're not -- where are you working now?

23  A   Therapeutic Family Services.

24  Q   When did you start working for them?

25  A   July -- late June, early July either '21 -- '20 or '21.

Conway Court Reporting

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

13

1    I'm not really sure.  I really don't remember.

2    Q    Okay.  Well, let's -- and then what role do you have with

3    Therapeutic?

4    **A**    I'm a licensed professional counselor.

5    Q    Is that -- are you seeing folks with -- on Medicaid and --

6    **A**    Yes.

7    Q    Okay.  With that job, how are you paid?  Salary, hourly,

8    billable, what?

9    **A**    Billable hours.

10   Q    Okay.  Is it similar to how you were paid at Life

11   Strategies?  I'm not saying exactly the same.  I'm just

12   saying --

13   **A**    As far as I understand, I believe so.  I really don't

14   honestly remember.

15   Q    Okay.  All right.  But what I think I'm hearing from you

16   is is that your compensation is based upon the hour -- at

17   Therapeutic Family Services, it's based on the hours you bill;

18   is that right?

19   **A**    Yes, yes.

20   Q    Okay.  And just so I can kind of close this gap in my

21   mind, are you full time, part time with Therapeutic Family

22   Services?

23   **A**    I'm full time.

24   Q    Do you work overtime for them?

25   **A**    No.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

14

1  Q    Okay.  All right.  So was Life Strategies the last place

2  you worked before Therapeutic Family Services?

3  **A**    Yes.

4  Q    And so when I'm looking at Exhibit 31 here, I see that

5  it's got an address in Little Rock.  Was that just an address

6  you used so you could work or --

7  **A**    Yes.  Well, I -- actually, it was an address that -- it

8  was my wife's apartment.

9  Q    Oh, okay.

10  **A**    Yeah.

11  Q    Okay.  So were y'all living in a couple of places at that

12  point in time?

13  **A**    I have a home, yes, in Washington that I own that I live

14  in.  And when I moved to Little Rock for us to be together

15  basically --

16  Q    Right.

17  **A**    -- I stayed there with her.

18  Q    But have -- you all have since moved down -- or moved to

19  Washington; is that right?

20  **A**    Uh-huh.

21  Q    Is that a yes?

22  **A**    Yes.  I'm sorry.

23  Q    That's okay.  It's okay.  People do it all the time.

24  **A**    Yes, yes.

25  Q    So, okay.  All right.  Let's see.  So it looks like you

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

15

1   were at New Beginnings Behavioral Health for seven years?

2   A    Yes.

3   Q    And so then this Vista Health Services of Texarkana, was

4   that a job that involved your license, or was that something

5   different?

6   A    I was a mobile assessor.  I didn't have to be licensed for

7   that.

8   Q    Okay, all right.  And then you were a -- it looks like

9   before that with Therapeutic Family Services in Little Rock --

10  A    Yes.

11  Q    -- and Nuvision, N-U-V-I-S-I-O-N; right?

12  A    Yes.  Yes, sir.

13  Q    Okay.  Looks like -- and you've had history as a probation

14  officer/case manager and a technician -- mental health

15  technician.

16  A    Yes.

17  Q    So lots of experience in the mental health field; right?

18  A    Yes.

19  Q    So how -- what was it that prompted you to become a

20  professional counselor?

21  A    Just been working with kids all my life.  So I figured the

22  next step and better for my knees would be to become a licensed

23  professional.

24  Q    Did you say better for your knees?

25  A    Better for my knees.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

16

1    Q    Okay, okay.  I got you.  Okay.  And so when did you get

2    your license?

3    **A**    2013.  Around 2013.

4    Q    Okay.  And so if you started at New Beginnings in 2012,

5    were you -- I guess you were almost there to getting your

6    license.  Is that what it was?

7    **A**    Yes.  I would have worked there then.

8    Q    I got you.  Under your certifications and licenses it says

9    crisis prevention, intervention instructor.

10   **A**    Yes.

11   Q    Is that something you do on a regular basis?

12   **A**    Not anymore, no.

13   Q    When -- back -- when did you do that?

14   **A**    When I worked at Pinnacle Pointe.

15   Q    Where is -- oh, I'm sorry.  Okay.  So when you were a

16   mental health technician.

17   **A**    Yes.

18   Q    Oh, I see.  And then for a while it looks like you worked

19   at Pinnacle Pointe and at some other places; right?

20   **A**    Yes.

21   Q    So --

22   **A**    I did probation.  I did Pinnacle on the weekends.

23   Q    Got you.  Understand.  Okay, well, let's flip back here to

24   Exhibit 32.  I don't plan to recover all this.  So -- but this

25   looks to me like it's probably an earlier version of this,

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

17

1    similar document; is that right?

2    **A**    Yes.

3    Q    Then last but not least I'll ask you to turn to 33, just

4    your cover letter to go with the resume; right?

5    **A**    Yes.

6    Q    And what date is Exhibit 33 dated?

7    **A**    April 16th, 2018.

8    Q    Okay.  So looks like you applied or sent something in

9    then.  But then if you go to Exhibit 34, it's got a date of May

10   16th of 2019.  And then let's look.  And then we've got -- June

11   3rd of 2019 is the date of the acceptance listed on the second

12   page of Exhibit 34.  So let's stay on the first page for a

13   second, then we'll go to the second one.  It looks like the

14   offer of employment was made as a mental health professional at

15   a billable hour rate of $50.

16   **A**    That's what it says.

17   Q    Okay.  Is that what was -- and then looks like they were

18   also going to do some -- pay you for some training, if you look

19   down at the third bullet point.

20   **A**    Yeah.

21   Q    Okay.  And so let's look at the second page of this

22   document and just ask you if that's your signature on the

23   second page.

24   **A**    Yes.

25   Q    Okay.  So other than this document, did Life Strategies

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

18

1   give you any other document that set the terms of how you would

2   be paid?

3   **A**   I don't recall.

4   Q   Okay.  Is this paying you at a billable hour rate of $50,

5   is that how you were paid?

6   **A**   Honestly don't recall.

7   Q   Okay.  You just don't know one way or the other; right?

8   **A**   I really don't remember.

9   Q   Okay, all right.  Did you have a conversation with someone

10  that was in management at Life Strategies where you were

11  promised something additional pay-wise than what is stated in

12  Exhibit 34?

13  **A**   Not that I recall.

14  Q   Are you claiming -- and I just want to make sure I've got

15  this.  Are you claiming that someone at Life Strategies either

16  said something to you or provided you some document or piece of

17  information to tell you that you were going to be paid on a

18  basis other than $50 per billable hour?

19  **A**   Not that I recall.

20  Q   Okay.  And that's what I'm trying to get past.  I

21  understand that that's not what you recall.  But maybe there's

22  somebody else that's going to say something that you know of,

23  or there's some other document or item you've seen.  And so

24  that's why I'm asking you if that's what you're claiming, is

25  that you were going to be paid something different than what's

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

19

1    stated in that letter that's Exhibit 34.  And if you can't

2    think of anything, that's fine.  I just want to make sure that

3    I don't hear what you're claiming for the first time at trial.

4    **A**    We had -- there was just lots of meetings and staffings

5    and stuff.  I can't say for sure.

6    Q    Okay.  All right.  Let's turn to Exhibit 36 -- I'm sorry

7    -- 37.  Excuse me.  This is an orientation schedule.  And so

8    does this schedule kind of fairly represent what y'all did in

9    the training?

10   **A**    Yeah.

11   Q    Did you go over the things that are X-ed along the side of

12   this first page of Exhibit 37?

13   **A**    Yeah, I guess.

14   Q    Okay.  And you don't have any reason to doubt that?

15   **A**    I don't.

16   Q    Okay.  And then there on the second page of Exhibit 37,

17   there's some other items.  And I assume your answer would be

18   the same with respect to those?

19   **A**    Yeah, I guess.

20   Q    There's a signature on this Page 2734 that looks to be

21   your signature.  Is it your signature?

22   **A**    Yes.

23   Q    Then let's go to Exhibit 38.  Do you recognize that

24   document?

25   **A**    Yes.

Jennifer Williamson

20

1    Q    Okay.  Does -- under job competencies, essential duties

2    and responsibilities, does that accurately describe what your

3    job was while you were at Life Strategies?  And if you're

4    having trouble reading it, I can make it bigger.

5    A    Yeah.  Because I can't see this.

6    Q    I'm sorry about the size of the -- okay.  If you'll take

7    that and hold that, then you can take it --

8    A    Oh, okay.

9    Q    And you can either move that thing or --

10   A    Okay.  Looks about right.

11   Q    Okay.  And would it be fair to say that being a licensed

12   professional counselor in the job that you did at Life

13   Strategies, that it required you having the professional

14   training that you have?

15   A    Yes.

16   Q    Okay.  You have to know the techniques and have to know

17   how to know and kind of assess what's going to work with

18   someone; right?

19   A    Right.

20   Q    To be able to provide them therapy in a way that's

21   effective for them; correct?

22   A    Right.

23   Q    Okay.  And by the way, on Exhibit 38 at the bottom of the

24   page, is that your signature?

25   A    Yes.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

21

1    Q    Looks like it's also signed by Luke Sandlin.  Who is Luke

2    Sandlin?

3    **A**    He's the clinical director -- or he's the lead something.

4    It wasn't clinical.

5    Q    Okay.  Let's look at Exhibit 39 and see if you can

6    identify that as your signature on that document.

7    **A**    Yes.

8    Q    All right.  So was Mr. Sandlin your supervisor?

9    **A**    Yes.

10   Q    What work -- well, strike that.  Let me back up.

11        What kinds of therapy did you provide while you were at

12   Life Strategies?  Like, individual, group, family?

13   **A**    Oh.  Individual, group, family.

14   Q    Okay.

15   **A**    Yeah.  I did all of it.

16   Q    Did you provide any of that in the schools?

17   **A**    Yes.

18   Q    How many schools?

19   **A**    At least four to five.

20   Q    Which school district?

21   **A**    Little Rock.

22   Q    Was there a particular age range, or was it all school-age

23   range?

24   **A**    Most of it was school-age range.

25   Q    Okay.  And what I was saying is, I mean, like, you didn't

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

22

1   just do just elementary?

2   **A**   No.

3   Q   You did junior high and high school?

4   **A**   High school.  All.

5   Q   During the time you were at Life Strategies, how many days

6   a week did you work?

7   **A**   Five to six.

8   Q   How many hours a day do you think you worked?

9   **A**   On the modest end, probably 12.

10  Q   Okay.  And would that be 12 hours a day, six days a week?

11  **A**   Most weeks.

12  Q   So kind of take me through a day.  What time would you get

13  started working?

14  **A**   Typically 7:30 I was -- 7:15, 7:30 I was at my school --

15  elementary school every day.  And after elementary would be

16  over, I would usually go to the junior high and see one or two

17  kids, junior high, two or three kids maybe at home.  And that's

18  pretty much -- at least five days a week for sure.  And the

19  weekends usually, typically I would say four to five each

20  weekend, kids that I couldn't get to during the week -- during

21  my regular workweek rather.

22  Q   You would see four to five kids each weekend -- children I

23  mean?

24  **A**   Yes.  Most weekends.  I won't say every weekend but most.

25  Q   Would that be both Saturday and Sunday, or would it

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

23

1   typically be, like, a Saturday?

2   **A**   More Saturday.  I don't recall working very much on

3   Sunday, not direct care.

4   Q   When would your therapy day -- when would your therapy

5   part of your day end?

6   **A**   After 5:00 every day.

7   Q   Now, during the times that you were doing therapy, would

8   you have time to make maybe a portion of your notes, or did it

9   just vary?

10  **A**   Usually, no.  Because I had -- elementary-age kids are

11  high-volume kids.  I had very volatile kids.  So you can't type

12  a note while you've got a kid in front of you.  It was hands-on

13  with them.  And when would I leave there and go to middle

14  school, middle school kids are a little different.  But, again,

15  it's too much of a distraction.  Because most of the kids had

16  ADHD. They can't focus while you typing or you writing a note

17  or whatever.  Even taking notes is almost impossible with them.

18  Q   Okay.  So when did you do your notes?

19  **A**   Between 9:00 p.m. to 1:00, 2:00 in the morning most

20  nights.

21  Q   So you would spend four to five hours?

22  **A**   Conservatively, yes.

23  Q   And you say most nights.  Does that mean three days a

24  week, four days a week, five days a week?

25  **A**   At least four days a week.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

24

1    Q    Did you take any breaks during the day?

2    **A**    Maybe 15, 20 minutes here and there between clients or

3    bathroom.

4    Q    But you didn't take lunch breaks?

5    **A**    Most days I didn't.

6    Q    How often in a week would you take lunch breaks?

7    **A**    Maybe once a week.

8    Q    When you took a lunch break, how long would it be?

9    **A**    15, 20 minutes.

10   Q    During those lunch breaks, would you do any note entering?

11   **A**    Yeah.

12   Q    Okay.  I assume that the entering of notes was something

13   that had to be done on the computer?

14   **A**    Yes.

15   Q    You didn't have any paper records of the -- that you -- to

16   keep up with the notes; right?

17   **A**    No.

18   Q    How long would it take you to complete a progress note?

19   **A**    It's kind of hard to say, because it varies depending on

20   what skill I was working with them on in trying to make sure

21   the documentation flows in a way that it doesn't get sent back

22   to you.  You have to make sure it's worded correctly.

23   Everything is in stages or phases.  So to honestly answer your

24   question, it probably was 20, 30 minutes to do a note.

25   Q    To do a progress note?

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

25

1    **A**    Yes.

2    Q    What about a treatment plan?

3    **A**    Oh, God.  Treatment plans usually took at least an hour to

4    do.

5    Q    What about an update of a treatment plan?

6    **A**    45 minutes easily.

7    Q    Were there other -- was there other paperwork in the

8    electronic medical record system that you would have to do

9    other than progress notes, treatment plans, and updates?

10    **A**    Did safety plans.  We did crisis plans.  Anytime we had

11    crisis that's when we have to do, like, an additional crisis

12    form for a client in crisis that were harmful to themselves or

13    somebody else.  You had to do a -- that was a whole separate

14    thing from the progress note.

15    Q    Who did the scheduling for who you were going to see?

16    **A**    I primarily did it.

17    Q    Who made sure that you were authorized to see and to bill

18    a client?

19    **A**    I don't understand what you mean.

20    Q    Well, like, that you had the proper authorization from the

21    primary care physician, practitioner or -- did you have to have

22    any of that?

23    **A**    Well, the -- for Medicaid kids, yeah.  You have to have a

24    PCP referral.

25    Q    Okay.  Was there any other documentation you had to be

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

26

1  able to be -- did you have to have something that told you how

2  much therapy you could provide in a week?

3  **A**    Well, Medicaid had limits, had -- well, parameters where

4  you had to work through.  Yeah.

5  Q    Did it take that much time to get the information you had

6  to have to be able to be authorized to see the person?

7  **A**    I don't really know what the process was on that.

8  Q    Okay.  Was the billable-hour payment intended to

9  compensate for all the work involved in a visit?

10  **A**    No, no way possible.

11  Q    And so why do you say that it was not intended to do that?

12  **A**    Because even after you spent an hour with a kid, the

13  documentation to come home -- you would have to finish the

14  documentation after spending that much time with a kid, it's

15  not worth $50 an hour.

16  Q    And let me back up and kind of ask it back this way.

17  **A**    Okay.

18  Q    I understand that you may say that that wasn't enough pay

19  for doing that work.

20  **A**    Okay.

21  Q    What I'm trying to say is what makes you believe that Life

22  Strategies intended to pay you more than $50 per billable hour

23  for all the work that was involved with it?

24  **A**    Well, because they know what managing a caseload with 40,

25  50 kids takes.  They know what it takes.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

27

1   Q    Okay.  Are you saying that Life Strategies didn't pay you

2   what they promised to pay you?

3   **A**    I'm not saying they didn't pay me what they promised.

4   Q    Okay.

5   **A**    Or what they agreed to pay me.  I'll say that.

6   Q    But what I'm trying to understand from you is do you have

7   some piece of proof or testimony that someone said or did

8   something that told you Life Strategies was going to pay you

9   $50 an hour for you between 9:00 p.m. and 2:00 a.m. in the

10  morning?

11  **A**    No.  But we have to have documentation done within a

12  24-hour period (inaudible).

13  Q    Well, I -- and I'm not disputing that that was the work --

14  **A**    No.  I'm saying --

15  Q    -- that was involved.  But isn't it true that the payment

16  was a payment for all of the tasks involved in performing a

17  billable hour of therapy?

18  **A**    It was payment for that billable hour.

19  Q    And what makes you -- what tells you -- what can I look

20  at, or what can I see that will tell me or tell the judge in

21  this case that Life Strategies was intending to pay you more

22  than the billable hour rate?

23  **A**    I don't know.

24  Q    Well, the truth is there's nothing that says that, isn't

25  there?

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

28

1              MR. QUALLS:  Objection to form.

2   **A**    I don't know.

3   Q    (Mr. Mayfield continuing)  Well, what information do you

4   have that tells that?

5   **A**    I don't have any documentation.

6   Q    The truth is is we're now a couple years after you've

7   worked.  And at no time while you worked there did Life

8   Strategies say or do something that said you were going to be

9   paid in the way that you're claiming; correct?

10  **A**    Not that I recall, no.

11  Q    And you've not produced anything that says Life Strategies

12  intended to pay you something different than what it paid you?

13  **A**    No.  I haven't produced anything, but it's why I left.

14  Q    And, ma'am, if you were upset with the way that you were

15  paid, that's fine.  But my point and my question is you're

16  speculating to say that Life Strategies was going to pay you

17  more than $50, or whatever the rate was for a billable hour;

18  isn't that true?

19  **A**    No.  I'm not speculating that.

20  Q    Okay.  Well, what are you basing -- you're not

21  speculating.  So what are you basing that lack of speculation

22  on, ma'am?

23  **A**    I was paid a bill -- for a billable hour, but the

24  expectation to maintain those clients in compliance with what

25  they needed required you to work after hours to be able to

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

29

1    maintain those records and keep those kids billable.

2    Q    And here's what I want to understand, ma'am.  I understand

3    that you -- you're claiming overtime under the Fair Labor

4    Standards Act, okay, and the Arkansas Minimum Wage Act.  I

5    understand you're claiming overtime.  You're claiming an

6    overtime premium.

7         What I'm trying to understand is are you saying it's just

8    overtime?  Or are you saying that you were supposed to be paid

9    more as a base rate, not the overtime premium, but as a base

10   for your pay than what you were paid?

11   A    I don't really see the difference.

12   Q    Okay.  You think it all rolls together?

13   A    No, I'm not saying that.  I'm just saying to maintain what

14   you have to maintain according to their standard, you can't do

15   that in a simple eight-hour day.  It's impossible to do.

16   Q    Okay.  Let me --

17   A    That's all I'm saying.

18   Q    Well, let me ask it this way.

19   A    It required you to work more.

20   Q    Let me ask you this way.  Have you ever had to -- do you

21   take your car to have it repaired?

22   A    Uh-huh.

23   Q    Do you pay people to do that?

24   A    Uh-huh.

25   Q    Is that a yes?

Jennifer Williamson

30

1   **A**    Yes.  I'm sorry.

2   Q    Okay.  If you go to the shop and the guy tells you, It's

3   going to cost me $50 to change your oil --

4   **A**    Yeah.

5   Q    Okay.  What are you thinking it's going to cost you for

6   that task to be done?

7   **A**    $50.

8   Q    Okay.  If the person comes up to you at the place that

9   services your vehicle and says, Well, you know, now that I'm

10  looking at it, it's going to cost $100, because I thought it

11  was going to take 15 minutes.  But it took me half an hour

12  instead.  What are you going to say?

13  **A**    I'm going to pay him, because I know if it costs -- if it

14  takes longer to do, it's going to require more money.

15  Q    That's what you're going to do?

16  **A**    I've had to do it.

17  Q    Okay, all right.

18  **A**    Just did it this week.

19  Q    So let me ask this.  If one of your coworkers, if it

20  doesn't take them -- if it takes them five minutes or ten

21  minutes to do what takes you 20 minutes, should y'all make

22  something different?

23          MR. QUALLS:  Objection to form.

24  Q    (Mr. Mayfield continuing)  Should you make more money than

25  that person does because it took you longer?

Conway Court Reporting

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

31

1   **A**   No two people do things the same way.

2   Q   Okay.

3   **A**   What I had for me as a standard and a quality of care, a

4   quality of documentation, they may not have.  It's just

5   different.  We're all different.  I don't want to put something

6   on paper that I have go back and try to fix later.  I want to

7   make sure my documentation stands for itself.

8   Q   Okay.  So since you -- I take it you believe that you were

9   not paid appropriately while you were at Life Strategies?

10   **A**   (No answer)

11   Q   I'm sorry.  I didn't hear an answer.

12   **A**   I didn't hear a question.

13   Q   Well, are you saying you were paid inappropriately at Life

14   Strategies?

15   **A**   No, I'm not saying that.

16   Q   Okay.  And I think, as I've understood from you -- well,

17   strike that.

18       Have you tried to calculate how much you believe Life

19   Strategies owes you?

20   **A**   No.

21   Q   Do your professional ethics as a licensed professional

22   counselor apply to your work?

23   **A**   Yes.

24   Q   And did those ethics standards indicate that you won't

25   claim work that you worked when you did not?

**Conway Court Reporting**

Jennifer Williamson

32

1   **A**   Yes.

2   Q   Would that same kind of ethical standard apply to your

3   compensation?

4   **A**   Yes.

5   Q   How did you receive your pay statements?

6   **A**   I think there's some app.

7   Q   You're able to look at them online or on your phone in

8   some way?

9   **A**   I believe so.

10   Q   What information did your pay statements contain?

11   **A**   Whatever the pay was and how many hours I had listed,

12   whatever.  It's always very confusing.  But it would show hours

13   that I had and then overtime.  I don't know.  It was confusing,

14   honestly.

15   Q   Okay.  So it looks like -- let's take a look here at

16   Exhibit 40.  And this is -- I believe if I've understood

17   correctly, there were two different times.  This would have

18   been when y'all were with -- when Life Strategies was with

19   Paylocity; right?

20   **A**   Okay.

21   Q   And so do you know how many hours you would average in

22   terms of billing in a week, or did that vary over time?

23   **A**   It varied depending on holidays and school hours, that

24   kind of thing.  It varied.

25   Q   And I forgot to ask about this.  During the summer, what

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

33

1  was your work schedule like?

2  **A**    We had summer program.

3  **Q**    And so what time would you typically start in the summer?

4  **A**    Usually around 8:00, like, billable hours.

5  **Q**    Right.

6  **A**    But prior to that, picking up and providing the

7  transportation before that.

8  **Q**    So y'all would transport the children?

9  **A**    Uh-huh, yes.

10 **Q**    And where would you go?

11 **A**    We would go -- if we were having a program at one of the

12 elementary schools, we would go over there.  Or if we were

13 doing something at the office, we'd transport the kids to the

14 office.

15 **Q**    Would the children you picked up, if it was at an

16 elementary school, would they typically be close to the

17 elementary school, live close?

18 **A**    Not always.  Because we had -- it was kids that lived even

19 in North Little Rock that went to the schools in Little Rock.

20 **Q**    Okay, all right.  So what time would that program end in

21 the summer?

22 **A**    We were probably close -- stop around 2:00 or 3:00.  And

23 then we have to transport a lot of them home in the evenings.

24 **Q**    When would you do your notes during the summer?

25 **A**    Usually around the same time around 8:00, 9:00 at night.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

34

1   Q   Did you have as much in billings during the summer or more

2   or about the same, less?

3   **A**   Honestly, I don't remember.

4   Q   I think -- and we'll skip over here on Exhibit 40.  Let's

5   go to -- let's get past the training time.  Let's look here at

6   Page 268.  It says 268 at the bottom in Exhibit 40.

7   **A**   Oh.

8   Q   It's probably going to be your third page, I believe.

9   **A**   Okay.

10  Q   Okay.  All right.  So this is information provided to me

11  by Life Strategies, and it's got regular hours.  And for this

12  one, it's got 40 for this period.  Do you see that?

13  **A**   Yes.

14  Q   Okay, and it looks like this is for the period of June

15  27th, 2019, July 10th, 2019.  Do you see that?

16  **A**   Yes.

17  Q   So then it has something below that that says staff.  What

18  is that, if you know?

19  **A**   A staff meeting.

20  Q   Okay.  So you got paid a lesser rate for staff meetings;

21  is that right?

22  **A**   Yes.

23  Q   Was there a particular time of the week when those staff

24  meetings would be held?

25  **A**   They were -- it varied.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

35

1    Q    Okay.  Now, did you do group therapy?

2    A    Yes.

3    Q    And I'm assuming there was a lot of that -- well, was

4    there some in the summer program?

5    A    Yes.

6    Q    And some in the elementary schools?

7    A    Yes.

8    Q    Would you have it at the higher grades, have group?

9    A    Yes.

10    Q    How many groups would you typically have?

11    A    Wow.  Lower end, two.

12    Q    Okay.  Two per day?

13    A    Yes.

14    Q    I -- as I understand it, group units would be billed in

15    units, which would be 15 minutes; right?

16    A    Uh-huh.

17    Q    And you got a set amount per unit per person; right?

18    A    Right.

19    Q    And a group could be no less than two and no more than

20    ten; correct?

21    A    Yes.

22    Q    Did you have an average or typical size of a group?

23    A    Eight to ten, more or less.

24    Q    And the more you had in a group, then the more you got

25    paid per unit; right?  Because it was per unit per student.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

36

1   **A**    Yeah.

2   Q    Okay.  In the summer program, did y'all have groups?

3   **A**    Yeah.

4   Q    Would the numbers vary in terms of how many you might have

5   in a -- on a day?

6   **A**    Yes, it would.

7   Q    More, less, about the same than during the school year?

8   **A**    Probably -- I would say about the same.

9   Q    Okay.  So typically about two a day?

10  **A**    Yes.

11  Q    And then size would be about the same, about --

12  **A**    Eight to ten.

13  Q    -- eight to ten?

14  **A**    Yes.

15  Q    Okay.  I forgot to ask you this about Saturdays.  And

16  we'll talk about Saturdays during the school year first of all.

17  Saturdays during the school year, if I understood you correctly

18  earlier, you were talking about billing four or five hours in a

19  day.  Does that sound about right?

20  **A**    Yes.

21  Q    If you billed four or five hours, you weren't working 12

22  hours on a Saturday?

23  **A**    Not on Saturdays.

24  Q    Okay.  How long would you spend on a Saturday doing

25  paperwork?

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

37

1    **A**    Probably two or three hours, unless I had treatment plans

2    due.  Then I would spend --

3    Q    A little more?

4    **A**    A little bit more.

5    Q    Did you do paperwork on Sundays normally?

6    **A**    Yeah.

7    Q    And so how much time on Sundays?

8    **A**    It varied.  Four or five hours.

9    Q    Okay.  So let's look at 272 for just a second.  Are you on

10   that page?

11   **A**    Okay.

12   Q    So for that it's 77.25 regular hours.  And then under the

13   group -- you would agree with me that that group, that you've

14   got to divide that number by four?  You didn't work 276 hours

15   that week?

16   **A**    No.

17   Q    Okay, all right.  And I'm not trying to be rude.  I'm just

18   -- I just -- and so then if we've got eight in a group, then

19   you can take it and divide it by four and then divide it by

20   eight to figure out how long it took you; isn't that right?

21   **A**    You can divide the hours by four.

22   Q    You can divide the hours by four, but then you have to --

23   since it's per person as well, you've got to divide it by the

24   number of people too, don't you?  If you divide it by four,

25   that's the total of number of hours for all group.  But you're

Jennifer Williamson

38

1   paid five dollars per unit, which is a quarter hour, per

2   person; right?  You get more money if there's five people in a

3   group than you do if there's three.

4   **A**   Right.

5   Q   Okay.  All right.  That's good enough for our purposes.

6   **A**   Yeah.

7   Q   I won't make you do the rest of the math problems.

8   **A**   I was going, The math?  Oh, God.

9   Q   That's okay.  All right.  Well, let's turn over to Exhibit

10  41 and -- just to make sure this is clear in the record.  We've

11  got -- y'all switched over, it looks like, to ADP at some point

12  in time or Workforce, whatever you want to call it.  And at

13  that point as I'm looking at this, it suggests to me that the

14  pay period of -- actually that first one may not do it.  But at

15  some point y'all switched to where the pay period was twice a

16  month instead of every two weeks, didn't you?

17  **A**   I guess, yes.

18  Q   Okay.  If I'm looking here -- like, I'm looking at Page

19  285.  You don't have to turn to that.  But I'll represent to

20  you that it says a period begins on February 1 and ends on

21  February 15th.  That would suggest you got paid for half the

22  month, wouldn't it?

23  **A**   Yeah.

24  Q   Okay.  All right.  And then as we're looking -- you can

25  keep it on this first page, on this Page 282, which is in

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

39

1    Exhibit 41.  Your stubs, would you go and look at them

2    regularly?  And it's okay if you didn't.  I'm just trying to --

3    I mean, whatever I think is not what the answer is to this one.

4    It's just --

5    **A**    No.  Honestly, I did not.

6    **Q**    Okay.  Did you ever look at your pay and go, My pay is

7    wrong, or there is some error with it or something I need to

8    check on?

9    **A**    Yeah, a few times.

10   **Q**    What did you do in those circumstances?

11   **A**    Usually just called Luke and asked him, you know, did

12   something not get paid or -- because with Medicaid, not

13   everything gets paid at the time that you maybe submitted or

14   whatever.  So --

15   **Q**    When you did that, would he go over the -- go over your

16   pay with you?

17   **A**    Not really.  He just kind of like -- okay, well, we can

18   check on that.  And he kind of let me know who I didn't get

19   paid for or what was out of compliance or whatever the

20   situation was.

21   **Q**    Okay.

22   **A**    Yeah.

23   **Q**    And then was that something if you had something that was

24   out of compliance, isn't that something that -- did y'all talk

25   about that some from time to time?

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

40

1   **A**   Yeah.

2   Q   Did you ever complain to anyone at Life Strategies saying,

3   I should be paid overtime?

4   **A**   Yeah.

5   Q   Who?

6   **A**   I told him.

7   Q   You told Luke that?

8   **A**   Yeah.

9   Q   When did you tell Luke that?

10   **A**   I don't know a date.

11   Q   How many times did you say that to him?

12   **A**   I don't know.  Maybe once or twice.

13   Q   What was his response?

14   **A**   I honestly don't even remember what he -- how he

15   responded.  I think he just listened.

16   Q   Okay.  Do you know any of the other persons that are

17   either parties in this case or that have opted in to this case?

18   **A**   No.

19   Q   Have you visited with any of the other folks that are

20   parties in this case or opt-ins in this case outside the

21   presence of the attorneys?

22   **A**   I don't talk to anybody that I worked with previously from

23   Life Strategies.

24   Q   Okay.  Other than -- in any of these instances with Luke,

25   were they just, like, verbal conversations?

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

41

1   **A**   Yeah.

2   Q   Did you ever send anything in writing to him concerning

3   your pay?

4   **A**   I don't recall ever sending anything.

5   Q   Did you send anything in writing to someone else that your

6   pay was in error?

7   **A**   I don't recall, but I've talked to people in billing

8   before or had talked to people in billing.  I don't know if I

9   sent an email or if I actually talked to a person per se.  I

10  don't recall.  I don't know.

11  Q   Yeah.  Okay, okay.  And then when I say writing, I'm

12  talking about whether it's a text message or an --

13  **A**   Right.

14  Q   -- email or a letter, you know.  But nothing you can think

15  of?

16  **A**   Nothing I can think of.

17  Q   And nothing that you put in writing saying that you were

18  owed overtime; correct?

19  **A**   That's correct.  I don't recall.

20  Q   I'm going to talk about some different folks, and I just

21  -- I think your answers are going to be similar, but I just

22  want to make sure I've covered this.  Did you ever complain or

23  question your pay to Dawn Mitchell?  Do you know who that is?

24  **A**   Yeah, yeah.

25  Q   You do --

Jennifer Williamson

42

1    **A**    I know who --

2    Q    You know who it is.

3    **A**    I know it is.

4    Q    But you didn't question or complain anything about your

5    pay to her; correct?

6    **A**    That's correct.

7    Q    What about Dr. Walters?

8    **A**    Never met them.

9    Q    Okay.  What about Kerri Garrison?

10   **A**    Don't recall them either.

11   Q    Okay.  What about Nellie Caldwell?

12   **A**    I think I met her.

13   Q    But you never talked about pay with her; correct?

14   **A**    No.

15   Q    Diane Yancey?

16   **A**    I don't know who that is.

17   Q    Shannon Ayers?

18   **A**    Name is familiar.  I don't know that I've met her.

19   Q    Kendra Fite?

20   **A**    I talked to Kendra before.

21   Q    Did you talk to her about your pay?

22   **A**    No.

23   Q    When you left Life Strategies, did you tell them that it

24   was because of the way that you were paid or maybe not paid,

25   whichever -- however you want to phrase it.

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

43

1   **A**   No.

2   Q   Okay.  I'd ask you to look at Exhibit 42.  I'd ask you in

3   Exhibit 42 down towards the bottom half of the page, there's an

4   email that looks to be from jeniferwilliamson@lscihealth.com

5   and the subject being resignation.  Was that the email that you

6   sent to Mr. Sandlin?

7   **A**   Yeah.

8   Q   And that was to be effective July 10th?

9   **A**   Yes.

10  Q   And if I'm reading this correctly, it says, I've enjoyed

11  the time meeting and working with each of you.  I'm thankful

12  and eternally grateful for the opportunities you have afforded

13  me here; however, I feel as though the time has come for me to

14  move forward in my career path.  Is that what you said?

15  **A**   Yeah.

16  Q   Okay.  Have you had any discussions since you left Life

17  Strategies with someone that maybe worked there at some point

18  about how y'all -- how you were paid while you worked there?

19  **A**   No.

20  Q   And then your spouse did not work at Life Strategies --

21  **A**   No.

22  Q   -- is that right?  Okay.  I assumed that, but I didn't

23  want to assume.  I wanted to ask just to --

24  **A**   Oh, okay.

25  Q   -- make sure since she was in the mental -- since she's in

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

44

1   the mental health --

2   **A**    Uh-huh.

3   Q    -- does mental health work as well.  You've also, just to

4   make sure I'm clear on my previous question, have not talked to

5   somebody who told you or complained about something about their

6   pay at Life Strategies; correct?

7   **A**    Not that I recall, no.

8   Q    Okay.  Let's take a quick break, and I may be done.  We'll

9   see.  I'll probably have -- I do have a few questions, but

10  we'll take a break for a minute.

11               (WHEREUPON, after a break was taken, the

12                proceedings were resumed as follows, to-wit:)

13  BY MR. MAYFIELD:

14  Q    Have you ever had any disciplinary action taken with

15  respect to your license?

16  **A**    No.

17  Q    Ever had an instance where your license was somehow

18  invalid or not in good standing?

19  **A**    No.

20  Q    Are there any other employers that you've had since June

21  2018 that we haven't talked about?

22  **A**    No, I don't think so.

23  Q    Was there a gap between your employment at Life Strategies

24  and your next employer?

25  **A**    Yeah, some.  And that may --

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

45

```
 1   Q    How much of a gap do you think it was?
 2   A    Probably a few weeks.
 3   Q    Oh, okay.  All right.  In working with Medicaid patients
 4   at Life Strategies, you had to comply with the Medicaid rules;
 5   correct?
 6   A    Yeah.
 7   Q    Your times couldn't overlap?
 8   A    Yes.
 9   Q    Meaning you agree that they could not?
10   A    I agree, yes.
11   Q    Okay.
12   A    I'm sorry.
13   Q    And the chart had to be in compliance with what Medicare
14   required -- Medicaid required?  Excuse me.
15   A    Agreed.
16   Q    During the time you were at Life Strategies, were you full
17   time or part time?
18   A    Full time.
19   Q    You would agree that your notes had to be accurate;
20   correct?
21   A    Yes.
22   Q    And you can enter a note that you're providing mental
23   health service to a patient as long as you actually perform
24   that service; correct?
25   A    Correct.
```

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

46

1  Q    You can't write a note for treating a patient if you're

2  not actually providing the service; right?

3  **A**    No.

4  Q    Life Strategies can't bill for your services if you don't

5  enter the notes correctly; is that right?

6  **A**    Right.

7  Q    And if Life Strategies didn't get paid for an hour of

8  services for a billable hour, you would not get paid for that

9  hour; correct?

10  **A**    Correct.

11  Q    And Life Strategies went over with you what made up a

12  billable hour; right?

13  **A**    Yes.

14  Q    And you may -- did you have some knowledge of what was

15  involved even before you went to work there?

16  **A**    Yes.

17  Q    Okay.  Ma'am, is there anything that I have said or done

18  that has caused you to change an answer that you've given to me

19  to where it was somehow inaccurate?

20  **A**    No.

21             MR. MAYFIELD:  Okay.  All right.  Thank you,

22         ma'am.  That's all the questions I have at this time.

23             MR. QUALLS:  None from me.

24             (WHEREUPON, the proceedings were concluded in

25         the matter at 4:18 p.m.)

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

47

1                    C E R T I F I C A T E

2    STATE OF ARKANSAS     )

3                          )ss

4    COUNTY OF POPE        )

5

6        I, AMANDA R. BROWN, Certified Court Reporter #741 and

7    Notary Public, do hereby certify that the facts stated by me in

8    the caption on the foregoing proceedings are true; and that the

9    foregoing proceedings were reported verbatim through the use of

10   the voice-writing method and thereafter transcribed by me or

11   under my direct supervision to the best of my ability, taken at

12   the time and place set out on the caption hereto.

13

14       I FURTHER CERTIFY, that I am not a relative or employee of

15   any attorney or employed by the parties hereto, nor financially

16   interested or otherwise, in the outcome of this action, and

17   that I have no contract with the parties, attorneys, or persons

18   with an interest in the action that affects or has a

19   substantial tendency to affect impartiality, that requires me

20   to relinquish control of an original deposition transcript or

21   copies of the transcript before it is certified and delivered

22   to the custodial attorney, or that requires me to provide any

23   service not made available to all parties to the action.

24

25

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

48

1       WITNESS MY HAND AND SEAL this 3rd day of April, 2023.

2

3       _____

4       AMANDA R. BROWN, CCR

5       Certified Court Reporter #741

6       My Commission Expires:  6-21-29

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

25               www.conwaycourtreporting.com

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

49

ERRATA SHEET

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

_____    _____Page ____ of ____

        WITNESS                    DATE

JENIFER WILLIAMSON

923bf849-d5a3-47d9-a865-35cb3b2dfb92

Jennifer Williamson

50

SIGNATURE PAGE

I, JENIFER WILLIAMSON, do hereby certify that I have read the foregoing 46 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 21st day of March, 2023, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief.  Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.


_____        _____
        DATE                                    WITNESS


****************************************************************
STATE OF _____ )
COUNTY OF _____ )

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the _____ day of _____, 2023.


                              _____
                                         NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

923bf849-d5a3-47d9-a865-35cb3b2dfb92